NICHOLAS A. TRUTANICH
United States Attorney
District of Nevada
Nevada Bar No. 13644

BRIANNA SMITH
Assistant United States Attorney
Nevada Bar No. 11795
501 Las Vegas Blvd. So., Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Brianna.Smith@usdoj.gov

*Attorneys for the Defendants United States
and Anita Serrano*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| Michele Leuthauser,<br><br>              Plaintiff,<br><br>       v.<br><br>United States of America and Anita Serrano,<br><br>              Defendants. | Case No. 2:20-cv-00479-JCM-VCF<br><br>**Defendant Anita Serrano's Motion to Dismiss Plaintiff's Complaint** |

### I.  Introduction

As explained in Defendant United States' Motion to Dismiss, ECF No. 11, this is an action challenging the alleged conduct of former Transportation Security Administration (TSA) employee Anita Serrano during a pat down at McCarran International Airport (LAS) on June 30, 2019.  Plaintiff Michelle Leuthauser alleges that Ms. Serrano sexually assaulted her during that pat down, and brings the following counts against her in her individual capacity:

Count I: Fourth Amendment unreasonable search;

Count IV: Civil battery pursuant to state law; and

Count V: Intentional infliction of emotional distress pursuant to state law.

1    Defendant Serrano moves to dismiss Plaintiff's Fourth Amendment claim pursuant

2    to Federal Rule of Civil Procedure 12(b)(6) on two grounds.[1]  First, the Court ought not

3    create a *Bivens* damages remedy in the "new context" of this case, *Ziglar v. Abbasi*, 137 S. Ct.

4    1843 (2017), because there are alternate processes for protecting Plaintiff's asserted interests,

5    and "special factors" that strongly counsel against implying a non-statutory cause of action.

6    *See, e.g., Hobbs v. Devine,* 819 F. Appx. 543 (9th Cir. Sept. 1, 2020). Second, even if the Court

7    permits a *Bivens* remedy under the circumstances here, Defendant Serrano is entitled to

8    qualified immunity. *See, e.g., Escamilla v. United States*, No. 17-cv-7748, 2018 WL 1684307, at

9    *10 (C.D. Cal. Apr. 4, 2018) ("[E]ven if facts supporting a *Bivens* claim could be alleged, the

10   claim would still be precluded by qualified immunity.").

11                              **II. Plaintiff's Allegations**

12           The following allegations in the complaint as set forth below are salient to the

13   consideration of this motion, although Defendant disputes that the event occurred as

14   alleged.  Plaintiff Michele Leuthauser was a ticketed passenger for a flight departing LAS on

15   June 30, 2019. Complaint, ¶¶ 14-15. Plaintiff arrived at LAS around 9 a.m. and proceeded

16   through a TSA security screening checkpoint. Complaint, ¶¶ 14, 16. Plaintiff went through

17   an Advanced Imaging Technology system, which alarmed. Complaint, ¶ 19. An

18   "[u]nknown Transportation Security Officer, a TSA employee to conduct passenger

19   screening," now identified as Defendant Anita Serrano, brought Plaintiff to a private room

20   for additional screening, where they were joined by an additional TSA screening employee.

21   Complaint, ¶¶ 22, 24-5.

22           There was a mat in the private room with footprints on it to indicate how a passenger

23   should stand during the pat down. Complaint, ¶ 26. Plaintiff stood on the mat as indicated,

24   but Serrano asked Plaintiff to widen her stance. Complaint, ¶ 27. Serrano began the pat

25

26   [1] This motion is submitted only on behalf of Defendant Serrano. This Court granted in part
     and denied in part Defendant United States' Motion to Dismiss.  *See* Order, ECF No. 17.
27   Counts IV and V are framed as alternative theories to Plaintiff's FTCA claims.  Complaint,
     ¶¶ 80, 82. The United States' Certification of Serrano is forthcoming and will effectively
28   dismiss Plaintiff's state law claims Counts IV and V. *See* 28 U.S.C. § 2679.

down by sliding her hands up the inside of Plaintiff's legs. Complaint, ¶ 30. Once Serrano reached the top of the inner thigh, Plaintiff contends Serrano fondled and digitally penetrated her, despite the presence of another TSA employee. Complaint, ¶¶ 31-3.

Leuthauser claims she experienced distress but regained control of herself, at which point a supervisor arrived to complete the pat down. Complaint, ¶¶ 37-9. After her screening was complete and she was allowed to leave the checkpoint, she contacted airport police. Complaint, ¶¶ 40-1. The airport police did not take a report. Complaint, ¶ 42.

Plaintiff asserts that a medical professional recommended to Plaintiff that she "discontinue her travel job as part of [her] recovery." Complaint, ¶ 45. She followed this advice and took a three-month break from her job, but ultimately resigned her position rather than resume traveling. Complaint, ¶¶ 46-9. Plaintiff is now employed in a position that does not require travel, but took a "significant pay cut." Complaint, ¶ 50.

In her Fourth Amendment claim (Count I), Plaintiff alleges that Serrano conducted Plaintiff's pat down at LAS pursuant to the administrative search doctrine, and that neither the administrative search doctrine nor TSA policy permits body cavity searches. Complaint, ¶¶ 54-8.  As a result, Plaintiff asserts, Serrano violated her Fourth Amendment protections.  Complaint, ¶¶ 59, 62-3.

### III. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Dismissal is appropriate when a claim lacks a cognizable legal theory or the facts pleaded are insufficient to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

"A plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Further, a court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Ashcroft v. Iqbal*, 556 U.S. 662, 278 (2009), nor is it "required to accept as true

3

allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citation omitted).

When no cause of action is available under *Bivens*, this Court has dismissed a plaintiff's putative *Bivens* claims pursuant to Rule 12(b)(6). *See Schwarz v. Meinberg,* 761 F. Appx. 732 (9th Cir. 2019) (affirming dismissal of claims stemming from conditions of incarceration).

## IV. Argument

### A.   Plaintiff fails to state a cognizable *Bivens* claim in this context.

In *Bivens*, the Supreme Court "recognized for the first time an implied action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). But the Supreme Court has authorized "an implied damages remedy under the Constitution itself" just twice since *Bivens*,[2] and has not recognized any new *Bivens* claims in 40 years. *Abbasi*, 137 S. Ct. at 1855.  As the Supreme Court made clear in *Abbasi*, expansion of *Bivens* is a "disfavored judicial activity." *Id.* at 1857 (internal quotations omitted).  Indeed, the Supreme Court has "gone so far as to observe that if 'the Court's three *Bivens* cases [had] been … decided today,' it is doubtful that we would have reached the same result."  *Hernandez v. Mesa*, 140 S. Ct. 735, 742-43 (2020) (quoting *Abbasi*, 137 S. Ct. at 1856).  Plaintiff's attempt to assert a *Bivens* claim here should thus be viewed with skepticism and caution.[3]

---

[2] *See Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment claim for failure to render adequate medical care to federal inmate); *Davis v. Passman*, 442 U.S. 228 (1979) (Fifth Amendment gender discrimination by Congressman).

[3] In light of *Hernandez* and *Abbasi*, there is reason to doubt the continued viability of any older Ninth Circuit decisions that permitted even modest extensions of the *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1864 ("[E]ven a modest extension is still an extension."); *see also, Fazaga v. FBI*, 916 F.3d 1202, 1241 (9th Cir. 2019) (noting past circuit precedent but citing *Abbasi* to caution that "[r]ecent cases, however, have severely restricted the availability of *Bivens* actions for new claims and contexts"); *Schwarz v. Meinberg*, 761 F. App'x 732, 734 (9th Cir. 2019) ("In *Ziglar v. Abbasi*, the [Supreme] Court cautioned lower courts not to expand *Bivens* remedies outside the three previously recognized *Bivens* claims.").  But, since *Abbasi*, the

4

Under *Abbasi* and its progeny, a district court cannot permit a *Bivens* claim against "any new context *or category of defendants*" if the claim presented "is different in a meaningful way" from the three circumstances in which the Supreme Court recognized an implied cause of action. *Abbasi*, 137 S. Ct. at 1857, 1859 (emphasis added). If so, "then the context is new." *Id.* The Supreme Court "has urged caution before extending *Bivens* remedies into any new context." *Id.* at 1857 (quotations omitted). Indeed, a district court must approach putative constitutional claims against individual-capacity federal defendants arising in a new context with the presumption that a *Bivens* remedy is not available. *See, e.g.*, *Buenrostro v. Fajardo*, 770 F. App'x 807, 808 (9th Cir. 2019) (explaining that *Abbasi* "instructs against further extensions of *Bivens* to 'new' contexts"); *Farah v. Weyker*, 926 F.3d 492, 500 (8th Cir. 2019) ("[R]ecognizing the [Supreme Court]'s caution in this regard, we have adopted a presumption against judicial recognition of direct actions for violation of the Constitution by federal officials." (quotations omitted)); *Sibley v. Roberts*, 224 F. Supp. 3d 29, 37 n.7 (D.D.C. 2016) (noting "the strong presumption against creating new Bivens remedies"); *Heap v. Carter*, 112 F. Supp. 3d 402, 431 (E.D. Va. 2015) (same). This presumption accords with the Supreme Court's reminder "that Congress is best positioned to evaluate 'whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal government' based on constitutional torts." *Hernandez*, 140 S. Ct. at 742, *quoting Abbasi*, 137 S. Ct. at 1856.

When a case arises in a new context, and prudence thus demands "restraint" and "skepticism" towards a putative individual-capacity claim, *id.*, a district court must perform a two-part analysis to determine whether a *Bivens* remedy should be recognized. *Wilkie*, 551 U.S. at 550. First, "there is the question whether any alternative, existing process for

---

*Bivens* framework has narrowed substantially to limit lawsuits against federal agents; this court's past pronouncements are thus not controlling." (quotation and citation omitted)); *Sutter v. United States*, No. 17-cv-7245, 2019 WL 1841905, at *6 n.4 (C.D. Cal. Mar. 12, 2019) (noting "consensus of several district courts in the Ninth Circuit" that "pre-*Abbasi* cases" that recognized a cause of action beyond the circumstances of *Bivens, Davis*, and *Carlson* "are no longer controlling").

protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* Second, "even in the absence of such alternative, a *Bivens* remedy is a subject of judgment: the federal courts must take the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation." *Id.* (quotations omitted). "The Court's precedents now make clear that a *Bivens* remedy will not be available if there are 'special factors counseling hesitation in the absence of affirmative action by Congress.'" *Abbasi*, 137 S. Ct. at 1857 (*quoting Bivens*, 403 U.S. at 396).

The Supreme Court "has not defined the phrase 'special factors counseling hesitation,'" but the "necessary inference . . . is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857-58. "Thus, to be a 'special factor counseling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1858. This standard—that any factor counsels hesitation in recognizing a *Bivens* remedy in a new context—"is remarkably low." *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009). "'Hesitation' is 'counseled' whenever thoughtful discretion would pause even to consider." *Id.*

### 1. This case presents a new context as the Supreme Court has never extended *Bivens* to any claim arising in the airport security screening context.

Plaintiff's allegations differ significantly from those in *Bivens*, *Davis*, and *Carlson*, and she seeks to pursue an individual-capacity damages remedy in a new context – airport security screening – and against an entirely new category of federal employee—TSA screening employees who are not law enforcement officers.[4] Beyond also invoking the

---

[4] *See* ECF No. 17 at 6 (the FTCA's law enforcement proviso to the intentional torts exception "does not include TSA screeners[] because they do not execute searches, seize evidence, or make arrests."); ECF No. 28 at 2 (same); *cf. Tun-Cos v. Perrotte*, 822 F.3d 514, 525 (4th Cir. 2019) (finding that "ICE agents, who are charged with the enforcement of the immigration laws," were a new, "meaningfully distinct" category of defendants from the *Bivens* "traditional law enforcement officers"), *cert. denied*, 140 S. Ct. 2565 (2020).

Fourth Amendment (the constitutional provision at issue in *Bivens* itself), her claims are fundamentally different than *Bivens*, as they address an administrative search at an airport security screening checkpoint, and concern different aspects of the Amendment's protection. *Bivens* remedies "are not recognized Amendment by Amendment in wholesale fashion," but rather, "are context-specific." *Wilson v. Libby*, 498 F. Supp. 2d 74, 86 (D.D.C. 2007), *aff'd*, 535 F.3d 697 (D.C. Cir. 2008). This case does not arise in the same context as *Bivens* simply because Plaintiff has invoked the Fourth Amendment. *Hernandez*, 140 S. Ct. at 743.   A claim may present a new context "even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Id.*  Restating these precepts for the present context, "[i]t is not enough to argue . . . that [particular constitutional claims] have been permitted under *Bivens* before. We must look at the issue anew in this particular context, airport security, and as it pertains to this particular category of defendants, TSA screeners."  *Vanderklok v. United States*, 868 F.3d 189, 199-200 (3d Cir. 2017); *Mengert v. TSA*, No. 19-cv-304-JED-JFJ, 2020 WL 7029893 at *8  (N.D. Okla. Nov. 30, 2020); Osmon v. United States, No. 20-cv-31-MR-WCM, slip op. at 21 (W.D.N.C. Dec. 7, 2020).

Because this case arises in a new context, there is no avoiding the two-part "special factors" analysis. As explained below, that analysis counsels against extension of *Bivens* to Plaintiff's claims against Defendant Serrano.

### 2.    Existing processes preclude recognition of Plaintiff's claims.

If there is an existing alternate process for protecting Plaintiff's asserted interests that "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S. Ct. at 1858. The availability of *any* forum that allows a plaintiff to challenge agency decisions or bring to light allegedly unconstitutional conduct can be enough to preclude recognition of a *Bivens* claim. *See, e.g.*, *Fazaga v. FBI*, 916 F.3d 1202, 1242 (9th Cir. 2019) ("We will not recognize a *Bivens* claim where there is any alternative, existing process for protecting the plaintiff's interests." (quotations omitted)); *Bagola v. Kindt*, 131 F.3d 632, 644 (7th Cir. 1997) ("Administrative schemes that expose unconstitutional conduct by

government officials, even if they do not provide a distinct remedy for that conduct, serve a deterrent purpose that renders the availability of a Bivens claim less essential.").

Here, Plaintiff plainly has "*some* procedure to defend and make good on [her] position" outside the *Bivens* arena. *Wilkie*, 551 U.S. at 552 (emphasis added). Airline passengers aggrieved by a screening experience may seek injunctive relief from TSA screening procedures that they believe to be unconstitutional. Congress has provided for, and channeled, such relief through a petition for review in an appropriate federal court of appeals. 49 U.S.C. § 46110.[5] This avenue extends to claims that are "inescapably intertwined" with TSA procedures, or are "as-applied challenges" that "arise out of the particular facts" of a passenger's screening experience. *Gilmore v. Gonzales*, 435 F.3d 1125, 1133 n.9 (9th Cir. 2006). The ability to seek review of TSA screening in a court of appeals is a "meaningful safeguard" for airline passengers like Plaintiff. *Nat'l Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1248 (10th Cir. 1989).[6]

Apart from in-court avenues, an "alternative remedial structure" under *Abbasi*, 137 S. Ct. at 1858, "can take many forms, including *administrative*, statutory, [and] equitable" processes, *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018) (emphasis added). Relevant here, the Department of Homeland Security (DHS)—TSA's parent department— has established a civil rights complaint process that plainly provides Plaintiff with "a significant opportunity to expose allegedly unconstitutional conduct." *Bagola v. Kindt*, 131 F.3d 632, 643 (7th Cir. 1997). Congress directed the DHS Office for Civil Rights and Civil Liberties (CRCL) to "review and assess information concerning abuses of civil rights, civil liberties, and profiling . . . by employees and officials of the Department," including TSA

---

[5] *See, e.g., R*uskai v. Pistole, 775 F.3d 61 (1st Cir. 2014) (adjudicating a petition for review asserting Fourth Amendment challenge to pat-downs experienced by the petitioner at TSA checkpoints); *Corbett v. TSA*, 930 F.3d 1225, 1240 (11th Cir. 2019) (explaining that when a passenger experiences a particular screening procedure, "it may be possible . . . to bring a Fourth Amendment challenge to TSA's policy" with a petition for review based on the specific "set of facts" about what actually occurred).

[6] *See Abbasi*, 137 S. Ct. at 1862-63, 1865 (injunctive relief was an alternative process considered in new-context and special-factors analyses).

employees. 6 U.S.C. § 345(a)(1). Congress further specifically directed CRCL to "investigate complaints and information indicating possible abuses of civil rights or civil liberties." *Id.* at (a)(6).[7] Where Congress has already constructed a process for addressing federal misconduct, courts ought not step in by implying a *Bivens* cause of action. *See, e.g., Farkas v. Williams,* No. 13-cv-3208, 2013 WL 12185786, at *4 (C.D. Cal. Nov. 15, 2013) (holding that the court should not augment statutory grievance procedures by creating a new judicial remedy).

Plaintiff took advantage of another, more immediately available avenue for raising her allegations and seeking redress: she complained to law enforcement officers at LAS. *See* ECF No. 4 at ¶ 41.  She could have also told TSA management officials at the checkpoint where she was screened. *See* Passenger Screening Using Advanced Imaging Technology, 81 Fed. Reg. 11,364, 11,374 (2016) ("TSA takes all allegations of misconduct seriously. Passengers who believe they have experienced unprofessional conduct at a security checkpoint may request to speak to a supervisor at the checkpoint[.]"). Raising a complaint at the checkpoint to either law enforcement or TSA management creates the opportunity for an investigation with potentially serious consequences for TSA employees who are found to have violated a traveler's rights. For example, TSA screeners who depart from permissible conduct may be subject to the criminal justice process and face disciplinary sanctions, up to loss of employment. *See, e.g.*, *Cho v. Oquendo*, No. 16-cv-4811, 2017 WL 3316098, at *2 (E.D.N.Y. Aug. 2, 2017) (noting that a TSA screener was immediately fired for sexually assaulting a passenger); *People v. Oquendo*, No. 2015QN043395 (Queens County N.Y.)

---

[7] *See also* DHS Management Directive No. 3500 (May 19, 2004), available at: https://www.dhs.gov/sites/default/files/publications/crcl-directive-3500.pdf (describing CRCL's roles and responsibilities); 42 U.S.C. § 2000ee-1 (requiring the Secretary to "designate not less than 1 senior officer" to ensure that the Department "appropriately consider[s] … civil liberties concerns when … officials are proposing, developing, or implementing laws, regulations, policies, procedures, or guidelines related to efforts to protect the Nation against terrorism," "periodically investigate and review department, agency, or element actions, policies, procedures, guidelines, and related laws and their implementation to ensure that such department, agency, or element is adequately … civil liberties in its actions," and "has adequate procedures to receive, investigate, respond to, and redress complaints").

(documenting arrest, arraignment, and guilty plea of the same TSA screener). Travelers'
ability to complain about the behavior of TSA screeners and have those screeners held
accountable is a significant means of redressing claims of the type Plaintiff has asserted here.
*See, e.g.*, *De La Paz v. Coy*, 786 F.3d 367, 376-77 (5th Cir. 2015) (noting the fact that Customs
and Border Protection "[a]gents may be prosecuted criminally for violating aliens' rights
against excessive force" as one of the existing protections of the plaintiff's rights that made a
*Bivens* remedy unnecessary).

"Taken together," *Chappell v. Wallace*, 462 U.S. 296, 304 (1983), the various
processes for air travelers to raise complaints and seek redress confirm that "this is not a
case . . . in which 'it is damages or nothing,'" *Abbasi*, 137 S. Ct. at 1862-63, 1865 (certain
internal quotation marks omitted). Because the existing processes provide Plaintiff with
adequate fora for bringing to light allegations of constitutional violations, a "new and
freestanding remedy in damages," *Wilkie*, 551 U.S. at 550, against TSA screeners is
unnecessary and inappropriate under the circumstances here.

**Additional Special Factors Preclude Plaintiff's Claims.**

Regardless of whether a plaintiff has other available recourse, recognizing "a *Bivens*
remedy is a subject of judgment: the federal courts must make the kind of remedial
determination that is appropriate for a common-law tribunal, paying particular heed . . . to
any special factors counseling hesitation before authorizing a new kind of federal litigation."
*Wilkie*, 551 U.S. at 550 (quotation omitted); *see also Bivens*, 403 U.S. at 396 (a constitutional
remedy should not be implied where "special factors counsel[] hesitation in the absence of
affirmative action by Congress"). In any particular case, "[t]he range of concerns" that may
constitute special factors is "broad." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 280
(1997) (Kennedy, J., concurring) (citation omitted). And "[t]he only relevant threshold—
that a factor 'counsels hesitation'—is remarkably low." *Arar v. Ashcroft*, 585 F.3d 559, 574

(2d Cir. 2009). Special factors should be considered in the aggregate,[8] and this case implicates several.

First, Congress has paid "repeated and careful attention" to both TSA screening operations and the protection of civil rights and liberties across all DHS functions, including TSA screening. *De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015). Despite legislating extensively with regard to those issues since 9/11, Congress has never authorized a cause of action for damages against TSA screeners in their individual capacities.[9] Instead, "Congress chose to *limit* the scope of judicial review of TSA actions. In creating the TSA, Congress restricted judicial review to affirming, amending, modifying, or setting aside orders of the agency." *Vanderklok*, 868 F.3d at 208 (emphasis added) (citing 49 U.S.C. § 46110(c)). Moreover, when it legislated with respect to passenger grievances arising from TSA screening, Congress chose to establish only an administrative procedure, not a federal-court damages claim.[10] Additionally, Congress provided administrative remedies for travelers claiming property damage or personal injury as a result of TSA screening. *See* 31 U.S.C. § 3723; 28 U.S.C. § 2675(a).

---

[8] *See Chappell*, 462 U.S. at 304; *Meshal v. Higgenbotham*, 804 F.3d 417, 425-26 (D.C. Cir. 2015) ("We do not here decide whether either factor alone would preclude a Bivens remedy, but both factors taken together do so.").

[9] Since creating TSA with the Aviation and Transportation Security Act of 2001, Congress has enacted significant legislation nearly every year with regard to airport security screening and traveler redress processes. *See, e.g.*, 49 U.S.C. §§ 44926 (requiring the establishment of "a timely and fair redress process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat"); 44903(j)(2)(G) (requiring the establishment of "a timely and fair process for individuals identified as a threat . . . to appeal to the Transportation Security Administration the determination and correct any erroneous information"); *see also Ruskai*, 775 F.3d at 63-64; *Corbett v. TSA*, 767 F.3d 1171, 1175 (11th Cir. 2014); and *Elec. Privacy Info. Ctr. v. DHS,* 653 F.3d 1, 3 (D.C. Cir. 2011) (each discussing legislation enacted post-ATSA in 2004 and 2012, to improve TSA's airport screening procedures).

[10] *Vanderklok*, 868 F.3d at 208 ("[W]e cannot ignore that the remedies in the airport security context are circumscribed as a direct result of Congressional decisions.  Congress decided the scope of tort liability for the government and government employees and Congress allowed the creation of an administrative mechanism by which to adjudicate certain TSA complaints.  We should hesitate to create new remedies when it appears that the available ones are limited by Congressional design." (internal citations omitted)).

Moreover, Congress has considered bills to provide additional or alternative procedures.[11] None included the remedy of a damages cause of action against a TSA screening employee. The only time that was considered in a remotely similar context—the remedial scheme available to passengers allegedly aggrieved by their placement on the "No Fly List"—Congress considered, but voted against, an amendment that would have authorized a damages remedy against the government. H.R. Rep. No. 108-724, pt. 5, at 270-71 (2004).

Despite Congress's clear recognition that disputes might arise over the propriety of TSA conduct, it has not provided the remedy Plaintiff seeks. The Court should respect that decision and not augment the processes Congress provided. *See Abbasi*, 137 S. Ct. at 1862 (congressional "silence" with respect to a damages remedy "is relevant . . . and . . . telling"). Like the Third Circuit in *Vanderklok*, this Court "should hesitate to create" additional remedies under *Bivens* "when it appears that the available ones are limited by Congressional design." 868 F.3d at 208; *see also Wilkie*, 551 U.S. at 562 ("Congress is in a far better position than a court to evaluate the impact of a new species of litigation against those who act on the public's behalf." (quotation omitted)).

Second, a TSA security screening checkpoint is a "uniquely sensitive area" where the actions or inactions of screeners can have national security implications. *Mocek v. City of Albuquerque*, 813 F.3d 912, 924 (10th Cir. 2015). TSA's operations are an essential part of the national security apparatus developed to prevent attacks like 9/11. *See Vanderklok*, 868 F.3d at 207 ("TSA employees . . . are tasked with assisting in a critical aspect of national security[.]"); *Mohamed v. Holder*, 995 F. Supp. 2d 520, 527 (E.D. Va. 2014) ("Today, we are

---

[11] *See* S. 2207 § 2, 112th Cong. (2012) (proposing a TSA Ombudsman's Office to "record complaints from the general public regarding [TSA] screening practices" and "resolve passenger complaints at airports accusing TSA employees of mistreatment"); S. 3302 §§ 3, 11, 112th Cong. (2012) (considering an "Air Travelers' Bill of Rights" that would be incorporated into TSA policies and practices and displayed in TSA screening areas); H.R. 1583 § 2, 113th Cong. (2013) (considering an administrative appeals system for passengers who believe they were "wrongly delayed" or "denied a right, benefit, or privilege" because they were "wrongly identified as a threat when screening against the terrorist watchlist").

at war with those who would, if possible, use a commercial aircraft as an instrument of mass murder."). And courts have repeatedly recognized that TSA screeners' work serves the most compelling of government interests. *See, e.g.,* U*nited States v. Hartwell,* 436 F.3d 174, 179 (3d Cir. 2006) ("[T]here can be no doubt that preventing terrorist attacks on airplanes is of paramount importance."). Accordingly, a "special factor counseling hesitation in implying a *Bivens* action here is that [Plaintiff]'s claims can be seen as implicating the Government's whole response to the September 11 attacks, thus of necessity requiring an inquiry into sensitive issues of national security." *Vanderklok,* 868 F.3d at 206 (quotation omitted).

"Matters intimately related to . . . national security" are "rarely proper subjects for judicial intervention," *Haig v. Agee*, 453 U.S. 280, 292 (1981), because "[n]ational-security policy is the prerogative of the Congress and President," *Abbasi*, 137 S. Ct. at 1861 (citing U.S. Const. Art. I, § 8; Art. II, § 1, § 2). Reluctance to craft new remedies "in a case with national security implications must be particularly 'pronounced when the judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other equitable relief.'" *Vanderklok*, 868 F.3d at 207 (quoting *Abbasi*, 137 S. Ct. at 1861). It is therefore unsurprising that the Supreme Court has never implied a *Bivens* remedy in a case involving national security concerns. *See Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012). The risk of interfering with the government's ability to ensure security at the nation's airports is a special factor acknowledged to counsel hesitation in allowing a damages cause of action against TSA screening personnel. *Vanderklok*, 868 F.3d at 209 ("Ultimately, the role of the TSA in securing public safety is so significant that we ought not create a damages remedy in this context."); *Scruggs*, 2019 WL 1382159, at *5 & n.9 (declining to extend *Bivens* to TSA screening context due, in part, to "national-security issues").[12]

---

[12] *See also Arar*, 585 F.3d at 575 (identifying as a special factor the Supreme Court's rulings that "matters touching upon . . . national security fall within an area of executive action in which courts have long been hesitant to intrude absent congressional authorization" (quotations omitted)); *Rasul v. Myers*, 563 F.3d 527, 532, n.5 (D.C. Cir. 2009) (finding that the risk of obstructing national security policy was a special factor).

Third, recognizing a Fourth Amendment damages claim against TSA screeners under the circumstances here would create an unworkable category of constitutional litigation. In 2019, TSA's front-line employees working at airport checkpoints routinely screened more than 2.2 million people every day, setting a record on December 1 when passenger throughput reached 2,870,764 travelers.[13] Permitting a cause of action against individual TSA employees whenever an airline passenger believes that some element of the security screening process was too invasive of his or her privacy would bring a huge number of daily interactions "within the *Bivens* regime." *Wilkie*, 551 U.S. at 561. Neither Congress nor the Supreme Court has ever indicated that individual-capacity damages claims should be so broadly available against federal employees who are not law enforcement officers. "[A]cross this enormous swath of potential litigation would hover the difficulty of devising a . . . standard that could guide an employee's conduct" or "a judicial factfinder's conclusion." *Id.*

Further, while airport security screening is directed by TSA's comprehensive Standard Operating Procedures ("SOPs"), which provide "uniform procedures and standards" that TSA must follow, *Durso v. Napolitano*, 795 F. Supp. 2d 63, 65 (D.D.C. 2011), application of the prescribed procedures to the limitless variety of passengers and permutations in which passengers will present at a checkpoint for screening necessarily entails a certain degree of "discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 603 (2008). "In such situations, allowing a challenge based on the" allegedly "arbitrary singling out of a particular person would undermine the very discretion that such . . . officials are entrusted to exercise." *Id.* Even in the highly circumscribed context of airport screening, the sheer volume of passengers leads to TSA screeners being called upon, on occasion, to make ad hoc, multifactorial determinations that do not lend themselves to a clear standard. *See*

---

[13] *See* "TSA Year in Review: 2019," Jan. 15, 2020, available at https://www.tsa.gov/blog/2020/01/15/tsa-year-review-2019, and "TSA checkpoint travel numbers for 2020 and 2019," updated daily, at https://www.tsa.gov/coronavirus/passenger-throughput.

*Wilkie*, 551 U.S. at 554 (describing "the difficulty of defining limits to legitimate zeal on the public's behalf"). In such situations, courts are not well positioned to second guess, for example, a TSA's screener's decision that additional screening was necessary to ensure that an object felt under clothing during a pat down was not a potential threat. *See id.* at 562 (declining to recognize a *Bivens* remedy when "a judicial standard" applicable to the claim would be "endlessly knotty to work out"); *see also Ruskai*, 775 F.3d at 77 (describing the need for "deference to TSA's expertise regarding the nature of evolving threats, how people behave in airports, and the capabilities of TSA's workforce and systems").[14]

Finally, the Court should consider the potential chilling effect of recognizing a *Bivens* remedy in the context of airport security, where "the stakes are so high and the consequences of a lapse in security so potentially catastrophic." *Mohamed*, 995 F. Supp. 2d at 527. TSA screeners "who face personal liability for damages might refrain from taking urgent and lawful action" to respond to potential threats. *Abbasi*, 137 S. Ct. at 1863.  Fear of landing in court with personal assets on the line could seriously jeopardize TSA screeners' confidence in making critical, quick decisions and ensuring that every screening they perform is fully effective. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987) ("[P]ermitting damages suits against government officials can entail substantial costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."). If screeners fear exposure to personal liability—a fear that may be heightened in situations when the screening Standard Operating Procedures affords

---

[14] Courts may be understandably wary about imposing specific constitutional restrictions on TSA employees' ability to make critical decisions about the application of screening procedures. Given that we live "[i]n a world where air passenger safety must contend with such nuanced threats as attempts to convert underwear into bombs," attempting to set bright line constitutional rules that should be applicable to every possible situation is difficult and could have unintended consequences on security effectiveness.  *George v. Rehiel*, 738 F.3d 562, 578 (3d Cir. 2013); *see also United States v. McCarty*, 648 F.3d 820, 825 (9th Cir. 2011) (noting that "thin, flat explosives called 'sheet explosives' may be disguised as a simple piece of paper or cardboard, and may be hidden in just about anything"); 81 Fed. Reg. at 11,384 (noting that TSA screeners face the "known threat posed by" explosives deliberately "concealed on culturally sensitive areas of the body" in an effort to exploit the natural hesitancy to thoroughly search those areas).

a degree of discretion, the nature of a potential threat is unclear, or a passenger is acrimonious and uncooperative—they may hesitate or refrain from the thoroughness necessary to ensure that no prohibited item or potential threat gets through the checkpoint. Congress and the Supreme Court have recognized that it is not in the public interest for liability concerns to cause hesitancy and restraint in the context of airport security.[15] As the Third Circuit recognized in *Vanderklok*, "[t]he threat of damages liability could indeed increase the probability that a TSA agent would hesitate in making split-second decisions about suspicious passengers. In light of Supreme Court precedent, past and very recent, that is surely a special factor that gives us pause." 868 F.3d at 207.[16] This Court should be very wary that opening the door to *Bivens* actions against TSA screeners under the circumstances here could have unintended consequences on security effectiveness. *See Wilkie*, 551 U.S. at 561 ("The point here is not to deny that Government employees sometimes overreach . . . . The point is the reasonable fear that a general *Bivens* cure would be worse than the disease.").

In sum, there are significant special factors that counsel dispositive "hesitation" against embracing the *Bivens* remedy sought by Plaintiff. Given the tremendous volume of interactions between the public and TSA screeners, the variety of ways to pursue relief when aggrieved by those interactions, the nature of screeners' critical national security function,

---

[15] *See Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 253 & 256 (2014) (explaining that Congress enacted a law granting civil immunity from defamation for reporting suspicious airline passenger behavior so that "[b]aggage handlers, flight attendants, gate agents, and other airline employees who report suspicious behavior to the TSA should not face financial ruin if, in the heat of a potential threat, they fail to choose their words with exacting care," and finding that "[i]f such slips of the tongue could give rise to major financial liability," airline employees would be chilled from contacting TSA to report threats—"exactly the kind of hesitation that Congress aimed to avoid").

[16] *See also Tobey v. Jones*, 706 F.3d 379, 394 (4th Cir. 2013) (Wilkinson, J., dissenting) (noting that given "the protracted burdens of a lawsuit and the prospect of . . . damages liability . . . I would expect other TSA agents to refrain from responding to some unknown quantum of future security threats"); *cf. Vennes v. An Unknown No. of Unidentified Agents*, 26 F.3d 1448, 1452 (8th Cir. 1994) ("Expanding Bivens . . . would have a chilling effect on law enforcement officers and would flood the federal courts with constitutional damage claims by the many criminal defendants who leave the criminal process convinced they have been prosecuted and convicted unfairly.").

and the risk of chilling them from thorough execution of their duties, exposing TSA

screening employees to *Bivens* claims for money damages from their personal assets is

inappropriate and unnecessary. When hesitation is counseled, courts should leave the

question to Congress and decline to imply a cause of action.[17] Accordingly, dismissal of the

putative *Bivens* claims against Defendant Serrano is appropriate.

### 3. Courts adhere to hesitation under analogous factual circumstances.

Courts have been consistent in adhering to the foregoing approach even under

circumstances similar to the present allegations. For example, the Northern District of

Oklahoma recently declined to extend a *Bivens* remedy where a passenger alleged that she

had been strip searched in violation of the Fourth Amendment's guarantees against

unreasonable searches and seizures. *Mengert v. TSA*, No. 19-cv-304-JED-JFJ, 2020 WL

7029893 at *7 (N.D. Okla. Nov. 30, 2020). Although the plaintiff alleged that her

experience was outrageous on its face and exceeded the limits of the administrative search

doctrine and TSA's screening procedures, the court undertook the threshold evaluation of

the appropriateness of extending a *Bivens* remedy using the two-step framework described

above and found that the plaintiff's claim indeed arose in a new context.  The court

specifically noted "two major differences": first, the search in *Bivens* took place in a home as

part of a criminal investigation, while the search in *Mengert* occurred at an airport security

checkpoint pursuant to the administrative search doctrine. "The Fourth Amendment right is

at its apogee when the challenged search entails the invasion of a person's home. [. . .]

Administrative searches, by contrast, require neither a warrant not probable cause, the

rationale being that, due to some 'special need,' the public's interest in maintaining the

search regime outweighs the privacy interests of the individuals who are subjected to it."

*Mengert*, 2020 WL 7029893 at *8 (internal citations omitted). The second identified

distinction between the search in *Bivens* and the search in *Mengert* search was its authority: in

---

[17] *See Abbasi*, 137 S. Ct. at 1858 ("In sum, if there are sound reasons to think Congress *might* doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts *must* refrain from creating the remedy in order to respect the role of Congress[.]" (emphasis added)).

*Bivens*, the FBI's statutory mandate was "to aid in the detection and prevention of the unlawful importation" of narcotics, while the mandate of TSA's security screening program is "transportation security." *Id*. The *Mengert* court found that her claims "involve a different type of government actor, conducting a different type of search, for a different reason" *Mengert*, 2020 WL 7029893 at *9—exactly the same conditions as Plaintiff's search.

Accordingly, the *Mengert* court proceeded to examine whether special factors counseled hesitation in extending a *Bivens* remedy into this new context, and it found that two special factors counseled hesitation. First, TSA security screening searches were "national security matters" "rarely fit for judicial intervention." *Mengert*, 2020 WL 7029893 at *9. Second, extending a *Bivens* remedy into the TSA security screening context "has the potential to be highly disruptive" due to the high volume of passenger screenings that occur, where "each of these interactions entail[] the invasion of a person's privacy." *Id*. The *Mengert* court acknowledged that "the potential for personal liability would discourage overreach by TSA screeners," but ultimately concluded exposure to *Bivens* liability "risks chilling [the screeners'] willingness to engage in thorny—but constitutionally valid— exercises of their [search] authority, thereby putting the public at risk." *Id*. As discussed above, the same factors counsel hesitation under these facts.

The Memorandum and Recommendation in *Osmon v. United States* echoes the *Mengert* court's analysis. The Memorandum and Recommendation concluded that the airport screening environment was a "new context" for purposes of the *Bivens* analysis, because the "setting and class of defendant" were different. *Osmon v. United States*, No. 20-cv-00031-MR-WCM, slip op. at 21 (W.D.N.C. Dec. 7. 2020). The Memorandum enumerated other factors that counseled hesitation in extending the *Bivens* remedy – "even assuming no alternative, remedial structure exists" – including the national security context of TSA security screenings and the potential chilling effect of individual liability. *Osmon*, slip op. at 25-6.

Courts who have considered this issue generally and specifically have uniformly agreed that a *Bivens* remedy should not be extended into the airport security screening context, so Plaintiff's Fourth Amendment claims should be dismissed

**B.     Defendant Serrano Is Entitled to Qualified Immunity.**

Even if a *Bivens* cause of action could be implied under the circumstances here, Plaintiff's Fourth Amendment claim should still be dismissed because Defendant Serrano is entitled to qualified immunity. The doctrine of qualified immunity recognizes that subjecting public officials to personal liability distracts them from their duties, inhibits their actions, and may deter qualified people from accepting public service. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted).

When a defendant raises the defense of qualified immunity, the plaintiff bears the burden to demonstrate that the defendant violated a specific constitutional right, and that the specific right was clearly established. *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009). A particular constitutional right was "clearly established" only if it "was sufficiently clear that *every* reasonable official would understand that what he [was] doing [was] unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation omitted and emphasis added). Importantly, a constitutional right can be considered clearly established only when it is "defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019); *see also Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014) ("[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."). Constitutional rights defined "at a high level of generality" or in a generic fashion, such as "the right to be free of excessive force," are not appropriate benchmarks for evaluating whether a defendant's has violated a clearly established right. *Emmons*, 139 S. Ct. at 503.

19

To establish that a particular right was clearly established, a plaintiff must point to "existing precedent" that was so clear as to have placed the constitutional question confronted by the defendant "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The prior precedent identified by the plaintiff must be a "controlling Supreme Court or Ninth Circuit decision," and it "must articulate 'a constitutional rule specific enough to alert *these* [defendants] *in this case* that *their particular conduct* was unlawful." *West v. City of Caldwell*, 931 F.3d 978, 984 (9th Cir. 2019) (quoting *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (emphasis in original)). "[I]f a reasonable officer *might* not have known *for certain* that the conduct was unlawful—then the officer is immune from liability." *Abbasi*, 137 S. Ct. at 1867 (emphasis added). Because public officials are entitled to the benefit of any doubt, they are indeed "presumed to be immune." *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994). *See also Abbasi*, 137 S. Ct. at 1867 ("qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'") (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Further, the pleadings requirements explained in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) frame considerations of qualified immunity. Allegations that recast legal conclusions "in the form of factual allegation[s]" "are not entitled to an assumption of truth." *Moss v. U.S. Secret Service*, 672 F.3d 962, 969 (9th Cir. 2009).

Plaintiff's Fourth Amendment claim seeks a remedy for (1) unjustifiably being asked to stand in a way that made her genitals accessible and (2) being rubbed and digitally penetrated through her clothing without consent. *See* Complaint, ¶¶ 27-8, 32-3, Count I. The allegations presented by Plaintiff, while serious, are internally inconsistent, and that inconsistency cannot cloud the qualified immunity analysis. In order to reach her unsubstantiated legal conclusion that she was subject to an unlawful cavity search, *see* Complaint, ¶ 59, Plaintiff alleges that there was no security purpose to Serrano's request that Plaintiff widen her stance, *see* Complaint, ¶¶ 27-8. However, Plaintiff offers no support for that conclusion. Further, Plaintiff described that Serrano "pressed against the thin material

of [Plaintiff's] leggings," Complaint, ¶ 32, which is contrary to the general understanding of a body cavity search.

Instead of allowing Plaintiff's unsubstantiated allegations and legal conclusions to guide the qualified immunity analysis, the qualified immunity analysis asks that the defendant's activity be examined without the gloss of Plaintiff's subjective experience.[18]  In considering whether Serrano is entitled to qualified immunity, the Court should only accept Plaintiff's plausible factual allegations, not her labels, conclusions, and characterizations, nor her allegations about Serrano's motives or subjective intent.  *See Twombly*, 550 U.S. at 555.  Thus, the Court should look only at Serrano's objective conduct and consider whether any existing precedent had clearly and specifically held that conduct, by itself and irrespective of underlying subjective factors involving motive or intent, to be a violation of the Fourth Amendment such that Serrano was, or should have been, on notice that her alleged actions were unconstitutional.

There is no controlling precedent that addresses the constitutional limitations of the width of a passenger's stance during an airport security screening pat down or the touch within the pat down itself.  Although both may be addressed in the future, causing TSA's workforce to know for certain that passenger foot placement or certain methods of pressing passengers in order to resolve security alarms are constitutionally unreasonable, those constitutional certainties do not exist now, and they did not exist at the time of Plaintiff's pat down at LAS.  Accordingly, Serrano is entitled to qualified immunity.

Respectfully submitted this 28th day of December 2020.

NICHOLAS A. TRUTANICH
United States Attorney


 */ s/  Brianna Smith*
BRIANNA SMITH
Assistant United States Attorney

---

[18] Feelings about TSA's pat down procedures vary. "Accepted as mildly annoying or uncomfortable for some, the standard pat-down is experienced as quite an intrusive indignity by many others…." *Ruskai*, 775 F.3d at 69.