# EXHIBIT F

**Deposition Transcript of Anita Serrano**

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

Page 1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4    MICHELE LEUTHAUSER,                )
                                        )     **CONFIDENTIAL**
5          Plaintiff,                   )
                                        )
6          vs.                          )  CASE NO.
                                        )  2:20-cv-00479-JCM-VCF
7    UNITED STATES OF AMERICA; and      )
     UNKNOWN TRANSPORTATION SECURITY    )
8    ADMINISTRATOR OFFICER.             )
                                        )     **CONDENSED**
9          Defendants.                  )     **TRANSCRIPT**
     _____)

10

11

12

13

14

15                   * * * CONFIDENTIAL * * *

16      REMOTE VIDEOCONFERENCE DEPOSITION OF ANITA SERRANO

17                     Taken by Plaintiff

18             Taken on Friday, January 8, 2021

19                       At 8:54 a.m.

20            At All-American Court Reporters

21          1160 North Town Center Drive, Suite 300

22                     Las Vegas, Nevada

23

24

25    REMOTELY REPORTED BY:  CINDY MAGNUSSEN, RDR, CCR NO. 650

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

2 (Pages 2 to 5)

## Page 2

APPEARANCES:
For Plaintiff:
        JONATHAN CORBETT, ESQ.
        (Present Via Videoconference)
        Law Office of Jonathan Corbett
        958 North Western Avenue
        Suite 765
        Hollywood, California 90029
        (310) 684-3870

For Defendants:

        BRIANNA SMITH, ESQ.
        (Present Via Videoconference)
        Assistant United States Attorney
        501 South Las Vegas Boulevard
        Suite 1100
        Las Vegas, Nevada 89101
        (702) 388-6336

Also Present Via Videoconference:
        Cynthia Galvan, Zoom Host
        All-American Court Reporters

        Krista Maizel, Esq.
        Transportation Security Administration
Also Present Telephonically:
        Magistrate Judge Cam Ferenbach

        EXAMINATION

WITNESS:                        PAGE
Anita Serrano
    Examination by Mr. Corbett        4
        EXHIBITS
        (None Offered)

## Page 3

        LAS VEGAS, NEVADA; JANUARY 8, 2021
                8:54 A.M.
                -oOo-
            P R O C E E D I N G S
        ZOOM HOST:  The attorneys participating
in this proceeding acknowledge that the court reporter
is not physically present in the proceeding room with
the deponent or counsel and that she will be reporting
this proceeding remotely.
        Counsel, if you are in agreement to the remote
deposition, please state your name and consent to the
agreement for the record, then the court reporter, Cindy
Magnussen, CCR Number 650, will swear in the deponent
remotely.
        MR. CORBETT:  Hello.  Jonathan Corbett,
for plaintiff, consents.
        MS. SMITH:  Good morning.  Brianna Smith.
We consent.
        Thereupon--
            ANITA SERRANO,
was called as a witness, and having been first duly sworn,
was examined and testified as follows:
        MR. CORBETT:  May I proceed?  Court
reporter, are we good to proceed?
        THE COURT REPORTER:  Yes.

## Page 4

            EXAMINATION
BY MR. CORBETT:
    Q.  Okay.  So Ms. Smith -- sorry.  Ms. Serrano, am I
pronouncing your name correctly?  Anita Serrano?
    A.  That's correct.
    Q.  Great.  Have you ever taken a deposition before
this?
    A.  No.
    Q.  Okay.  Before we start, I'd just like to remind
you that this is a proceeding that is under oath.  It is
equivalent to you being on the witness stand in a real
courtroom in front of a jury and a judge, and the
information that you provide can be used as evidence
during the trial, just as statements you might make on a
witness stand.  Do you understand that part?
    A.  I do.
    Q.  Great.
        For the record, and just so we can make sure
we have identified the right person, I'm going to ask
you to describe yourself.
        Some of these questions might seem obvious,
but can you state your gender first?
    A.  Female.
    Q.  Your age?
    A.  Thirty-eight.

## Page 5

    Q.  Would you say you're average, more than average,
less than average weight?
    A.  I don't know what constitutes average weight.
    Q.  Or just describe in your own terms your build.
    A.  Average.
    Q.  Okay.  Your skin tone, is it light?  Fair?
Dark?
    A.  Fair.
    Q.  And your hair color?
    A.  Somewhere in the middle between dark and medium.
    Q.  Okay.  And was your hair that color all 2019?
    A.  Yes.
    Q.  Okay.  We're here because of an incident that
happened at an airport with TSA.  Is it correct that you
were an employee with TSA on June 30th, 2019?
    A.  Yes.
    Q.  What was the start date for your employment?  If
you don't remember the exact date, a month and year would
be okay.
    A.  It was December 12th, 2016.
    Q.  When you started with the TSA, were you given
any kind of training?
    A.  Yes.
    Q.  Can you briefly describe the duration and the
subject matter of your training?

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

3 (Pages 6 to 9)

---

Page 6

1    A. There was about --
2        MS. MAIZEL: I'd like to object. This is
3    Krista Maizel. Ms. Serrano, just a second, please.
4        This is Krista Maizel on behalf of the
5    Transportation Security Administration. I'm going to
6    object to the extent that the response calls for or
7    contemplates the disclosure of sensitive security
8    information.
9        I will instruct Ms. Serrano not to answer
10   solely to the extent that her response may disclose
11   sensitive security information.
12       Ms. Serrano, if you can answer the question or
13   the parts of the question without disclosing sensitive
14   security information, please feel free to do so.
15   Otherwise, please hold the disclosure of sensitive
16   security information. Thank you.
17       MR. CORBETT: Before you answer,
18   Ms. Smith, I thought that we had the issue of sensitive
19   security information taken care of. Is that not the
20   case?
21       MS. SMITH: We discussed it. Yes. And I
22   mentioned to you there was going to be some objections
23   if your questions impede on SSI.
24       And what Krista was objecting to is in the
25   event that your question calls for it, Anita is not to

---

Page 7

1    answer. So proceed.
2        MR. CORBETT: So just to clarify, you are
3    instructing your witness not to speak of any SSI
4    whatsoever during this call?
5        MS. SMITH: Correct.
6        MS. MAIZEL: That is correct.
7        MR. CORBETT: You can -- for the record,
8    please note my objection and note that the counsel for
9    both parties did speak of this beforehand. And this
10   comes as a surprise to me.
11   BY MR. CORBETT:
12       Q. Ms. Serrano, if you can answer the question
13   without reviewing sensitive security information, I'll
14   repeat. The question was: If you can describe the
15   length and general subject matter of your training?
16       A. The training included classroom training and
17   on-the-job training.
18       Q. Okay. How long was the training?
19       A. I'm not sure that I can answer that.
20       MR. CORBETT: Can we have a ruling from
21   TSA's attorney as to whether she can answer how long
22   her job training was?
23       MS. MAIZEL: I don't know the extent of
24   her understanding of the question, so I would reserve
25   my objection to solely whether or not it discloses

---

Page 8

1    sensitive security information.
2        MR. CORBETT: Look, we're going to have a
3    problem here that's going to have to be resolved before
4    the judge if she can't even answer how long her
5    training was.
6        MS. MAIZEL: I can't formulate questions
7    for you. She's answered that she had classroom and
8    on-the-job training.
9        MR. CORBETT: The answer --
10       MS. MAIZEL: Maybe there's a way to
11   rephrase the question.
12   BY MR. CORBETT:
13       Q. The question, I will repeat one more time, how
14   many days did your training last at the start of your
15   employment?
16       A. I believe the classroom training was
17   approximately four weeks long.
18       Q. Okay. And the rest of the training?
19       A. The on-the-job training was between four and six
20   weeks.
21       Q. Okay. So a total of approximately two months of
22   training; is that correct?
23       A. Correct.
24       Q. When you started with the TSA, what was the job
25   that you started as?

---

Page 9

1    A. A transportation security officer.
2        Q. What is the general role of a transportation
3    security officer?
4        A. Perform screening functions at the assigned
5    airport.
6        Q. Passenger screening?
7        A. Including passenger screening.
8        Q. Okay. So would I understand correctly that your
9    training included the subject matter of screening of
10   passengers?
11       A. It did include that.
12       Q. Anything regarding pat-downs?
13       A. I'm sorry. Can you repeat? You cut out for the
14   first couple words.
15       Q. Did your training include anything regarding
16   pat-downs?
17       A. Yes.
18       Q. Specifically, you learned TSA's proper procedure
19   for conducting pat-downs at the checkpoint; is that
20   correct?
21       A. That is correct.
22       Q. Did you also learn how to deal with TSA body
23   scanners, also known as advanced imaging technology?
24       A. Yes. That was incorporated in the training.
25       Q. Okay. Did the training include anything

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

4 (Pages 10 to 13)

---

Page 10

1 regarding when a private room is available or required to
2 be used by a passenger who is being screened?
3 MS. MAIZEL: Objection to the extent that
4 the response calls for sensitive security information.
5 If it does not, Ms. Serrano, you may answer.
6 THE WITNESS: It does. That's directly
7 talking about how the training referred to standard
8 operating procedures, which is SSI.
9 MR. CORBETT: TSA is now saying that they
10 cannot say whether the training discussed the use of a
11 private room; is that correct?
12 MS. MAIZEL: To the extent that that
13 response contemplates the disclosure of sensitive
14 security information, that is correct.
15 MR. CORBETT: I need TSA to explain if
16 that necessitates the release of sensitive security
17 information or not.
18 MS. MAIZEL: The full response from the
19 agency is that any question that calls for or
20 contemplates the disclosure of sensitive security
21 information will not be answered by this witness.
22 This witness is referring to her own -- she is
23 policing her answer in accordance with the restrictions
24 about disclosure of sensitive security information.
25 \\\

---

Page 11

1 BY MR. CORBETT:
2 Q. Ms. Serrano, were you trained as to sensitive
3 security information?
4 A. Yes.
5 Q. During your training, was it made clear if you
6 were allowed to designate material as sensitive security
7 information or not?
8 MS. SMITH: I'm objecting. What was the
9 question? It sounds like you're asking for
10 attorney-client privileged information.
11 MR. CORBETT: Negative. The question
12 was: During --
13 MS. SMITH: And I'm sorry. I just want
14 to say I can't really hear you either. If there's a
15 way you could like lean in.
16 Thank you.
17 BY MR. CORBETT:
18 Q. The question was: During your training, were
19 you trained as to whether or not you were allowed to
20 designate information as SSI?
21 A. I was trained as to what constitutes SSI.
22 Q. The question was: Were you trained as to
23 whether or not you personally may designate information
24 as SSI?
25 A. I was not trained on whether or not I could

---

Page 12

1 designate SSI.
2 Q. Were you trained as to making a determination
3 that information constituted SSI, or, alternatively, were
4 you told that that was a task that was something other
5 people would be responsible for?
6 A. I was not trained as to whether or not I could
7 designate SSI or -- I'm -- if you can break that question
8 up, please. It's a -- I'm having trouble answering both
9 parts of the question.
10 Q. Sure. Based on your training, are TSA
11 transportation security officers tasked with determining
12 whether something constitutes SSI, or is that left to
13 other people?
14 A. Based -- I have not been trained on whether or
15 not TSA officers can designate SSI. That was not part of
16 my training.
17 Q. Okay. If you had a question as to something
18 that was -- as to whether or not something was SSI on the
19 job, how would you go about resolving that question?
20 Would you speak to someone? Would you do research?
21 A. We have and every checkpoint had an SSI officer
22 or typically in a managerial position, and you can ask
23 questions regarding standard operating procedures and
24 SSI.
25 Q. Okay. Have you ever had any legal training?

---

Page 13

1 A. No.
2 Q. Have you ever read the federal statute that
3 creates the SSI designation?
4 A. I have not.
5 Q. Have you ever read the federal regulations put
6 out by the TSA that detail what is and is not sensitive
7 security information?
8 A. Isn't the Code of Federal Regulations, the CFR
9 regarding SSI? I have not read that.
10 Q. Okay. Is it safe to say that you are not well
11 qualified to determine if something is or is not SSI?
12 MS. SMITH: I'll object to the form of
13 the question.
14 MR. CORBETT: Okay. Could we have the
15 witness answer?
16 THE WITNESS: Is it safe to say that? It
17 is safe to say -- I would feel safe saying that I am
18 not qualified to determine what is SSI.
19 MR. CORBETT: Great. Agency Counsel,
20 based on this admission from the witness that she can
21 and cannot determine whether something is sensitive
22 security information, I'm really not sure how you
23 expect this to proceed.
24 MS. MAIZEL: I didn't hear her.
25 MR. CORBETT: Before you speak, I want an

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

5 (Pages 14 to 17)

Page 14

1   objection on the record that this is obstruction.
2          Local counsel -- sorry, Counsel for TSA from
3   the Department of Justice spent last night filing a
4   motion accusing me of violating the local Rule 11
5   requiring professionalism and civility.  And yet here we
6   are during the deposition that my client must pay for,
7   and eventually you will pay for, where I'm not allowed
8   to question a witness regarding SSI despite the fact
9   that we took care of this issue in advance.  I want that
10  on the record.
11         The question was to TSA's in-house counsel, how
12  is this deposition going to proceed when the witness
13  cannot determine what is SSI and therefore cannot
14  determine when she can make an answer?
15         MS. MAIZEL:  If I may, I don't recall
16  that being the first question.  The first question that
17  I recall was whether or not she is able to determine or
18  was she trained in determining SSI.
19         She -- I believe the testimony from the witness
20  is that she was not trained in how to designate SSI, but
21  she was trained in what was distinguished or determined
22  to be SSI, which I understand to be two different
23  issues.
24         How the deposition proceeds maybe is something
25  we need to talk about without the witness in the room,

Page 15

1   or I defer to Ms. Smith who I know had most recent
2   conversations with you.  I was not privy to those
3   conversations.
4          MS. SMITH:  Correct.  Jonathan and I
5   discussed SSI, the issue of it.  I asked him if he
6   understood it, he said that he did.
7          I asked him if he complied with the procedure
8   for TSA to ask about SSI.  He said -- well, actually, I
9   don't think you answered whether you had or you hadn't.
10  So he's aware of it, and he chose to proceed today
11  accordingly.
12         MR. CORBETT:  Ms. Smith, I very clearly
13  asked you what procedures you would like me to follow,
14  and you said you would check with your client.
15         Your e-mail says, quote, Forgive me as we have
16  not had many TSA cases in our office with -- so the
17  intricacies I need to confer with TSA.
18         I received no further follow-up e-mail on that
19  from you.
20         MS. SMITH:  I told you -- you asked some
21  inappropriate question in an e-mail, and I said the way
22  you framed that e-mail, I mean, if you actually ask it,
23  sounds like it would avoid the SSI.
24         So if you had any other further questions, you
25  could have called, and you certainly should have

Page 16

1   complied with the procedure that I informed you about.
2          MR. CORBETT:  I will look forward to
3   motion practice.
4          I'm going to continue with the deposition
5   anyway, even though I am pessimistic that I will be able
6   to get the answers that I'm required -- that the witness
7   is required to provide by law.
8          MS. SMITH:  Well, I think -- what I think
9   we should do, then, is I think we should call the
10  magistrate.  I'll pull up the number here.  Because
11  what I don't want is I don't think you will be entitle
12  to depose my client twice.  It's inappropriate.
13  Especially since you knew about the procedure up front.
14         And to avoid that, I'm totally comfortable to
15  present it to the magistrate, and we can discuss that
16  accordingly.
17         MR. CORBETT:  Sure.  If you would like to
18  get a magistrate on the line, that's fine.
19         MS. SMITH:  Okay.  So we will take a
20  break.  We will go off the record.
21         What I'll do is I'll pull the number, and I'll
22  circulate a call-in number.
23         MR. CORBETT:  Okay.
24         MS. SMITH:  All right.  Thanks.
25         (Brief Recess.)

Page 17

1          (Parties Appearing Telephonically)
2          JUDGE FERENBACH:  This is
3   Judge Ferenbach.
4          Okay.  Who is on the line, please?
5          MS. SMITH:  Brianna Smith for the Federal
6   Defendants.
7          JUDGE FERENBACH:  Ms. Smith.
8          MR. CORBETT:  Thank you.  Jonathan
9   Corbett for the plaintiff, Your Honor.
10         JUDGE FERENBACH:  Thank you, Mr. Corbett.
11  Anybody else on the line?
12         MS. MAIZEL:  Yes, Your Honor.  My name is
13  Krista Maizel.  I'm an attorney with the Transportation
14  Security Administration.
15         JUDGE FERENBACH:  All right.  So you're
16  not of record in this case, are you, Ms. Maizel?
17         MS. MAIZEL:  No, Your Honor.
18         JUDGE FERENBACH:  So you're the client
19  representative, I guess?
20         MS. MAIZEL:  Yes.
21         JUDGE FERENBACH:  Okay.  All right.
22         All right.  So I understand there's a problem
23  during the deposition of Ms. Anita Serrano.  So who
24  wants to tell me about that?
25         MS. SMITH:  I'll start, Your Honor.

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

Page 18

1    This is a case involving what is alleged to be,
2 like, an improper pat-down for the short version.
3    Under the CFR -- in order to ask about
4 sensitive security information, the requesting attorney
5 in this case, Mr. Corbett, has to comply with the
6 background check. And Krista can speak to that a little
7 better than me.
8    And before the deposition began, we had a
9 discussion about that. Mr. Corbett said that he was
10 aware of the procedure. And, you know, he said, Would
11 this type of question be okay? And he said, for
12 example, During your training, did you understand --
13    JUDGE FERENBACH: You know what,
14 Ms. Smith, Ms. Smith, you're getting a little too deep
15 in the weeds for me.
16    What I understand is the questions have been
17 asked, and you're asserting a privilege?
18    MS. SMITH: Correct.
19    JUDGE FERENBACH: Okay.
20    MS. SMITH: And it's based on sensitive
21 security information. Right.
22    JUDGE FERENBACH: All right. And so
23 based on the privilege that you're asserting, you're
24 instructing the witness not to answer?
25    MS. SMITH: Yes.

Page 19

1    JUDGE FERENBACH: All right.
2 Mr. Corbett?
3    MR. CORBETT: Hi, Your Honor. The issue
4 is that the TSA in this deposition is essentially
5 asserting that pretty much anything that happens in the
6 checkpoint and with the training of its employees
7 constitutes sensitive security information.
8    The question that triggered this call asked
9 this TSA screener, who was the deponent, if she was
10 trained as to whether or not to take passengers into a
11 private room during the screening.
12    TSA counsel --
13    JUDGE FERENBACH: Sorry. Hold on. Hold
14 on. Was that the question? That was the end of the
15 question?
16    MR. CORBETT: That was the question.
17 Correct.
18    JUDGE FERENBACH: All right. Okay. So
19 then -- and then -- hold on. Hold on. You know, we're
20 doing this on the phone, so you've got to take a
21 breath. All right?
22    And after you asked that question, Ms. Smith
23 instructed the witness not to answer?
24    MR. CORBETT: No. Ms. Maizel, the
25 counsel for TSA, who I do not believe is counsel for

Page 20

1 the deponent and has not appeared, but is here any way,
2 instructed the witness not to reveal any SSI, which
3 caused the witness to be unable to respond. And in
4 part because the witness is not trained as to
5 determining whether things are SSI or not.
6    So, essentially, the other side has given the
7 witness an out to any question she wants.
8    JUDGE FERENBACH: I understand your
9 problem, sir.
10    Here's what we're going to do. Rule 30, 30(c),
11 it governs examination during deposition. And it says,
12 A person may instruct a deponent not to answer only when
13 necessary to preserve a privilege, and some other
14 reasons. But this is the one that applies here.
15    The U.S. Government is taking the position that
16 the questions you're asking are covered by a privilege.
17    I have a hearing at 10 o'clock. I've got a lot
18 of other things to do here. I'm not going to be able to
19 sort through these questions today on the phone.
20    So here's what we're going to do. You can ask
21 sort of a range of questions, if you want. Don't take
22 too long about it. So you created a record of what
23 questions you think are, you know, improperly being
24 instructed not to answer. And then you will need to
25 file a motion to compel. And then I'll give the

Page 21

1 government a chance to respond on it. You can reply.
2 If I need a hearing, I will set one, and we will sort it
3 out.
4    But at this stage, during the deposition,
5 although I -- I don't think Ms. Maizel should be
6 involved instructing the witness in any way. She's the
7 client representative sitting there. It's going to have
8 to be Ms. Smith as the attorney of record. And, you
9 know, within her scope of her obligations as an officer
10 of the court that's instructing on a good faith basis on
11 privilege. Because that's all going to get sorted out.
12    Any questions?
13    MR. CORBETT: No, Your Honor. That
14 sounds perfectly comprehendible to me.
15    MS. SMITH: Yes. That's sounds fine.
16 Thank you.
17    JUDGE FERENBACH: Now, let's talk about a
18 couple other things as long as I've got you here.
19    I've got the docket up, and there's this
20 emergency motion to strike a memorandum. Let's see. I
21 wrote that down. Hold on. I'll be right back.
22    Looks like it's a December 28th, 2020
23 memorandum from Ms. Smith to the US Attorney for
24 District of Nevada, Mr. Trutanich, entitled Request for
25 Certification of Scope of Employment. And, you know,

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

7 (Pages 22 to 25)

Page 22

1  the -- basically it's a clawback type issue.
2       What I have done is I have contacted the
3  clerk's office, and I have ordered that Docket 34-1 be
4  sealed.  And I see now it already has, the miracles of
5  electronics.  And, of course, 32 is already sealed
6  because when the 34 took the place of 32, 32 got sealed.
7  So for now, temporarily, that's sealed.
8       You know, I've got the motion and the response.
9  If the government wants to file a reply, you know, get
10 it in to me by next Wednesday.  I'll take a look at it,
11 maybe I can rule on the papers.
12      If not, I'll set a hearing.  And, also, I just
13 learned that Judge Mahan has referred to me the actual
14 motion -- oh, yeah.  The motion to substitute parties,
15 which is now, I guess -- which number is that?
16      Let's see.  The original motion to substitute
17 parties was 32.  So I guess that's 34.  But it doesn't
18 have a flag on it.  I don't know why.
19      Anyway, I'm going to be deciding that motion to
20 substitute parties.  So if there needs to be any -- does
21 there need to be any more briefing on that?
22           MR. CORBETT:  Your Honor, there's a bit
23 of an issue because although the UCF system sees it as
24 a motion, the documents were captioned as a notice.
25 The TSA is attempting to substitute parties as of

Page 23

1  right.  So you will see my --
2           JUDGE FERENBACH:  You know, what
3  Mr. Corbett.  You're going to do a lot better with me
4  if you just answer my question than try and make some
5  argument that's on the top of your mind.
6           MR. CORBETT:  I apologize, Your Honor.
7           JUDGE FERENBACH:  Does there need to be
8  any more briefing on the motion to substitute?
9           MR. CORBETT:  I think that there may be a
10 lot more briefing and potentially an evidentiary
11 hearing on, well, the notice of substitution.
12           JUDGE FERENBACH:  All right.  Well, it
13 says to me Number 32, motion to substitute party, is
14 referred to me, which I guess is now 34.
15      So 32 is viewed as a motion.  It was filed on
16 December 30th.  And there's been no response to it yet,
17 other than the motion to strike.
18      So let me ask it this way:  Mr. Corbett, do you
19 want to file an opposition to Number 32, which is now
20 Number 34, the motion to substitute parties?
21           MR. CORBETT:  Yes, Your Honor.  If the
22 Court is viewing Number 34 as a motion, I would like to
23 oppose it.  I think I put most of the argument that I
24 would write in that motion to strike.
25           JUDGE FERENBACH:  Okay.  If you want to

Page 24

1  write it up a little better, that's fine.  So I think
2  the ordinary time it would be due would be maybe the
3  12th, next Tuesday.
4       Can you just get it in by the 12th?
5           MR. CORBETT:  Yes, Your Honor.
6           JUDGE FERENBACH:  Okay.  Great.  So that
7  will be the 12th.  Reply in the ordinary course.
8       If I can decide the emergency motion to strike
9  without a hearing, I'll get that out of the way.  But we
10 will probably hold a hearing on the substitute, maybe, I
11 don't know.  I've got to look at it.  And if there's
12 going to be a motion to compel based on the instructions
13 not to answer, why don't you get that in to me by next
14 Wednesday, too, Mr. Corbett, so I can know, you know --
15 manage it so we can do everything as efficiently as
16 possible.
17           MR. CORBETT:  Yes, Your Honor.
18           JUDGE FERENBACH:  Okay.  Well, have a
19 good Friday, everyone.  Thank you.
20           MS. SMITH:  Thank you.  Have a good one.
21           MS. MAIZEL:  Thank you.
22      (Brief Recess.)
23      (Proceedings Resumed on Zoom Videoconference.)
24 BY MR. CORBETT:
25      Q.  Ms. Serrano, just before we begin, I'd like to

Page 25

1  remind you that you're still under the oath from before.
2       Is there a private room at the checkpoint
3  where passengers are sometimes taken for screening?
4       A.  Yes.
5       Q.  Were you trained as to the purpose of this room?
6       A.  The purpose?  The -- yes.
7       Q.  Okay.  And what is the purpose of that private
8  room?
9       A.  To conduct private screening.
10      Q.  Is there a rule that requires certain varieties
11 of screening to be conducted in the private room?
12      A.  There is --
13           MS. SMITH:  Objection to form.
14           THE WITNESS:  -- SSI.
15 BY MR. CORBETT:
16      Q.  I'm sorry?  Your answer one more time?
17      A.  There are specific rules regarding private
18 screening rooms.
19      Q.  Okay.  And did your training cover that?
20      A.  That's -- the content of the training is SSI.
21      Q.  Okay.  So if there is a privilege, it needs to
22 be called out by your attorney.
23      Ms. Smith, is there an objection here?
24           MS. SMITH:  I think what you asked was:
25 Are there rules that cover that room?  And her answer

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

8 (Pages 26 to 29)

---

Page 26

1  is yes. So --
2         MR. CORBETT: Right. The next question
3  was: Did your training cover those rules, to which the
4  witness so far has refused to answer. Do you have an
5  objection?
6         MS. SMITH: I don't think so. I don't
7  think she said that.
8         MR. CORBETT: Okay. Let me ask one more
9  time.
10  BY MR. CORBETT:
11     Q. Did your training cover the rules for the
12  private room?
13     A. Yes.
14     Q. Okay.
15         MS. SMITH: I'm sorry. You're breaking
16  up. So that doesn't help either.
17         MR. CORBETT: I didn't say anything yet.
18  BY MR. CORBETT:
19     Q. Did your job title change at all during your
20  tenure with the TSA?
21     A. It did.
22     Q. What other job titles did you have?
23     A. Lead transportation security officer.
24     Q. Approximately when did you receive that
25  promotion?

---

Page 27

1     A. I would say August. It was about a year and a
2  half after I had started. So August 2018.
3     Q. Was that your title on June 30th, 2019?
4     A. It was.
5     Q. Do you still work for the TSA?
6     A. I do not.
7     Q. When did your employment with TSA end?
8     A. It was December -- December 2019.
9     Q. Did your employment end because you resigned, or
10  were you terminated or otherwise? What happened?
11     A. I resigned.
12     Q. What was the reason for resigning your job?
13     A. I was feeling burned out.
14     Q. Have you taken a new job since?
15     A. I have.
16     Q. What do you do?
17     A. I am an environmental health and safety
18  technician. I am a contractor for a large aerospace
19  company.
20     Q. And where are you located now?
21     A. Where is -- my residence or my employment?
22     Q. Where do you live?
23     A. I live in Washington --
24     Q. Okay.
25     A. -- State.

---

Page 28

1     Q. And before working for TSA, did you have another
2  job?
3     A. Yes.
4     Q. What was the job you held immediately prior to
5  working for TSA?
6     A. I worked at the Ethel M Chocolate Factory in
7  Las Vegas.
8     Q. Okay. Have you ever been arrested?
9     A. No.
10     Q. Have you been to college?
11     A. Yes.
12     Q. Did you finish college?
13     A. Yes. I have a bachelor's degree.
14     Q. And what's your bachelor's in?
15     A. It's in professional aeronautics with dual
16  minors in occupational safety and health and aviation
17  safety.
18     Q. Are you married?
19     A. I am not.
20     Q. Do you live with a partner?
21     A. No. I do not.
22     Q. Did you do anything to prepare for this
23  deposition?
24     A. I read the statements of the -- of STSO Brionnes
25  and TSO Jacobs. And I read my original redacted

---

Page 29

1  statement that I wrote in this -- about approximately,
2  what was that, July 2019.
3     Q. The first name you mentioned, it was
4  STSO Brionnes, if I heard that right. Can you spell that
5  name?
6     A. I believe it's B-r-i-o-n-n-e-s.
7     Q. Do you know STSO Brionnes' first name?
8     A. Nilda, N-i-l-d-a.
9     Q. Was she your direct supervisor on June 30th,
10  2019?
11     A. She was not my direct supervisor, as in I was
12  not assigned to her. But she was on the checkpoint.
13     Q. Okay. And what was her role in interacting with
14  my client? And I'll specify that any time I use the word
15  "my client" during the deposition, I'm speaking of
16  Michele Leuthauser.
17     A. STSO Brionnes completed the pat-down.
18     Q. Thank you.
19         The second name that you mentioned was Jacobs;
20  is that correct? Common spelling?
21     A. That's correct.
22     Q. Do you know TSO Jacobs' first name?
23     A. It's Michellin.
24     Q. M-i-c-h-e-l-l-i-n?
25     A. That's as close as I would be able to get.

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

9 (Pages 30 to 33)

Page 30

1    Q.  Thank you.
2        And Ms. Jacobs is the female?
3    A.  Yes.
4    Q.  What was her role?
5    A.  She was TSO, and she was the second female in
6  the private screening room.  Second officer, I mean.
7  Second female officer.
8    Q.  Thank you.  Have you spoken to anyone other than
9  your attorney about this case?
10   A.  No.
11   Q.  At no point you spoke to other TSA employees?
12   A.  Certainly not.
13   Q.  You did not speak to any investigators?
14   A.  I spoke to somebody with the Office of the
15  Inspector General interviewed me in July 2019.
16   Q.  During that discussion, what was the nature of
17  it?
18   A.  She took a verbal testimony from me.
19   Q.  Have you reviewed any documents pertaining to
20  this case other than the three that I think you
21  mentioned, which were the statements of STSO Brionnes,
22  TSO Jacobs, and your own redacted statement?
23   A.  Other than the court documents that my lawyers
24  have sent me, no.
25   Q.  Which court documents have you reviewed?

Page 31

1    A.  I don't have them offhand.  It was the original
2  when Ms. Maizel first contacted me and sent me a -- I'm
3  not sure what that was.
4    Q.  Did you read a document that might have been
5  entitled Complaint?
6    A.  I may have.
7    Q.  Just so that we understand, we're hopefully
8  talking about the same thing, a Complaint is a document
9  that starts a court case that sets out the allegations by
10  plaintiff against defendant.
11       Does that sound like a document you might have
12  reviewed?
13   A.  It does.
14   Q.  Great.  Were you working for TSA on June 30th,
15  2019?  And I apologize.  Some of these questions may seem
16  repetitive, but I've got to get them out there.
17   A.  I was.
18   Q.  Did you follow your training at all times on
19  that day?
20   A.  I did.
21   Q.  So, to the best of your recollection, you did
22  not break any of TSA's rules or policies that day.
23  Correct?
24   A.  That's correct.
25   Q.  Where was your job location on June 30th, 2019?

Page 32

1    A.  McCarran International Airport at the C annex
2  checkpoint.
3    Q.  I'm pretty familiar with McCarran Airport.  I'm
4  not familiar with what an annex is.  Is that just a
5  secondary checkpoint off of C?
6    A.  It's the checkpoint where most Southwest flights
7  fly out of.  It's just -- that's what they call the
8  checkpoint because you have to access it from a long
9  hallway, so they call it the annex.
10   Q.  Oh, so it's a hallway that leads you just past
11  the regular checkpoint C?  Is that the idea?
12   A.  No.  There is only one checkpoint C.  They just
13  call it C annex.  I don't know why.  It's -- there is one
14  way to access it, is down a long hallway.
15   Q.  Okay.  The only way to access the C gates is
16  through the C annex?
17   A.  That's not correct.
18       On the other side of the checkpoint, all of
19  the gates are connected so that you can go through any
20  checkpoint and still get your -- catch your flight at
21  any gate.
22       So once you're through any other checkpoint,
23  you could still access the -- C checkpoint from any
24  other location.
25   Q.  What were your job duties on the date of

Page 33

1  June 30th, 2019?
2    A.  Passenger screening.  Property screening.
3    Q.  Okay.  So you worked at the checkpoint, and you
4  would, perhaps, use technology to search bags, as well as
5  operate body scanners and conduct pat-downs.  Does that
6  sound about right?
7    A.  Yes.  We would use equipment to conduct
8  screening operations.
9    Q.  Do you remember interacting with my client?
10   A.  I do.
11   Q.  Can you describe my client's appearance, just as
12  I asked you before, approximate weight, maybe height,
13  skin tone?
14   A.  Fair skin tone.  Taller than I.  So I would say
15  not -- not short.  I would call myself short.  So taller
16  than myself.  Maybe above average weight.  That's it.
17   Q.  How tall are you, Anita?
18   A.  I'm 5-foot-3.
19   Q.  Thank you.
20       When did you first see my client?
21   A.  I approached her standing out -- standing in
22  front of the AIT ATR, or I guess it would be in back.  In
23  back of it.  Behind it.
24   Q.  Were you working the AIT machine at that time?
25   A.  I was not.

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

10 (Pages 34 to 37)

Page 34

1  Q. How did you end up at the AIT machine?
2  A. I was -- somebody came over the radio and asked
3  if there was a female available for a private screening
4  to which I replied that I was and asked which lane the
5  passenger was waiting at.
6  Q. Did you see the results of the body scanner
7  screening?
8  A. I did not.
9  Q. Were you told what the results were?
10  A. Yes, I was.
11  Q. What were you told?
12  A. I was told that there was a groin anomaly.
13  Q. Groin anomaly.
14  So we're clear for the record, does a groin
15  anomaly mean that the AIT machine detected that
16  something was on the person of my client's -- in the
17  area of her groin?
18  A. That means that the image produced by the scan
19  indicates an alarm or an anomaly across a certain area.
20  Q. Okay. So if it were something -- if something
21  were concealed on my client's upper thigh, would that
22  come as a groin alarm?
23  A. Can't say. In a situation where we're talking
24  about technology that produces a two-dimensional image,
25  so I can't say if someone had something concealed on

Page 35

1  their upper thigh whether or not it would produce an
2  anomaly on or not. That's the -- up to the technology,
3  not myself.
4  Q. Certainly. And I understood that the AIT is not
5  particularly effective. But my question is: Is there a
6  separate alarm? Let's say the AIT machine did detect
7  something on an upper thigh. Would that still be a groin
8  alarm, or would that be some kind of separate alarm?
9  A. I -- the answer is SSI.
10  MS. SMITH: I'll object to SSI.
11  MR. CORBETT: Sorry. Just to be clear, I
12  could barely hear you, Ms. Smith. Counsel is objecting
13  that SSI is here?
14  MS. SMITH: Yes. I'll object to SSI and
15  instruct her not to answer.
16  BY MR. CORBETT:
17  Q. If my client were -- scratch that.
18  If the AIT were to detect something around my
19  client's lower abdomen, would that alarm be a groin
20  alarm?
21  A. The answer is SSI.
22  MR. CORBETT: Okay. So, Ms. Smith, I'm
23  going to need you to assert privilege, not the witness.
24  MS. SMITH: I think that question was
25  similar to the other question, wasn't it, Anita, with

Page 36

1  respect to your answer? I just want to make sure I
2  heard it right.
3  THE WITNESS: Yes. It's -- as I
4  understand, the question is asking me if an alarm or
5  anomaly is produced in a certain area, does that
6  constitute a groin alarm?
7  And that is directly from the standard
8  operating procedure, which has been designated SSI.
9  MS. SMITH: Okay. I'll object and
10  instruct her not to answer on SSI grounds.
11  BY MR. CORBETT:
12  Q. When you approached my client, what did you
13  first say to her?
14  A. I said, Hi, are you the one who has asked for a
15  private screening?
16  Q. Over the radio, were you told that my client
17  asked for a private screening?
18  A. No.
19  Q. So why did you come up to my client and ask her
20  if she's the one who asked for a private screening?
21  MS. SMITH: I'll object. Lacks
22  foundation.
23  Go ahead.
24  MR. CORBETT: Ms. Serrano.
25  THE WITNESS: When -- can you repeat the

Page 37

1  question, please?
2  BY MR. CORBETT:
3  Q. You testified that you started the interaction
4  with my client by asking her if she was the passenger who
5  requested a private screening.
6  Why did you say that to her?
7  A. When a person receives advisements, and this is
8  information that's given to the public.
9  When a person receives advisements that they
10  have -- they have an anomaly or an alarm in a certain
11  area of their body, part of the advisements is to ask,
12  Are you -- Would you like to request a private
13  screening? If the passenger answers in the
14  affirmative, then another officer is asked to complete
15  the private screening pat-down.
16  So when I was asked over the radio, Is there a
17  person available for a private screening, and I was
18  told that they were waiting outside of an AIT ATR, then
19  it was reasonable for me to deduce that it was because
20  that's part of the standard advisements is Would you
21  like a private screening?
22  Q. Ms. Serrano, I think I'm hearing competing
23  testimony from you. I think that I heard you say
24  originally that you were told that a passenger needed
25  assistance and that you were not told that she requested

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

11 (Pages 38 to 41)

Page 38

1  a private room.  Yet your answer to the most recent
2  question seems to indicate that you were advised that she
3  asked for a private room.
4        Can you clarify whether over the radio, you
5  were told that this passenger requested a private
6  screening?
7            MS. SMITH:  I'll object.  Form.
8  Compound.
9            THE WITNESS:  I was asked over the radio,
10  Is there a female available for a private screening?  I
11  replied, Yes.
12        When I approached, I deduced on my own that it
13  was because she had gone through the machine, the
14  scanner, received her advisements, and -- see, if I go
15  into the difference between a required private screening
16  and a requested private screening, then that's SSI.
17  That's directly from SOP.
18        So no.  Nobody -- to answer your question,
19  nobody told me that the passenger requested a private
20  screening.
21  BY MR. CORBETT:
22    Q.  Thank you.
23        Did you advise my client that she was not
24  required to go to a private room?
25    A.  I did not.

Page 39

1    Q.  Was my client required to go to a private room?
2    A.  No.
3    Q.  Is it fair to say that you intended to conduct a
4  resolution pat-down on my client?
5    A.  No.  That is not fair.
6    Q.  What is the difference between a resolution
7  pat-down and the pat-down you intended to perform on my
8  client?
9    A.  The pat-down I intended to perform is called a
10  targeted pat-down.  And I cannot disclose the difference
11  between the two, because that is directly from the SOP.
12    Q.  Okay.  So my understanding -- and I haven't been
13  exposed to the SOP that speaks of this, this is just from
14  my experience flying -- is that a resolution pat-down
15  happens at the checkpoint when there is an anomaly,
16  versus this targeted pat-down you speak of when an
17  anomaly cannot be resolved at the checkpoint.
18        Do I have that right?
19            MS. SMITH:  I'll object that it calls for
20  SSI and instruct the witness not to answer.
21  BY MR. CORBETT:
22    Q.  What was it -- scratch that.
23        Was there something in particular that caused
24  you to decide that this would be a targeted pat-down,
25  not a resolution pat-down?

Page 40

1    A.  Yes.  Knowledge of the SOP told me that this was
2  a targeted pat-down, not a resolution pat-down.
3    Q.  And would that be based on the results that the
4  body scanner put out?
5    A.  It is based on the procedures that are laid out
6  for TSA officers to follow.
7    Q.  I'm not sure that's responsive to my question,
8  so I will repeat it.
9        Is the output of the body scanner the thing
10  that causes a targeted pat-down to be required versus a
11  simple resolution pat-down?
12            MS. SMITH:  I'll object.  I think that
13  calls for SSI as well.  And I'll instruct her not to
14  answer.
15  BY MR. CORBETT:
16    Q.  Ms. Serrano, you testified before that you did
17  not see the results of the body scanner.  By the way,
18  just for clarity, any time I say "body scanner," I'm
19  referring to AIT.
20        You testified that you did not see the results
21  of my client's body scan; is that correct?
22    A.  That is correct.
23    Q.  Other than telling you that there was a groin
24  anomaly, were you advised as to the result of my client's
25  body scan?

Page 41

1    A.  No.  I was told that it was a groin anomaly.
2    Q.  Did you follow your training and TSA procedures
3  when you decided a targeted pat-down was required with no
4  more information than that there was a groin anomaly?
5    A.  Yes.
6    Q.  Did you suspect that my client had something on
7  her person that she was secreting that you would find
8  during a pat-down?
9            MS. SMITH:  I'll object to the form of
10  the question.
11            MR. CORBETT:  Ms. Serrano.
12            THE WITNESS:  The results of an anomaly
13  raised suspicion.  That's correct.  So yes.  If I
14  received results from the technology indicating an
15  anomaly is present, then I am alarmed by any alarm.
16  BY MR. CORBETT:
17    Q.  Is it fair to say that frequently AIT results in
18  false alarms, in your experience?
19    A.  I don't know that I can -- I'm not an expert on
20  the -- the rate of anomalies which are resolved without
21  incident versus the anomalies which produce a prohibited
22  item.
23    Q.  Thank you.
24        Ms. Serrano, would you say that you have done
25  more than 100 of these targeted pat-downs as a result

Anita Serrano ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

12 (Pages 42 to 45)

Page 42

1 of the groin alarm in your experience for TSA?
2     A. Yes.
3     Q. Would you say that more than half of the time
4 you conducted a pat-down, you found -- for that reason,
5 you found nothing?
6     A. Finding nothing, I don't know what constitutes
7 finding nothing.
8     Q. Finding no objects concealed on the person?
9     A. No prohibited items concealed on the person?
10     Q. Well, let's start with prohibited items.  Yes.
11     A. I would say that in -- can you repeat the
12 question, please?
13     Q. Absolutely.
14         Would you say that the majority of times you
15 conducted targeted pat-down as a result of an AIT groin
16 alarm, you do not find a prohibited item?
17     A. Yes.  I would say that.
18     Q. Would you say that the majority of the times
19 that you conduct a targeted pat-down as a result of an
20 AIT groin alarm, you did not find any item concealed on
21 the person?
22     A. I would not say that.  I would say that the
23 majority of the time an item is found in the area at
24 which the body scanner produces an anomaly.
25     Q. Would you say that at least 25 percent of the

Page 43

1 time you conduct a targeted pat-down as a result of a
2 groin search, you do not find any item at all?
3     A. No.  I would not say that.
4     Q. Okay.  So to be clear, you're saying more than
5 75 percent of the time you conduct such a pat-down -- a
6 targeted pat-down as a result of a groin anomaly, you do
7 actually find an object?
8     A. An object.  Yes.
9     Q. To be clear about your testimony from there, are
10 you saying that there are some times that a client can
11 request a private room and other times where the TSA
12 directs a client that they must go to a private room?
13     A. That's correct.
14     Q. After you asked my client if she was the
15 passenger who requested a private room, what did she tell
16 you?
17     A. She affirmed.  I don't know if she said yes or
18 yeah, but she affirmed.
19     Q. And what did you tell her then?
20     A. I asked her to step to where her property was
21 exiting the X-ray machine.  And I asked for her to point
22 out her property to me without touching it so that I
23 could pick it up.
24     Q. Did she do that?
25     A. She did not.

Page 44

1     Q. She refused or what happened?
2     A. She did not reply to my request or acknowledge
3 my request.  She walked over to where her property
4 ultimately was coming off of the -- you know, off of the
5 chute, the rollers, and she picked up her cell phone.
6     Q. Did you take this as her ignoring your command
7 or just simply failing to understand?
8     A. I -- I was speaking clearly and was close enough
9 that she could hear me.  And I was using plain language.
10 So I suppose I took it as that she was ignoring, not that
11 she -- there was a failure to understand.
12     Q. Okay.  So did you take this as her failing to
13 respect your authority to give those commands?
14     A. I just took it as a -- I don't know that I
15 thought that much into it, that I have an authority that
16 I'm trying to assert and she's openly defiant.  I didn't
17 think about it in those terms, really.
18     Q. Okay.  After my client grabbed or touched her
19 cell phone, what happened next?
20     A. I said, Don't touch it.  Just tell me what's
21 yours, and I'll pick it up.
22     Q. And --
23     A. And she threw her cell phone down in the bin and
24 gestured to a second bin, that that was hers as well.
25     Q. Okay.  And what happened next?

Page 45

1     A. So I picked up the -- both of the bins.  And I
2 asked her to follow me to the private screening room,
3 which is located in the back of the checkpoint.
4     Q. Did my client comply?
5     A. She followed me.
6     Q. Okay.  So the two of you traveled to a private
7 screening room.  I'm assuming this is quite near the
8 checkpoint?
9     A. It is.  It's at the very back of the checkpoint.
10 At the end of the lanes with some space for walking.  An
11 aisleway in between.
12     Q. Was there a closed door that you opened for her?
13     A. I don't recall if the door was closed or not.
14     Q. Okay.  But my client was let into the room by
15 you?
16     A. Correct.
17     Q. Was anyone else summoned at this point to join
18 you?
19     A. Yes.  When we were walking on the way back to
20 the private screening room, TSO Michellin Jacobs crossed
21 paths with me.  And I asked if she was in a rotation or
22 if she was free.
23         She indicated that she was not in rotation,
24 and she was free.  And I asked if she would do a
25 private screening with me.

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

13 (Pages 46 to 49)

| Page 46 | Page 48 |
|---------|---------|

Page 46

1    Q. Why did you ask for assistance with the private
2  screening?
3    A. The -- well, that's SSI. It's in the SOP.
4    Q. Does TSA procedure require two -- sorry.
5  Scratch that.
6    Ms. Smith, do you have an objection to that?
7    MS. SMITH: Yeah. I think it is SSI
8  because you're asking again about the procedure. So
9  I'll instruct her not to answer.
10   MR. CORBETT: Thank you.
11 BY MR. CORBETT:
12   Q. Ms. Serrano, is it TSA policy that in a private
13 room, there should be two or more screeners?
14   MS. SMITH: And I'll object again. SSI.
15 And I'll instruct her not to answer.
16 BY MR. CORBETT:
17   Q. So do I have it correct, then, that you,
18 Ms. Serrano, and Ms. Jacobs, and my client entered the
19 private room together at approximately the same time?
20   A. Correct.
21   Q. And then you closed the door behind the group?
22   A. Correct.
23   Q. Did Ms. Jacobs, in any way, participate in the
24 screening of my client other than acting as, essentially,
25 a witness?

Page 47

1    A. No.
2    Q. She never touched my client?
3    A. No.
4    Q. Did she ever speak to my client in front of you?
5    A. Not that I'm -- no. I don't think so.
6    Q. Are there any cameras in the private room, to
7  the best of your knowledge?
8    A. The cameras on the checkpoint are mounted on the
9  ceiling.
10   Q. Can they see in the private room?
11   A. I don't know.
12   Q. As far as you're aware, in the private room
13 itself, is there a ceiling mounted camera?
14   A. There's no ceiling -- there's no lid on the
15 room. So it's four open walls, and it's open on top.
16 There's no ceiling in the private screening room. It's
17 an open top room.
18   Q. Got it. So is it some kind of dividers that are
19 put into like a group of four walls or is it permanent
20 walls or can you describe more the --
21   A. They are temporary. It's like temporary walls
22 that are like a metal frame with frosted glass and for,
23 you know, to make -- well, I guess there would only be
24 three panels because it's pushed up against an exterior
25 wall.

Page 48

1    Q. Okay. Approximately how tall are the walls on
2  this room?
3    A. I would guess maybe 7 feet tall.
4    Q. And is it fair to say there are very high
5  ceilings in this area?
6    A. In that area, on the checkpoint, yes. There are
7  very high ceilings. There's no second floor above, to my
8  knowledge.
9    Q. So the cameras are mounted more than 20 feet in
10 the air, would you say?
11   A. Yes.
12   Q. More than 40 feet in the air?
13   A. I don't know 40 feet when I see it.
14   Q. And these temporary walls have a built-in door
15 of some kind, I take it?
16   A. Yes. A metal framed door with frosted glass or
17 frosted plexi or whatever they use.
18   Q. What happened next once you were inside and the
19 door was closed?
20   A. I set her property -- there's a table in there.
21 Like a long stainless steel table like you would find in
22 a bakery or in a restaurant. So I put her two bins on
23 the table. And I -- I believe I changed my gloves at
24 that point. I think took off the gloves I was wearing
25 and grabbed a pair of fresh gloves from a box.

Page 49

1    And I asked Ms. Leuthauser if she would step
2  on the yellow footprints on the mat.
3    Q. Okay. So there's some kind of floor mat on the
4  ground that has footprints on it. Is that your
5  testimony?
6    A. That's correct.
7    Q. What is the purpose of this floor mat?
8    A. It's utilized from pat-downs to -- as a
9  reference point for getting the passenger in the correct
10 stance to perform the pat-down.
11   Q. Did you advise my client to place her feet on
12 the footprints of the floor mat?
13   A. I did.
14   Q. At any point, did you advise her to spread her
15 feet wider?
16   A. No.
17   Q. Do you remember what my client was wearing?
18   A. I do not.
19   Q. After my client was standing on the mat, what
20 happened next?
21   A. I began to provide her with the advisements,
22 which is telling her what -- where she has alarmed, where
23 the anomaly was, and what I was going to be doing to --
24 in order to clear that alarm.
25   Q. And can you describe -- or can you repeat for us

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

14 (Pages 50 to 53)

---

Page 50

1  what you told her you were going to be doing?
2      A. I can.
3      So I said, You've alarmed in the groin area.
4  So I'm going to be patting down from your waistband to
5  your knees, front and back. I'm going to use my
6  fingers in a pinching motion and slide around your
7  waistband from seam to seam. I'm going to use the back
8  of my hand -- and as I'm pantomiming this to you, sir,
9  now, the way I pantomime out in front of us so that
10  they can see the motion if there's any language barrier
11  or any other reason that a pantomime would be helpful.
12      So I said, I'm going to be sliding my
13  fingertips around your waistband. I'm going to use the
14  back of my hands to clear your buttocks in an up and
15  down motion. I'm going to use the back of my hands on
16  your groin in a side to side and then up and down
17  motion.
18      In order to clear your legs, I'll place one
19  hand on your hip, one hand on your thigh, the inside
20  hand goes up until it meets resistance of the torso.
21  Then both hands go all the way down to the knee. And
22  I'll repeat that on both legs, front and back.
23      I then -- well, I wasn't able to get those
24  advisements out the first time. So I attempted to
25  deliver those advisements multiple times.

---

Page 51

1      Q. What happened that interrupted?
2      A. The passenger was interrupting. She was waving
3  her hand and saying, Just do it, just do it, just do it
4  already. I have a plane to catch. I just want to get
5  out of here. I don't want to do this. Just let me go.
6  Put me in the machine again. Scan me again. I don't
7  have anything there. Just do it already. I don't need
8  to hear all of this.
9      There was a number of complaints about
10  getting -- proceeding with the process, getting it over
11  with, just doing it. And she offered suggestions for
12  other ways that I might be able to screen her.
13      Q. Okay. So am I hearing two different kind of
14  categories in the complaint? The first being that she
15  was in a rush, and the second, was there some objection
16  to this -- the screening that you proposed?
17      A. Yes. There was --
18      MS. SMITH: I'll object to the form of
19  the question.
20      Compound. Go ahead, Anita. Sorry.
21      THE WITNESS: Her objection to the
22  screening process was that she wasn't hiding anything
23  and should not be submitted to a pat-down screen and
24  was asking if she can be placed back inside the body
25  scanner to try again.

---

Page 52

1  BY MR. CORBETT:
2      Q. And I take it that you told her no?
3      A. That's correct. I told her that this is the way
4  that this alarm needs to be cleared, and that I -- and I
5  persisted in trying to get the words out of my mouth of
6  what was going -- what the pat-down consisted of.
7      Q. Did you eventually complete your advisements
8  with my client?
9      A. I did. When I eventually got through the
10  pantomime portion and the description of how I was to be
11  conducting the pat-down screening, I asked her if she had
12  any medical devices which -- that I might feel. She said
13  no.
14      Typically, at this point is when you would ask
15  in those advisements, Would you like a private
16  screening? Although, obviously, I skipped it, because
17  to my knowledge, the private screening had already been
18  requested and affirmed by the passenger.
19      And I asked if there is anything sore,
20  sensitive, or painful to the touch that I should know
21  about. And she replied to all three of those
22  questions, medical devices -- I guess I didn't ask the
23  private screening -- medical devices and anything
24  painful, sore, or sensitive to the touch, in the
25  negative.

---

Page 53

1      Q. I'm still a little bit confused here regarding
2  whether my client was taken to private screening because
3  she asked to be taken to private screening or because
4  private screening was required in this situation. Can
5  you clarify?
6      A. To the best of my knowledge, it was because she
7  had asked for a private screening. The advisements that
8  I just iterated to you are the same advisements that
9  would have been conducted when she stepped out of the
10  body scanner machine.
11      Identical advisements. You've alarmed in the
12  groin area. I will be patting down this area. Do you
13  have any medical devices, anything sore, sensitive, or
14  painful to the touch, and would you like a private
15  screening?
16      Q. Do you know which TSA screener would have
17  provided her those advisements that is, I guess, the
18  operator of the AIT?
19      A. I believe her name is TSO Melicia Griffin. And
20  I think she has a hyphenated last name, so I don't know
21  if it's something-Griffin or Griffin-something.
22      Q. Thank you. So to be perfectly clear, my client
23  was not required to go to the private room. This was a
24  pat-down that could have been conducted at the
25  checkpoint?

---

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

15 (Pages 54 to 57)

---

Page 54

1    A.  Correct.
2    Q.  Okay.  After you finished your advisement, what
3  happened next?
4    A.  I stepped -- I asked -- again, I asked for -- it
5  was at least a second time.  I believe I had asked at
6  some point during the advisements that -- or mentioned
7  that in order to clear the legs, I needed her to place
8  herself on the footprints on the mat.
9    But I asked again before I started the
10  pat-down, Can you please place your feet -- take a
11  wider stance.  Place your feet on the yellow
12  footprints.
13    She, again, did not acknowledge that request
14  or make an attempt to adjust her stance.
15    Q.  I think I asked earlier if you had ever told my
16  client that she needed to spread her feet apart wider.
17  And your answer was no.  But you're now saying that at
18  some point, you did ask her to spread her feet wider?
19    A.  No.  I never said the words "Spread your feet
20  wider."  I have never said that during a pat-down, nor
21  would I ever.
22    I asked her to widen her stance.
23    Q.  Ms. Serrano, surely you must understand that in
24  order to widen one's stance, once must move one's feet
25  further apart; is that right?

---

Page 55

1    A.  I do understand.
2    MS. SMITH:  Form.  Argumentative.
3  BY MR. CORBETT:
4    Q.  Thank you.  So to clarify, you did ask my client
5  to widen her feet while she was on this footprint mat?
6    A.  I asked her to widen her stance.  Yes.
7    Q.  Did you ask her to widen her stance such that it
8  would be wider than the footprints would have dictated?
9    A.  I believe I -- so I -- hmm.  The proper stance
10  is part of the procedure, the yellow footprints on the
11  mat are a starting point.
12    The procedure defines where -- how a person's
13  feet need to be placed in relation to the rest of their
14  own body.  And, of course, since people are taller and
15  some people are shorter, those footprints are a
16  starting point.
17    However, the -- it's at liberty of the officer
18  to accomplish the specifics of the position required
19  for a pat-down, and that may require wider -- a wider
20  stance than the footprints indicate.
21    Q.  So is the answer to my question, then, yes, you
22  did ask her to move her -- to widen her stance wider than
23  the footprints would have indicated?
24    A.  I asked her to step on the footprints.  I did
25  not ask her to widen her stance wider than the

---

Page 56

1  footprints.  I asked her to, Widen your stance and step
2  on the footprints.
3    So my request was not to take a stance wider
4  than the footprints.  My request had been so far to
5  that point and throughout, to step on the footprints.
6    Q.  Okay.  So I'm just trying to make sure that I
7  get this --
8    A.  Had she stepped on -- directly on the
9  footprints, then I would have been satisfied with her
10  positioning in order to complete a targeted pat-down
11  search.
12    Q.  Okay.  So before you told her to widen her
13  stance, she was on the mat, just not on the footprints?
14    A.  Correct.  Her feet were narrower than the
15  footprints.
16    Q.  Okay.  And she -- you then asked her to widen
17  her stance.  Correct?
18    A.  Correct.
19    Q.  Did she widen them to the footprints or wider
20  than the footprints?
21    A.  She did not adjust her stance from when she
22  first stepped into the private screening room.
23    Q.  Did you then proceed with the pat-down or did
24  you ask again or what happened next?
25    A.  I asked a number of times and with no -- no --

---

Page 57

1  again, no acknowledgement of my request or any attempt to
2  step on the footprints.  So I began the pat-down along
3  her waistband.
4    Q.  When you began the pat-down then, you were
5  saying her feet were narrower than the footprints?
6    A.  That is correct.
7    Q.  Was this frustrating for you?
8    A.  It was.
9    Q.  You say you started your search of my client
10  with a waistband check; was that correct?
11    A.  That's correct.
12    Q.  Was there anything out of the ordinary found in
13  my client's waistband?
14    A.  No.
15    Q.  Were you able to search my client's waistband as
16  necessary without first interruption?
17    A.  Yes.  I screened the waistband.  Yes.
18    Q.  What happened next?
19    A.  Then I screened her buttock area.  So I used --
20  with my fingertips touching like this, used the flat of
21  the back of my hands, starting from one seam of the
22  pants.  I went in a vertical motion using an overlapping
23  motion following the contour of the body from seam to
24  seam.
25    Q.  So, at this point, my client was facing away

---

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

16 (Pages 58 to 61)

---

Page 58

1  from you; is that correct?
2      A.  That's correct.  This was conducted from behind
3  her.  I believe I took a knee when I began -- when I
4  began the targeted pat-down.
5      Q.  Would you say my client is of average height?
6  Taller than average height?
7      A.  Like I said before, when you asked for her to --
8  me to describe her, I would say that she is taller than
9  me.  And I am of below -- what I would consider below
10  average height.
11      Q.  So would you consider her of average height,
12  approximately?
13          (Speaking Simultaneously.)
14          THE WITNESS:  Yeah.  As best as I can
15  recall.
16          THE COURT REPORTER:  I didn't hear the
17  objection.
18          MS. SMITH:  I objected to the form.
19      Sorry.  Anita is real quick here.
20          THE WITNESS:  Sorry.
21          MS. SMITH:  It's okay.
22  BY MR. CORBETT:
23      Q.  The screening of her buttock area, were you able
24  to complete that successfully?
25      A.  Yes.

---

Page 59

1      Q.  Did my client make any further objections during
2  that screening?
3      A.  No.
4      Q.  What happened next?
5      A.  I asked -- before I began to try to attempt to
6  clear the legs, I asked her again if she can widen her
7  stance.  She did not acknowledge my request or attempt to
8  widen her stance.
9          I placed one hand on her hip.  My left hand on
10  her left hip.  My right hand on her left thigh about I
11  would say halfway between the groin and the knee.  I
12  brought my -- that inside hand up until it met the
13  resistance where her legs were touching.  And I stopped
14  and sort of leaned -- I mean, I don't mean to go off
15  camera here.
16          But I said to sort of lean over, and I asked
17  her again, Will you please widen your stance so that I
18  can clear your legs?  There are --
19      Q.  Sorry.  Were you finished with your answer?
20      A.  I am.
21      Q.  To be clear, you speak of moving your hand up
22  until you meet resistance.  Anatomically what part of the
23  body have you reached when you meet resistance?
24      A.  Which part did I reach on this occasion or
25  which -- what am I anatomically hoping to reach?

---

Page 60

1      Q.  Let's go for both.
2      A.  As per the advisements, like I said, inside hand
3  goes up until it meets resistance of the torso.
4          So when I meet the resistance of the torso,
5  where the torso meets the leg, that's my stopping
6  point.  Because I'm trying to clear the thigh.  So in
7  order to clear the entire thigh, I go up until I meet
8  resistance of the torso, and then that hand is brought
9  back down to the knee.
10      Q.  Okay.  And in this particular case?
11      A.  The -- her legs were touching.  Her thighs were
12  sort of, I guess, pressed together.  So when I brought
13  that inside hand up the thigh instead of reaching the
14  resistance of the torso, I met resistance of her other
15  leg.
16      Q.  So you're saying her legs were so narrow --
17      A.  Her thighs were touching.
18      Q.  -- that her thighs were touching and you were
19  unable to screen?
20      A.  Correct.
21      Q.  Just as a point of clarity regarding anatomy.
22  Would you say that your genitals are a part of your
23  torso?
24      A.  Yes.  I would say that.
25      Q.  Okay.  Thank you.

---

Page 61

1          So it seems like what I'm saying is -- what
2  I'm hearing is that at this point, you were unable to
3  complete that part of the pat-down to the point where
4  you were supposed to; is that correct?
5      A.  That's correct.
6      Q.  What did you do next?
7      A.  I -- as I said, I leaned around and asked for
8  her to take a wider stance so that I may complete the
9  screening on her leg.  There was not a response.  So I
10  stood, and I -- my goal was to come around to the front
11  and again pantomime the screening of the legs and explain
12  that I need to have the ability to bring that inside hand
13  up until it meets resistance of the torso with the
14  pantomime to show, you know, sort of what I'm trying to
15  achieve here.
16          As I was on my way up off of my knee and
17  coming around to the front, then the passenger said,
18  I've just been raped.
19      Q.  Okay.  Up until this point, TSO Jacobs had not
20  said anything to you or to the client?  Had remained
21  completely silent.  Correct?
22      A.  Correct.
23      Q.  Okay.  After my client said that she had been
24  raped, according to you, what happened next?
25      A.  I stopped the pat-down -- well, I looked at

---

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

17 (Pages 62 to 65)

Page 62

1  TSO Jacobs, and I said, I'll be right back.  And I
2  grabbed my radio -- so I stopped -- I stopped attempting
3  to explain the advisements again.  I discontinued the
4  pat-down at that point, and I grabbed my radio off of my
5  belt and I left the private screening room, leaving the
6  door open.
7      Q.  Okay.  And leaving TSO Jacobs and my client
8  inside?
9      A.  Correct.
10     Q.  What was the purpose of leaving the room and
11  grabbing the radio?
12     A.  I called on the radio.  I said, I need a female
13  to the private screening room.
14     Q.  Okay.  And to go back a little bit, so you are
15  saying that you never reached higher than part of the way
16  up my client's thigh?  You never, at any point, made
17  contact with her vulva, her labia, or any genital area;
18  is that correct?
19     A.  That's correct.
20     Q.  You called for assistance over the radio, and
21  what happened?
22     A.  I -- I believe that a -- honestly, I believe
23  this a male answered and said something affirming.  And I
24  said, I need a female to the private screening room.
25         And then STSO Brionnes approached and asked,

Page 63

1  What's up?  I said, There is a passenger here who has
2  alarmed in the groin area.  She's refusing to take the
3  proper stance.  I can't complete the pat-down.  It took
4  me a long time just to get the advisements out.
5      I said I was able to pat-down the waistband
6  and the buttocks with no further cause for alarm.  I'm
7  unable to clear her legs.  Because her stance is too
8  narrow.  And she said, Okay.  So we went -- her and
9  I -- STSO Brionnes and myself went back into the
10  private screening room and shut the door.
11     Q.  Okay.  So now there are three TSA employees and
12  my client in the room with the door closed?
13     A.  Correct.
14     Q.  What happened next?
15     A.  The STSO Brionnes began giving the same
16  advisements that I did, which were, you know, You have
17  alarmed in the groin area.  In order to clear the alarm,
18  you will be patted down from the waistband to the knees,
19  and so on.
20         Partway through those advisements, your client
21  sort of stopped.  She raised her voice.  She put her
22  hand -- I don't know if I can just point at the camera,
23  but she extended her hand like this.
24     Q.  This is going to be reduced into a writing, into
25  written testimony.

Page 64

1      A.  Okay.
2      Q.  So you can do your best to just describe in
3  words.
4      A.  Okay.
5      Q.  I appreciate being able to see it.
6      A.  Okay.
7      Q.  But do the best you can do for the record,
8  please.
9      A.  So Ms. Leuthauser interrupted STSO Brionnes'
10  advisements.  And she pointed her index finger at my face
11  with her arm extended and elbow locked, and she said very
12  loudly, I want her out.  And then she put her arm down.
13         So STSO Brionnes looked at me and said, It's
14  okay.  I got it.  And I didn't say anything.  I just
15  left the room and shut the door behind me.
16     Q.  Okay.  Did you have any further interaction with
17  my client that day?
18     A.  No.
19     Q.  Have you had any further interaction with my
20  client since?
21     A.  No.
22     Q.  I'm going to take from you a description of the
23  other three TSA employees, starting with STSO Brionnes.
24         Can you describe her physically?
25     A.  I would say she's approximately my height.

Page 65

1  Maybe even a little bit shorter.  So between 5-foot and
2  5-foot-3.  She -- excuse me -- is Hispanic, has light
3  skin.  Light colored skin.  And I would describe her as
4  overweight.
5      TSO Jacobs is, I would say, about -- pretty --
6  very similar to me physically.  Sort of an average
7  build.  A little on the shorter side.  Probably about
8  the same height.  5-2, 5-3.  She's African-American and
9  has fairly dark skin.
10     Q.  Okay.  And TSO Griffin?
11     A.  She is African-American.  Maybe a slightly more
12  slender -- maybe slightly more slender build.  I don't
13  know.  I would say average height for a woman, maybe 5-5.
14     Q.  Okay.  And all three of these people are female.
15  Correct?
16     A.  Correct.
17     Q.  Can you just give me approximate ages for each?
18     A.  Oh, I think STSO Brionnes is probably in her
19  40s.  But I really don't know.  I mean --
20     Q.  That's fine.  Approximate is okay.
21     A.  Yeah.  I would say in her 40s.  TSO Jacobs is a
22  little younger, probably in her 20s.  Maybe late 20s.
23  And Melicia -- is it Griffin or Griffith?  Griffin?
24     Q.  I don't know.
25     A.  TSO Griffin, I don't know, jeez.  I don't know.

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

18 (Pages 66 to 69)

---

Page 66

1  She looks -- she looks great. I wouldn't be surprised if
2  she said she was 50, and I wouldn't be surprised if she
3  said she was 28. So I would say let's -- let's average,
4  she's in her 30s.
5      Q. Okay. And I don't think I actually got your
6  age. How old are you?
7      A. I'm 38. And I did provide that.
8      Q. Oh, thank you. Sorry.
9          Okay. Did you speak with your supervisor
10  about the incidents subsequently that day?
11      A. With my supervisor? No. I did not.
12      Q. I think I'm actually asking more about
13  STSO Brionnes. Did you speak with her?
14      A. Oh, yes. I -- when Ms. Leuthauser left -- so
15  when I exited the private screening room, I went about my
16  duties, my LTSO duties.
17          When Ms. Leuthauser exited the private
18  screening room, I asked -- and STSO Brionnes came out.
19  I asked her, I said, Is everything okay? And she said,
20  Yeah. She said, I was able to -- I was finally able to
21  finish the pat-down with no other alarms. But she kept
22  asking me, Have you ever been raped? Have you ever
23  been raped?
24          And I said, God, please tell me that you
25  didn't answer that question. What does that have to

---

Page 67

1  do, your experience, what does that have to do with
2  screening at all? Please tell me you did not answer
3  that question.
4          And she said, Yes, I did. I told her that I
5  hadn't. And she said, But she was -- she was really
6  upset, and it took a long time to finish. But I
7  finished it, and there were no other alarms or
8  anomalies.
9      Q. Okay. So to the best of your knowledge, there
10  were no items of any kind found on my client's person?
11      A. I didn't ask about any objects or items of any
12  kind. She said there were no longer -- no other alarms
13  or anomalies.
14      Q. But she did not mention finding any objects?
15      A. She didn't mention either way, other than she
16  didn't say there were any -- she said there were no other
17  alarms.
18      Q. So the supervisor cleared my client and allowed
19  her to leave the checkpoint; is that correct?
20      A. No. She cleared the alarms.
21      Q. Was my client not clear after the alarms were
22  cleared?
23      A. We're sort of getting into semantics here. I
24  would liken it to when you're in a courtroom and you're
25  not asking, Is my client innocent? You're asking, Are

---

Page 68

1  they guilty or not guilty?
2          So what we do at the airport is we clear
3  alarms. We do not clear the person. We clear the
4  alarm. So to the best of my knowledge, the alarm was
5  successfully cleared.
6      Q. Well, I understand and I appreciate your
7  analogy. A passenger who has not yet started the
8  screening process who is perhaps in line for the travel
9  document checker, has not been cleared. You would say
10  that's an accurate statement. Correct?
11      A. There is -- there are no -- TSA doesn't have
12  jurisdiction until they begin -- until the screening
13  process has begun.
14      Q. Okay. So --
15      A. So it doesn't -- if somebody approaches a
16  checkpoint, and they have not begun the screening
17  process, they can have whatever they have. There
18  aren't -- doesn't meet the definition of a prohibited
19  item until the screening process has begun.
20      Q. So a person who was just handed their ID and
21  their boarding pass to the travel document checker and
22  been told to continue on to put their baggage onto the
23  X-ray conveyor belt, is it fair to describe that person
24  as a passenger who has not been cleared?
25      A. There's -- well, like I -- like I said, I

---

Page 69

1  understand where you're driving at, and I understand that
2  it is semantics. We don't clear passengers, we clear
3  alarms. So there is no designation of this passenger is
4  clear or not clear. It's, Were the alarms clear or not
5  cleared?
6      Q. Is it true that my client was not allowed to
7  touch her personal belongings until the pat-down had been
8  concluded and all alarms had been concluded?
9      A. That is correct.
10      Q. And you would not use -- you would not say that
11  the passenger needs to wait until they are cleared in
12  order to touch their luggage? You would say that the
13  passenger must wait until all of their alarms are
14  cleared?
15      A. I don't know that I have ever had instance to
16  make that designation verbally to a passenger.
17      Q. If you saw a passenger standing about the
18  checkpoint, let's say very close to the AIT, just past
19  it, and you were unsure if this person was waiting for a
20  pat-down or not and you wanted to ask this person's
21  status, would it not be fair to ask if this person has
22  been cleared or still waiting? You would instead ask if
23  there is some kind of alarm pending?
24          MS. SMITH: I'll object to the form.
25  \\\

---

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

19 (Pages 70 to 73)

---

Page 70

BY MR. CORBETT:
1  Q.  I'll retract that.
2      My question is:  I'm -- maybe semantical, but
3  how does TSA refer to passengers who have passed
4  through security?
5      A.  They -- just a passenger.  I don't know that
6  there is any designation for a passenger who -- I don't
7  know -- I'm not aware of any instance where we're
8  describing a group of individuals as these are people who
9  are clear and people who are not.
10     It would be described more as where is their
11 location in the airport?  If they are on the secure
12 side, that means that their property and their person
13 have submitted to screening and all alarms were clear,
14 you know -- were cleared or there were not any alarms
15 present, and they have moved into the secure area of
16 the airport.
17    Q.  Okay.  Has a passenger ever filed a complaint
18 against you regarding your work with the TSA other than
19 my client?
20    A.  Not that I'm aware of.
21    Q.  When was the first time that you heard that a
22 complaint had been filed or an issue had been raised
23 about this pat-down after your speaking with
24 STSO Brionnes right after the pat-down had been

---

Page 71

completed?
1     A.  It was probably July 20-something.  It was after
2  I had transferred to a different airport.  And I was
3  asked by an LTSO, by a lead -- a lead to complete a
4  statement.
5     Q.  Okay.  So approximately one or two months later?
6     A.  Less than one month.  Or one month.  Yeah.
7  About one month later.
8     Q.  Is it fair to say that you have such a clear
9  recollection of this pat-down because it was unusual for
10 a client to start speaking of rape in the middle of their
11 pat-down?
12    A.  Yes.  That was unusual.  And I do think that
13 that has something to do with it marking in my memory.
14    Q.  Based on your training, is a TSA screener ever
15 allowed to press her hand between the labia of a
16 passenger during a pat-down search?
17    A.  The content of our training is SSI.
18          MR. CORBETT:  Ms. Smith?
19          MS. SMITH:  I'm sorry.  I -- you were
20 breaking up, and I didn't catch the whole entire
21 question.  I'd like to hear it again.
22          MR. CORBETT:  Certainly, I'll say it
23 again, and I'm trying to phrase this, Ms. Smith, in --
24          MS. SMITH:  Yeah.  I know.

---

Page 72

(Speaking Simultaneously.)
1          MR. CORBETT:  -- way as possible.
2  BY MR. CORBETT:
3     Q.  Based on your training, does TSA policy ever
4  allow a screener to press her fingers between the labia
5  of a passenger?
6          MS. SMITH:  Krista, can I -- are you
7  there?
8  I'm sorry.  I'm freezing.
9          MS. MAIZEL:  I am here.
10         MS. SMITH:  I just wasn't sure that --
11 I'm not sure if that's SSI.
12 Can you tell me if you find that that is?
13         MS. MAIZEL:  I believe it is because he
14 is asking about the contents of the training.
15         MS. SMITH:  Okay.  All right.  I'll
16 object on the ground of SSI and instruct her not to
17 answer.  There probably is a way to ask it.
18 BY MR. CORBETT:
19    Q.  Does TSA procedure ever allow for a body cavity
20 search?
21    A.  Again, you're asking me specific questions about
22 the standard operating procedure, which has been
23 designated as SSI.
24         MR. CORBETT:  Ms. Smith.

---

Page 73

MS. SMITH:  Same objection.
1          MR. CORBETT:  Ms. Smith, I'm fairly sure
2  that TSA publicly states that they do not conduct
3  searches in this manner.
4     I don't think that this is so intrusive as to
5  the TSA's methods as to become SSI.  Are you certain
6  that you want to take an objection here?
7          MS. SMITH:  Well, I'd like to confer with
8  Krista.  I definitely don't want to, you know, assert
9  something that shouldn't be.  So -- but you are asking
10 about the procedure, and I think that's part of the
11 trouble here.
12         MR. CORBETT:  Okay.  If we can take a
13 five-minute break now.
14    I'll just advise that the next question is
15 going to be as the same question but with strip searches
16 rather than body cavity searches.
17    So if you could content during that time.
18         MS. SMITH:  Yeah.  That would be nice.
19         MR. CORBETT:  We can reconvene at 11:20.
20 Does that work?
21         MS. SMITH:  Yes.  That's fine.
22         MR. CORBETT:  Thank you very much.
23         MS. SMITH:  Thank you.  We will take a
24 break.

---

Anita Serrano ~  January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

20 (Pages 74 to 77)

---

Page 74

1      (Brief Recess.)
2  BY MR. CORBETT:
3      Q.  Again, just a reminder, you're under oath from
4  before.  The question we left off with was -- I'm going
5  to modify it -- is a body cavity search ever a part of
6  TSA procedures?
7      A.  No.
8      Q.  Is a strip search, having a passenger remove
9  inner clothing, ever a part of TSA procedures?
10      A.  Inner clothing?  No.  Outerwear, perhaps.
11      Q.  Pants?
12      A.  No.
13      Q.  Okay.  So by outerwear, do you mean jackets and
14  sweaters?
15      A.  Jackets and sweaters.  Absolutely.
16      Q.  Okay.  I just had one follow-up question from
17  earlier.  Why did you choose to become a TSA screener?
18      A.  A big part of it was after I got out of the
19  Marine Corps, I really wanted a job where I felt a sense
20  of camaraderie, being a part of something bigger than
21  myself.  And, honestly, the benefits of government
22  employment, the health care benefits are excellent.
23      Q.  Did you find that camaraderie in the TSA?
24      A.  I did.
25      Q.  Just briefly, how long did you serve in the

---

Page 75

1  United States military?
2      A.  From 2006 to 2011.
3      Q.  Were you honorably discharged?
4      A.  I was.
5          MR. CORBETT:  Thank you.  I have no
6  further questions.
7          Ms. Smith, do you have any?
8          MS. SMITH:  Let me just take a brief
9  one-minute break.
10          MR. CORBETT:  Sure.
11          MS. SMITH:  Thank you.
12      (Brief Recess.)
13          MS. SMITH:  I don't have any questions
14  for you, Anita.
15          We will take the transcript, read and sign it.
16  And then, Krista, I think there's something special we
17  have to do with the transcript.  This is my first go at
18  it.
19          MS. MAIZEL:  Right.  Although
20  definitively -- I can't speak definitively as to
21  whether or not the transcript does or does not contain
22  sensitive security information, it's a matter of course
23  for the agency to submit transcripts for review.
24          There's a special way to handle SSI.  The most
25  important one right now is in a password-protected

---

Page 76

1  attachment to an e-mail.  Never in the text of an e-mail
2  and never without a password.
3          So to the extent we are circulating this, if we
4  could please use a password-protected PDF format, that
5  would be great.  And then I'll submit it for SSI review
6  and get it confirmed one way or the other that it does
7  or does not have SSI.
8          MR. CORBETT:  Okay.  Does the court
9  reporting company have the technical means to send in a
10  password-protected ZIP file or something along the
11  lines?
12          ZOOM HOST:  I believe so, and I'll
13  reconfirm that with my office manager.
14          MS. MAIZEL:  Thank you.  And I have sent
15  Ms. Smith a handling guideline sheet.  If anyone has
16  additional questions, I'm always available to discuss
17  as well.
18          MS. SMITH:  Thank you.
19      (The confidential remote videoconference
20      deposition concluded at 11:36 a.m.)
21              * * * * *
22
23
24
25

---

Page 77

1              CERTIFICATE OF DEPONENT
2  PAGE   LINE    CHANGE
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15          * * * * *
16      I, Anita Serrano, deponent herein, do hereby
    certify and declare under penalty of perjury the within and
17  foregoing transcription to be my remote videoconference
    deposition in said action; that I have read, corrected and
18  do hereby affix my signature to said deposition this _____
19  day of _____, 2021.
20      _____
21          Anita Serrano, Deponent
22
23
24
25

---

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

21 (Page 78)

Page 78

CERTIFICATE OF REPORTER

I, Cindy Magnussen, Certified Court Reporter,
State of Nevada, do hereby certify:

That I reported the confidential remote videoconference
deposition of Anita Serrano, commencing on Friday,
January 8, 2021, at 8:54 a.m.

That prior to being deposed, the witness was duly
sworn by me to testify to the truth.  That I thereafter
transcribed my said shorthand notes into typewriting and
that the typewritten transcript is a complete, true and
accurate transcription of my said shorthand notes.  That
prior to the conclusion of the proceedings, the reading and
signing was requested by the witness or a party.

I further certify that I am not a relative or
employee of counsel of any of the parties, nor a relative or
employee of the parties involved in said action, nor a
person financially interested in the action.

IN WITNESS WHEREOF, I have set my hand in my
office in the County of Clark, State of Nevada, this 21st
day of January, 2021.

_____

CINDY MAGNUSSEN, RDR, CCR No. 650

Anita Serrano ~ January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

Page 1

**A**

**a.m** 1:19 3:2 76:20 78:7
**abdomen** 35:19
**ability** 61:12
**able** 14:17 16:5 20:18 29:25 50:23 51:12 57:15 58:23 63:5 64:5 66:20,20
**Absolutely** 42:13 74:15
**access** 32:8,14,15 32:23
**accomplish** 55:18
**accurate** 68:10 78:12
**accusing** 14:4
**achieve** 61:15
**acknowledge** 3:6 44:2 54:13 59:7
**acknowledgement** 57:1
**acting** 46:24
**action** 77:17 78:17 78:18
**actual** 22:13
**additional** 76:16
**adjust** 54:14 56:21
**Administration** 2:16 6:5 17:14
**ADMINISTRA...** 1:8
**admission** 13:20
**advance** 14:9
**advanced** 9:23
**advise** 38:23 49:11 49:14 73:15
**advised** 38:2 40:24
**advisement** 54:2
**advisements** 37:7,9 37:11,20 38:14 49:21 50:24,25

52:7,15 53:7,8,11 53:17 54:6 60:2 62:3 63:4,16,20 64:10
**aeronautics** 28:15
**aerospace** 27:18
**affirmative** 37:14
**affirmed** 43:17,18 52:18
**affirming** 62:23
**affix** 77:17
**African-American** 65:8,11
**age** 4:24 66:6
**agency** 10:19 13:19 75:23
**ages** 65:17
**agreement** 3:10,12
**ahead** 36:23 51:20
**air** 48:10,12
**airport** 5:14 9:5 32:1,3 68:2 70:12 70:17 71:3
**aisleway** 45:11
**AIT** 33:22,24 34:1 34:15 35:4,6,18 37:18 40:19 41:17 42:15,20 53:18 69:18
**alarm** 34:19,22 35:6,8,8,19,20 36:4,6 37:10 41:15 42:1,16,20 49:24 52:4 63:6 63:17 68:4,4 69:23
**alarmed** 41:15 49:22 50:3 53:11 63:2,17
**alarms** 41:18 66:21 67:7,12,17,20,21 68:3 69:3,4,8,13 70:14,15

**All-American** 1:20 2:14
**allegations** 31:9
**alleged** 18:1
**allow** 72:5,20
**allowed** 11:6,19 14:7 67:18 69:6 71:16
**alternatively** 12:3
**AMERICA** 1:7
**analogy** 68:7
**anatomically** 59:22,25
**anatomy** 60:21
**Anita** 1:16 2:21 3:20 4:4 6:25 17:23 33:17 35:25 51:20 58:19 75:14 77:15,20 78:6
**annex** 32:1,4,9,13 32:16
**anomalies** 41:20 41:21 67:8,13
**anomaly** 34:12,13 34:15,19 35:2 36:5 37:10 39:15 39:17 40:24 41:1 41:4,12,15 42:24 43:6 49:23
**answer** 6:9,12,17 7:1,12,19,21 8:4 8:9 10:5,23 13:15 14:14 18:24 19:23 20:12,24 23:4 24:13 25:16 25:25 26:4 35:9 35:15,21 36:1,10 38:1,18 39:20 40:14 46:9,15 54:17 55:21 59:19 66:25 67:2 72:18

**answered** 8:7 10:21 15:9 62:23
**answering** 12:8
**answers** 16:6 37:13
**Anybody** 17:11
**anyway** 16:5 22:19
**apart** 54:16,25
**apologize** 23:6 31:15
**appearance** 33:11
**APPEARANCES** 2:1
**appeared** 20:1
**Appearing** 17:1
**applies** 20:14
**appreciate** 64:5 68:6
**approached** 33:21 36:12 38:12 62:25
**approaches** 68:15
**approximate** 33:12 65:17,20
**approximately** 8:17,21 26:24 29:1 46:19 48:1 58:12 64:25 71:6
**area** 34:17,19 36:5 37:11 42:23 48:5 48:6 50:3 53:12 53:12 57:19 58:23 62:17 63:2 63:17 70:16
**argument** 23:5,23
**Argumentative** 55:2
**arm** 64:11,12
**arrested** 28:8
**asked** 15:5,7,13,20 18:17 19:8,22 25:24 33:12 34:2 34:4 36:14,17,20 37:14,16 38:3,9

43:14,20,21 45:2 45:21,24 49:1 52:11,19 53:3,7 54:4,4,5,9,15,22 55:6,24 56:1,16 56:25 58:7 59:5,6 59:16 61:7 62:25 66:18,19 71:4
**asking** 11:9 20:16 36:4 37:4 46:8 51:24 66:12,22 67:25,25 72:15 72:22 73:10
**assert** 35:23 44:16 73:9
**asserting** 18:17,23 19:5
**assigned** 9:4 29:12
**assistance** 37:25 46:1 62:20
**Assistant** 2:9
**assuming** 45:7
**ATR** 33:22 37:18
**attachment** 76:1
**attempt** 54:14 57:1 59:5,7
**attempted** 50:24
**attempting** 22:25 62:2
**attorney** 2:9 7:21 17:13 18:4 21:8 21:23 25:22 30:9
**attorney-client** 11:10
**attorneys** 3:5
**August** 27:1,2
**authority** 44:13,15
**available** 10:1 34:3 37:17 38:10 76:16
**Avenue** 2:4
**average** 5:1,1,2,3,5 33:16 58:5,6,10

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

Page  2

58:11 65:6,13
66:3
**aviation** 28:16
**avoid** 15:23 16:14
**aware** 15:10 18:10
47:12 70:8,21

**B**

**B-r-i-o-n-n-e-s**
29:6
**bachelor's** 28:13
28:14
**back** 21:21 33:22
33:23 45:3,9,19
50:5,7,14,15,22
51:24 57:21 60:9
62:1,14 63:9
**background** 18:6
**baggage** 68:22
**bags** 33:4
**bakery** 48:22
**barely** 35:12
**barrier** 50:10
**based** 12:10,14
13:20 18:20,23
24:12 40:3,5
71:15 72:4
**basically** 22:1
**basis** 21:10
**began** 18:8 49:21
57:2,4 58:3,4
59:5 63:15
**begun** 68:13,16,19
**behalf** 6:4
**believe** 8:16 14:19
19:25 29:6 48:23
53:19 54:5 55:9
58:3 62:22,22
72:14 76:12
**belongings** 69:7
**belt** 62:5 68:23
**benefits** 74:21,22
**best** 31:21 47:7

53:6 58:14 64:2,7
67:9 68:4
**better** 18:7 23:3
24:1
**big** 74:18
**bigger** 74:20
**bin** 44:23,24
**bins** 45:1 48:22
**bit** 22:22 53:1
62:14 65:1
**boarding** 68:21
**body** 9:22 33:5
34:6 37:11 40:4,9
40:17,18,21,25
42:24 51:24
53:10 55:14
57:23 59:23
72:20 73:17 74:5
**Boulevard** 2:10
**box** 48:25
**break** 12:7 16:20
31:22 73:14,25
75:9
**breaking** 26:15
71:21
**breath** 19:21
**Brianna** 2:8 3:17
17:5
**brief** 16:25 24:22
74:1 75:8,12
**briefing** 22:21 23:8
23:10
**briefly** 5:24 74:25
**bring** 61:12
**Brionnes** 28:24
29:4,17 30:21
62:25 63:9,15
64:13,23 65:18
66:13,18 70:25
**Brionnes'** 29:7
64:9
**brought** 59:12 60:8
60:12

**build** 5:4 65:7,12
**built-in** 48:14
**burned** 27:13
**buttock** 57:19
58:23
**buttocks** 50:14
63:6

**C**

**C** 3:4 32:1,5,11,12
32:13,15,16,23
**California** 2:5
**call** 7:4 16:9 19:8
32:7,9,13 33:15
**call-in** 16:22
**called** 3:21 15:25
25:22 39:9 62:12
62:20
**calls** 6:6,25 10:4,19
39:19 40:13
**Cam** 2:18
**camaraderie** 74:20
74:23
**camera** 47:13
59:15 63:22
**cameras** 47:6,8
48:9
**captioned** 22:24
**care** 6:19 14:9
74:22
**case** 1:6 6:20 17:16
18:1,5 30:9,20
31:9 60:10
**cases** 15:16
**catch** 32:20 51:4
71:21
**categories** 51:14
**cause** 63:6
**caused** 20:3 39:23
**causes** 40:10
**cavity** 72:20 73:17
74:5
**CCR** 1:25 3:13

78:23
**ceiling** 47:9,13,14
47:16
**ceilings** 48:5,7
**cell** 44:5,19,23
**Center** 1:21
**certain** 25:10
34:19 36:5 37:10
73:6
**certainly** 15:25
30:12 35:4 71:23
**CERTIFICATE**
77:1 78:1
**Certification** 21:25
**Certified** 78:3
**certify** 77:16 78:4
78:15
**CFR** 13:8 18:3
**chance** 21:1
**change** 26:19 77:2
**changed** 48:23
**check** 15:14 18:6
57:10
**checker** 68:9,21
**checkpoint** 9:19
12:21 19:6 25:2
29:12 32:2,5,6,8
32:11,12,18,20
32:22,23 33:3
39:15,17 45:3,8,9
47:8 48:6 53:25
67:19 68:16
69:18
**Chocolate** 28:6
**choose** 74:17
**chose** 15:10
**chute** 44:5
**Cindy** 1:25 3:12
78:3,23
**circulate** 16:22
**circulating** 76:3
**civility** 14:5
**clarify** 7:2 38:4

53:5 55:4
**clarity** 40:18 60:21
**Clark** 78:20
**classroom** 7:16 8:7
8:16
**clawback** 22:1
**clear** 11:5 34:14
35:11 43:4,9
49:24 50:14,18
53:22 54:7 59:6
59:18,21 60:6,7
63:7,17 67:21
68:2,3,3 69:2,2,4
69:4,4 70:10,14
71:9
**cleared** 52:4 67:18
67:20,22 68:5,9
68:24 69:5,11,14
69:22 70:15
**clearly** 15:12 44:8
**clerk's** 22:3
**client** 14:6 15:14
16:12 17:18 21:7
29:14,15 33:9,20
35:17 36:12,16
36:19 37:4 38:23
39:1,4,8 41:6
43:10,12,14
44:18 45:4,14
46:18,24 47:2,4
49:11,17,19 52:8
53:2,22 54:16
55:4 57:9,25 58:5
59:1 61:20,23
62:7 63:12,20
64:17,20 67:18
67:21,25 69:6
70:20 71:11
**client's** 33:11
34:16,21 35:19
40:21,24 57:13
57:15 62:16
67:10

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

Page 3

**close** 29:25 44:8
69:18
**closed** 45:12,13
46:21 48:19
63:12
**clothing** 74:9,10
**Code** 13:8
**college** 28:10,12
**color** 5:9,11
**colored** 65:3
**come** 34:22 36:19
61:10
**comes** 7:10
**comfortable** 16:14
**coming** 44:4 61:17
**command** 44:6
**commands** 44:13
**commencing** 78:6
**Common** 29:20
**company** 27:19
76:9
**compel** 20:25
24:12
**competing** 37:22
**complaint** 31:5,8
51:14 70:18,23
**complaints** 51:9
**complete** 37:14
52:7 56:10 58:24
61:3,8 63:3 71:4
78:11
**completed** 29:17
71:1
**completely** 61:21
**complied** 15:7 16:1
**comply** 18:5 45:4
**Compound** 38:8
51:20
**comprehendible**
21:14
**concealed** 34:21,25
42:8,9,20
**concluded** 69:8,8

76:20
**conclusion** 78:13
**conduct** 25:9 33:5
33:7 39:3 42:19
43:1,5 73:3
**conducted** 25:11
42:4,15 53:9,24
58:2
**conducting** 9:19
52:11
**confer** 15:17 73:8
73:18
**confidential** 1:15
76:19 78:5
**confirmed** 76:6
**confused** 53:1
**connected** 32:19
**consent** 3:11,18
**consents** 3:16
**consider** 58:9,11
**consisted** 52:6
**constitute** 36:6
**constituted** 12:3
**constitutes** 5:3
11:21 12:12 19:7
42:6
**contact** 62:17
**contacted** 22:2
31:2
**contain** 75:21
**contemplates** 6:7
10:13,20
**content** 25:20
71:18
**contents** 72:15
**continue** 16:4
68:22
**contour** 57:23
**contractor** 27:18
**conversations** 15:2
15:3
**conveyor** 68:23
**Corbett** 2:3,4,22

3:15,15,23 4:2
6:17 7:2,7,11,20
8:2,9,12 10:9,15
11:1,1,11,17 13:14
13:19,25 15:12
16:2,17,23 17:8,9
17:10 18:5,9 19:2
19:3,16,24 21:13
22:22 23:3,6,9,18
23:21 24:5,14,17
24:24 25:15 26:2
26:8,10,17,18
35:11,16,22
36:11,24 37:2
38:21 39:21
40:15 41:11,16
46:10,11,16 52:1
55:3 58:22 70:1
71:19,23 72:2,3
72:19,25 73:2,13
73:20,23 74:2
75:5,10 76:8
**Corps** 74:19
**correct** 4:5 5:14
7:5,6 8:22,23
9:20,21 10:11,14
15:4 18:18 19:17
29:20,21 31:23
31:24 32:17
40:21,22 41:13
43:13 45:16
46:17,20,22 49:6
49:9 52:3 54:1
56:14,17,18 57:6
57:10,11 58:1,2
60:20 61:4,5,21
61:22 62:9,18,19
63:13 65:15,16
67:19 68:10 69:9
**corrected** 77:17
**correctly** 4:4 9:8
**counsel** 3:8,10 7:8
13:19 14:2,2,11

19:12,25,25
35:12 78:16
**County** 78:20
**couple** 9:14 21:18
**course** 22:5 24:7
55:14 75:22
**court** 1:1,20 2:14
3:6,12,23,25
21:10 23:22
30:23,25 31:9
58:16 76:8 78:3
**courtroom** 4:12
67:24
**cover** 25:19,25
26:3,11
**covered** 20:16
**created** 20:22
**creates** 13:3
**crossed** 45:20
**cut** 9:13
**Cynthia** 2:14

_____
**D**
**D** 3:4
**dark** 5:7,10 65:9
**date** 5:17,18 32:25
**day** 31:19,22 64:17
66:10 77:18
78:21
**days** 8:14
**deal** 9:22
**December** 5:20
21:22 23:16 27:8
27:8
**decide** 24:8 39:24
**decided** 41:3
**deciding** 22:19
**declare** 77:16
**deduce** 37:19
**deduced** 38:12
**deep** 18:14
**defendant** 31:10
**Defendants** 1:9 2:7

17:6
**defer** 15:1
**defiant** 44:16
**defines** 55:12
**definitely** 73:9
**definition** 68:18
**definitively** 75:20
75:20
**degree** 28:13
**deliver** 50:25
**Department** 14:3
**deponent** 3:8,13
19:9 20:1,12 77:1
77:15,20
**depose** 16:12
**deposed** 78:8
**deposition** 1:16
3:11 4:6 14:6,12
14:24 16:4 17:23
18:8 19:4 20:11
21:4 28:23 29:15
76:20 77:17,17
78:6
**describe** 4:20 5:4
5:24 7:14 33:11
47:20 49:25 58:8
64:2,24 65:3
68:23
**described** 70:11
**describing** 70:9
**description** 52:10
64:22
**designate** 11:6,20
11:23 12:1,7,15
14:20
**designated** 36:8
72:24
**designation** 13:3
69:3,16 70:7
**despite** 14:8
**detail** 13:6
**detect** 35:6,18
**detected** 34:15

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

Page  4

determination
12:2
determine 13:11
13:18,21 14:13
14:14,17
determined 14:21
determining 12:11
14:18 20:5
devices 52:12,22
52:23 53:13
dictated 55:8
difference 38:15
39:6,10
different 14:22
51:13 71:3
direct 29:9,11
directly 10:6 36:7
38:17 39:11 56:8
directs 43:12
discharged 75:3
disclose 6:10 39:10
discloses 7:25
disclosing 6:13
disclosure 6:7,15
10:13,20,24
discontinued 62:3
discuss 16:15
76:16
discussed 6:21
10:10 15:5
discussion 18:9
30:16
distinguished
14:21
District 1:1,2
21:24
dividers 47:18
docket 21:19 22:3
document 31:4,8
31:11 68:9,21
documents 22:24
30:19,23,25
doing 19:20 49:23

50:1 51:11
door 45:12,13
46:21 48:14,16
48:19 62:6 63:10
63:12 64:15
Drive 1:21
driving 69:1
dual 28:15
due 24:2
duly 3:21 78:8
duration 5:24
duties 32:25 66:16
66:16

―――――――― E ――――――――
E 3:4,4
e-mail 15:15,18,21
15:22 76:1,1
earlier 54:15 74:17
effective 35:5
efficiently 24:15
either 11:14 26:16
67:15
elbow 64:11
electronics 22:5
emergency 21:20
24:8
employee 5:15
78:16,17
employees 19:6
30:11 63:11
64:23
employment 5:17
8:15 21:25 27:7,9
27:21 74:22
entered 46:18
entire 60:7 71:21
entitled 16:11
21:24 31:5
environmental
27:17
equipment 33:7
equivalent 4:11

Especially 16:13
Esq 2:3,8,15
essentially 19:4
20:6 46:24
Ethel 28:6
event 6:25
eventually 14:7
52:7,9
evidence 4:13
evidentiary 23:10
exact 5:18
examination 2:19
2:22 4:1 20:11
examined 3:22
example 18:12
excellent 74:22
excuse 65:2
EXHIBITS 2:23
exited 66:15,17
exiting 43:21
expect 13:23
experience 39:14
41:18 42:1 67:1
expert 41:19
explain 10:15
61:11 62:3
exposed 39:13
extended 63:23
64:11
extent 6:6,10 7:23
10:3,12 76:3
exterior 47:24

―――――――― F ――――――――
face 64:10
facing 57:25
fact 14:8
Factory 28:6
failing 44:7,12
failure 44:11
fair 5:6,8 33:14
39:3,5 41:17 48:4
68:23 69:21 71:9

fairly 65:9 73:2
faith 21:10
false 41:18
familiar 32:3,4
far 26:4 47:12 56:4
federal 13:2,5,8
17:5
feel 6:14 13:17
52:12
feeling 27:13
feet 48:3,9,12,13
49:11,15 54:10
54:11,16,18,19
54:24 55:5,13
56:14 57:5
felt 74:19
female 4:23 30:2,5
30:7 34:3 38:10
62:12,24 65:14
Ferenbach 2:18
17:2,3,7,10,15,18
17:21 18:13,19
18:22 19:1,13,18
20:8 21:17 23:2,7
23:12,25 24:6,18
file 20:25 22:9
23:19 76:10
filed 23:15 70:18
70:23
filing 14:3
finally 66:20
financially 78:18
find 41:7 42:16,20
43:2,7 48:21
72:13 74:23
finding 42:6,7,8
67:14
fine 16:18 21:15
24:1 65:20 73:22
finger 64:10
fingers 50:6 72:5
fingertips 50:13
57:20

finish 28:12 66:21
67:6
finished 54:2 59:19
67:7
first 3:21 4:22 9:14
14:16,16 29:3,7
29:22 31:2 33:20
36:13 50:24
51:14 56:22
57:16 70:22
75:17
five-minute 73:14
flag 22:18
flat 57:20
flight 32:20
flights 32:6
floor 48:7 49:3,7
49:12
fly 32:7
flying 39:14
follow 15:13 31:18
40:6 41:2 45:2
follow-up 15:18
74:16
followed 45:5
following 57:23
follows 3:22
footprint 55:5
footprints 49:2,4
49:12 54:8,12
55:8,10,15,20,23
55:24 56:1,2,4,5
56:9,13,15,19,20
57:2,5
foregoing 77:16
Forgive 15:15
form 13:12 25:13
38:7 41:9 51:18
55:2 58:18 69:24
format 76:4
formulate 8:6
forward 16:2
found 42:4,5,23

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

57:12 67:10
**foundation** 36:22
**four** 8:17,19 47:15
47:19
**frame** 47:22
**framed** 15:22
48:16
**free** 6:14 45:22,24
**freezing** 72:9
**frequently** 41:17
**fresh** 48:25
**Friday** 1:18 24:19
78:6
**front** 4:12 16:13
33:22 47:4 50:5,9
50:22 61:10,17
**frosted** 47:22
48:16,17
**frustrating** 57:7
**full** 10:18
**functions** 9:4
**further** 15:18,24
54:25 59:1 63:6
64:16,19 75:6
78:15

**G**

**G** 3:4
**Galvan** 2:14
**gate** 32:21
**gates** 32:15,19
**gender** 4:22
**general** 7:15 9:2
30:15
**genital** 62:17
**genitals** 60:22
**gestured** 44:24
**getting** 18:14 49:9
51:10,10 67:23
**give** 20:25 44:13
65:17
**given** 5:21 20:6
37:8

**giving** 63:15
**glass** 47:22 48:16
**gloves** 48:23,24,25
**go** 12:19 16:20
32:19 36:23
38:14,24 39:1
43:12 50:21 51:5
51:20 53:23
59:14 60:1,7
62:14 75:17
**goal** 61:10
**God** 66:24
**goes** 50:20 60:3
**going** 4:19 6:5,22
8:2,3 14:12 16:4
20:10,18,20 21:7
21:11 22:19 23:3
24:12 35:23
49:23 50:1,4,5,7
50:12,13,15 52:6
63:24 64:22
73:16 74:4
**good** 3:17,24 21:10
24:19,20
**government** 20:15
21:1 22:9 74:21
**governs** 20:11
**grabbed** 44:18
48:25 62:2,4
**grabbing** 62:11
**great** 4:6,17 13:19
24:6 31:14 66:1
76:5
**Griffin** 53:19
65:10,23,23,25
**Griffin-something**
53:21
**Griffith** 65:23
**groin** 34:12,13,14
34:17,22 35:7,19
36:6 40:23 41:1,4
42:1,15,20 43:2,6
50:3,16 53:12

59:11 63:2,17
**ground** 49:4 72:17
**grounds** 36:10
**group** 46:21 47:19
70:9
**guess** 17:19 22:15
22:17 23:14
33:22 47:23 48:3
52:22 53:17
60:12
**guideline** 76:15
**guilty** 68:1,1

**H**

**hair** 5:9,11
**half** 27:2 42:3
**halfway** 59:11
**hallway** 32:9,10,14
**hand** 50:8,19,20
51:3 59:9,9,10,12
59:21 60:2,8,13
61:12 63:22,23
71:16 78:19
**handed** 68:20
**handle** 75:24
**handling** 76:15
**hands** 50:14,15,21
57:21
**happened** 5:14
27:10 44:1,19,25
48:18 49:20 51:1
54:3 56:24 57:18
59:4 61:24 62:21
63:14
**happens** 19:5
39:15
**health** 27:17 28:16
74:22
**hear** 11:14 13:24
35:12 44:9 51:8
58:16 71:22
**heard** 29:4 36:2
37:23 70:22

**hearing** 20:17 21:2
22:12 23:11 24:9
24:10 37:22
51:13 61:2
**height** 33:12 58:5,6
58:10,11 64:25
65:8,13
**held** 28:4
**Hello** 3:15
**help** 26:16
**helpful** 50:11
**Hi** 19:3 36:14
**hiding** 51:22
**high** 48:4,7
**higher** 62:15
**hip** 50:19 59:9,10
**Hispanic** 65:2
**hmm** 55:9
**hold** 6:15 19:13,13
19:19,19 21:21
24:10
**Hollywood** 2:5
**honestly** 62:22
74:21
**Honor** 17:9,12,17
17:25 19:3 21:13
22:22 23:6,21
24:5,17
**honorably** 75:3
**hopefully** 31:7
**hoping** 59:25
**Host** 2:14 3:5
76:12
**hyphenated** 53:20

**I**

**ID** 68:20
**idea** 32:11
**Identical** 53:11
**identified** 4:19
**ignoring** 44:6,10
**image** 34:18,24
**imaging** 9:23

**immediately** 28:4
**impede** 6:23
**important** 75:25
**improper** 18:2
**improperly** 20:23
**in-house** 14:11
**inappropriate**
15:21 16:12
**incident** 5:13 41:21
**incidents** 66:10
**include** 9:11,15,25
**included** 7:16 9:9
**Including** 9:7
**incorporated** 9:24
**index** 64:10
**indicate** 38:2 55:20
55:23
**indicated** 45:23
55:23
**indicates** 34:19
**indicating** 41:14
**individuals** 70:9
**information** 4:13
6:8,11,14,16,19
7:13 8:1 10:4,14
10:17,21,24 11:3
11:7,10,20,23
12:3 13:7,22 18:4
18:21 19:7 37:8
41:4 75:22
**informed** 16:1
**inner** 74:9,10
**innocent** 67:25
**inside** 48:18 50:19
51:24 59:12 60:2
60:13 61:12 62:8
**Inspector** 30:15
**instance** 69:15
70:8
**instruct** 6:9 20:12
35:15 36:10
39:20 40:13 46:9
46:15 72:17
**instructed** 19:23

20:2,24
**instructing** 7:3
18:24 21:6,10
**instructions** 24:12
**intended** 39:3,7,9
**interacting** 29:13
33:9
**interaction** 37:3
64:16,19
**interested** 78:18
**International** 32:1
**interrupted** 51:1
64:9
**interrupting** 51:2
**interruption** 57:16
**interviewed** 30:15
**intricacies** 15:17
**intrusive** 73:5
**investigators** 30:13
**involved** 21:6
78:17
**involving** 18:1
**issue** 6:18 14:9
15:5 19:3 22:1,23
70:23
**issues** 14:23
**item** 41:22 42:16
42:20,23 43:2
68:19
**items** 42:9,10
67:10,11
**iterated** 53:8

**J**
**jackets** 74:13,15
**Jacobs** 28:25 29:19
30:2,22 45:20
46:18,23 61:19
62:1,7 65:5,21
**Jacobs'** 29:22
**January** 1:18 3:1
78:7,21
**jeez** 65:25

**job** 7:22 8:24 12:19
26:19,22 27:12
27:14 28:2,4
31:25 32:25
74:19
**join** 45:17
**Jonathan** 2:3,4
3:15 15:4 17:8
**judge** 2:18 4:12 8:4
17:2,3,7,10,15,18
17:21 18:13,19
18:22 19:1,13,18
20:8 21:17 22:13
23:2,7,12,25 24:6
24:18
**July** 29:2 30:15
71:2
**June** 5:15 27:3
29:9 31:14,25
33:1
**jurisdiction** 68:12
**jury** 4:12
**Justice** 14:3

**K**
**kept** 66:21
**kind** 5:22 35:8
47:18 48:15 49:3
51:13 67:10,12
69:23
**knee** 50:21 58:3
59:11 60:9 61:16
**knees** 50:5 63:18
**knew** 16:13
**know** 5:3 7:23 15:1
18:10,13 19:19
20:23 21:9,25
22:8,9,18 23:2
24:11,14,14 29:7
29:22 32:13
41:19 42:6 43:17
44:4,14 47:11,23
48:13 52:20

53:16,20 61:14
63:16,22 65:13
65:19,24,25,25
69:15 70:6,8,15
71:25 73:9
**knowledge** 40:1
47:7 48:8 52:17
53:6 67:9 68:4
**known** 9:23
**Krista** 2:15 6:3,4
6:24 17:13 18:6
72:7 73:9 75:16

**L**
**labia** 62:17 71:16
72:5
**Lacks** 36:21
**laid** 40:5
**lane** 34:4
**lanes** 45:10
**language** 44:9
50:10
**large** 27:18
**Las** 1:22 2:10,11
3:1 28:7
**late** 65:22
**law** 2:4 16:7
**lawyers** 30:23
**lead** 26:23 71:4,4
**leads** 32:10
**lean** 11:15 59:16
**leaned** 59:14 61:7
**learn** 9:22
**learned** 9:18 22:13
**leave** 67:19
**leaving** 62:5,7,10
**left** 12:12 59:9,10
59:10 62:5 64:15
66:14 74:4
**leg** 60:5,15 61:9
**legal** 12:25
**legs** 50:18,22 54:7
59:6,13,18 60:11

60:16 61:11 63:7
**length** 7:15
**let's** 21:17,20
22:16 35:6 42:10
60:1 66:3,3 69:18
**Leuthauser** 1:4
29:16 49:1 64:9
66:14,17
**liberty** 55:17
**lid** 47:14
**light** 5:6 65:2,3
**liken** 67:24
**line** 16:18 17:4,11
68:8 77:2
**lines** 76:11
**little** 18:6,14 24:1
53:1 62:14 65:1,7
65:22
**live** 27:22,23 28:20
**local** 14:2,4
**located** 27:20 45:3
**location** 31:25
32:24 70:12
**locked** 64:11
**long** 7:18,21 8:4,17
20:22 21:18 32:8
32:14 48:21 63:4
67:6 74:25
**longer** 67:12
**look** 8:2 16:2 22:10
24:11
**looked** 61:25 64:13
**looks** 21:22 66:1,1
**lot** 20:17 23:3,10
**loudly** 64:12
**lower** 35:19
**LTSO** 66:16 71:4
**luggage** 69:12

**M**
**M** 28:6
**M-i-c-h-e-l-l-i-n**
29:24

**machine** 33:24
34:1,15 35:6
38:13 43:21 51:6
53:10
**magistrate** 2:18
16:10,15,18
**Magnussen** 1:25
3:13 78:3,23
**Mahan** 22:13
**Maizel** 2:15 6:2,3,4
7:6,23 8:6,10
10:3,12,18 13:24
14:15 17:12,13
17:16,17,20
19:24 21:5 24:21
31:2 72:10,14
75:19 76:14
**majority** 42:14,18
42:23
**making** 12:2
**male** 62:23
**manage** 24:15
**manager** 76:13
**managerial** 12:22
**manner** 73:4
**Marine** 74:19
**marking** 71:14
**married** 28:18
**mat** 49:2,3,7,12,19
54:8 55:5,11
56:13
**material** 11:6
**matter** 5:25 7:15
9:9 75:22
**McCarran** 32:1,3
**mean** 15:22 30:6
34:15 59:14,14
65:19 74:13
**means** 34:18 70:13
76:9
**medical** 52:12,22
52:23 53:13
**medium** 5:10

Anita Serrano  ~   January 8, 2021
\* \* \* Confidential Remote Videoconference Deposition \* \* \*

meet 59:22,23 60:4
 60:7 68:18
meets 50:20 60:3,5
 61:13
Melicia 53:19
 65:23
memorandum
 21:20,23
memory 71:14
mention 67:14,15
mentioned 6:22
 29:3,19 30:21
 54:6
met 59:12 60:14
metal 47:22 48:16
methods 73:6
Michele 1:4 29:16
Michellin 29:23
 45:20
middle 5:10 71:11
military 75:1
mind 23:5
minors 28:16
miracles 22:4
modify 74:5
month 5:18 71:7,7
 71:8
months 8:21 71:6
morning 3:17
motion 14:4 16:3
 20:25 21:20 22:8
 22:14,14,16,19
 22:24 23:8,13,15
 23:17,20,22,24
 24:8,12 50:6,10
 50:15,17 57:22
 57:23
mounted 47:8,13
 48:9
mouth 52:5
move 54:24 55:22
moved 70:16
moving 59:21

multiple 50:25

**N**

N 3:4
N-i-l-d-a 29:8
name 3:11 4:4
 17:12 29:3,5,7,19
 29:22 53:19,20
narrow 60:16 63:8
narrower 56:14
 57:5
nature 30:16
near 45:7
necessary 20:13
 57:16
necessitates 10:16
need 10:15 14:25
 15:17 20:24 21:2
 22:21 23:7 35:23
 51:7 55:13 61:12
 62:12,24
needed 37:24 54:7
 54:16
needs 22:20 25:21
 52:4 69:11
negative 11:11
 52:25
Nevada 1:2,22
 2:11 3:1 21:24
 78:4,20
never 47:2 54:19
 54:20 62:15,16
 76:1,2
new 27:14
nice 73:19
night 14:3
Nilda 29:8
North 1:21 2:4
note 7:8,8
notes 78:10,12
notice 22:24 23:11
number 3:13 16:10
 16:21,22 22:15

 23:13,19,20,22
 51:9 56:25

**O**

O 3:4
o'clock 20:17
oath 4:10 25:1 74:3
object 6:2,6 13:12
 35:10,14 36:9,21
 38:7 39:19 40:12
 41:9 43:7,8 46:14
 51:18 69:24
 72:17
objected 58:18
objecting 6:24 11:8
 35:12
objection 7:8,25
 10:3 14:1 25:13
 25:23 26:5 46:6
 51:15,21 58:17
 73:1,7
objections 6:22
 59:1
objects 42:8 67:11
 67:14
obligations 21:9
obstruction 14:1
obvious 4:21
obviously 52:16
occasion 59:24
occupational 28:16
offered 2:24 51:11
offhand 31:1
office 2:4 15:16
 22:3 30:14 76:13
 78:20
officer 1:8 9:1,3
 12:21 21:9 26:23
 30:6,7 37:14
 55:17
officers 12:11,15
 40:6
oh 22:14 32:10

 65:18 66:8,14
okay 4:3,9 5:6,11
 5:13,19 7:18 8:18
 8:21 9:8,25 12:17
 12:25 13:10,14
 16:19,23 17:4,21
 18:11,19 19:18
 23:25 24:6,18
 25:7,19,21 26:8
 26:14 27:24 28:8
 29:13 32:15 33:3
 34:20 35:22 36:9
 39:12 43:4 44:12
 44:18,25 45:6,14
 48:1 49:3 51:13
 54:2 56:6,12,16
 58:21 60:10,25
 61:19,23 62:7,14
 63:8,11 64:1,4,6
 64:14,16 65:10
 65:14,20 66:5,9
 66:19 67:9 68:14
 70:18 71:6 72:16
 73:13 74:13,16
 76:8
old 66:6
on-the-job 7:17 8:8
 8:19
once 32:22 48:18
 54:24
one's 54:24,24
one-minute 75:9
oOo- 3:3
open 47:15,15,17
 62:6
opened 45:12
openly 44:16
operate 33:5
operating 10:8
 12:23 36:8 72:23
operations 33:8
operator 53:18
oppose 23:23

opposition 23:19
order 18:3 49:24
 50:18 54:7,24
 56:10 60:7 63:17
 69:12
ordered 22:3
ordinary 24:2,7
 57:12
original 22:16
 28:25 31:1
originally 37:24
outerwear 74:10
 74:13
output 40:9
outside 37:18
overlapping 57:22
overweight 65:4

**P**

P 3:4
PAGE 2:20 77:2
painful 52:20,24
 53:14
pair 48:25
panels 47:24
pantomime 50:9
 50:11 52:10
 61:11,14
pantomiming 50:8
pants 57:22 74:11
papers 22:11
part 4:15 12:15
 20:4 37:11,20
 55:10 59:22,24
 60:22 61:3 62:15
 73:11 74:5,9,18
 74:20
participate 46:23
participating 3:5
particular 39:23
 60:10
particularly 35:5
parties 7:9 17:1

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

Page  8

22:14,17,20,25
  23:20 78:16,17
**partner** 28:20
**parts** 6:13 12:9
**Partway** 63:20
**party** 23:13 78:14
**pass** 68:21
**passed** 70:4
**passenger** 9:6,7
  10:2 33:2 34:5
  37:4,13,24 38:5
  38:19 43:15 49:9
  51:2 52:18 61:17
  63:1 68:7,24 69:3
  69:11,13,16,17
  70:6,7,18 71:17
  72:6 74:8
**passengers** 9:10
  19:10 25:3 69:2
  70:4
**password** 76:2
**password-protec...**
  75:25 76:4,10
**pat-down** 18:2
  29:17 37:15 39:4
  39:7,7,9,10,14,16
  39:24,25 40:2,2
  40:10,11 41:3,8
  42:4,15,19 43:1,5
  43:6 49:10 51:23
  52:6,11 53:24
  54:10,20 55:19
  56:10,23 57:2,4
  58:4 61:3,25 62:4
  63:3,5 66:21 69:7
  69:20 70:24,25
  71:10,12,17
**pat-downs** 9:12,16
  9:19 33:5 41:25
  49:8
**paths** 45:21
**patted** 63:18
**patting** 50:4 53:12

**pay** 14:6,7
**PDF** 76:4
**penalty** 77:16
**pending** 69:23
**people** 12:5,13
  55:14,15 65:14
  70:9,10
**percent** 42:25 43:5
**perfectly** 21:14
  53:22
**perform** 9:4 39:7,9
  49:10
**perjury** 77:16
**permanent** 47:19
**persisted** 52:5
**person** 4:19 20:12
  34:16 37:7,9,17
  41:7 42:8,9,21
  67:10 68:3,20,23
  69:19,21 70:13
  78:18
**person's** 55:12
  69:20
**personal** 69:7
**personally** 11:23
**pertaining** 30:19
**pessimistic** 16:5
**phone** 19:20 20:19
  44:5,19,23
**phrase** 71:24
**physically** 3:7
  64:24 65:6
**pick** 43:23 44:21
**picked** 44:5 45:1
**pinching** 50:6
**place** 22:6 49:11
  50:18 54:7,10,11
**placed** 51:24 55:13
  59:9
**plain** 44:9
**plaintiff** 1:5,17 2:2
  3:16 17:9 31:10
**plane** 51:4

**please** 3:11 6:3,14
  6:15 7:8 12:8
  17:4 37:1 42:12
  54:10 59:17 64:8
  66:24 67:2 76:4
**plexi** 48:17
**point** 30:11 43:21
  45:17 48:24 49:9
  49:14 52:14 54:6
  54:18 55:11,16
  56:5 57:25 60:6
  60:21 61:2,3,19
  62:4,16 63:22
**pointed** 64:10
**policies** 31:22
**policing** 10:23
**policy** 46:12 72:4
**portion** 52:10
**position** 12:22
  20:15 55:18
**positioning** 56:10
**possible** 24:16 72:2
**potentially** 23:10
**practice** 16:3
**prepare** 28:22
**present** 2:3,9,13,17
  3:7 16:15 41:15
  70:16
**preserve** 20:13
**press** 71:16 72:5
**pressed** 60:12
**pretty** 19:5 32:3
  65:5
**prior** 28:4 78:8,13
**private** 10:1,11
  19:11 25:2,7,9,11
  25:17 26:12 30:6
  34:3 36:15,17,20
  37:5,12,15,17,21
  38:1,3,5,10,15,16
  38:19,24 39:1
  43:11,12,15 45:2
  45:6,20,25 46:1

46:12,19 47:6,10
  47:12,16 52:15
  52:17,23 53:2,3,4
  53:7,14,23 56:22
  62:5,13,24 63:10
  66:15,17
**privilege** 18:17,23
  20:13,16 21:11
  25:21 35:23
**privileged** 11:10
**privy** 15:2
**probably** 24:10
  65:7,18,22 71:2
  72:18
**problem** 8:3 17:22
  20:9
**procedure** 9:18
  15:7 16:1,13
  18:10 36:8 46:4,8
  55:10,12 72:20
  72:23 73:11
**procedures** 10:8
  12:23 15:13 40:5
  41:2 74:6,9
**proceed** 3:23,24
  7:1 13:23 14:12
  15:10 56:23
**proceeding** 3:6,7,9
  4:10 51:10
**proceedings** 24:23
  78:13
**proceeds** 14:24
**process** 51:10,22
  68:8,13,17,19
**produce** 35:1
  41:21
**produced** 34:18
  36:5
**produces** 34:24
  42:24
**professional** 28:15
**professionalism**
  14:5

**prohibited** 41:21
  42:9,10,16 68:18
**promotion** 26:25
**pronouncing** 4:4
**proper** 9:18 55:9
  63:3
**property** 33:2
  43:20,22 44:3
  48:20 70:13
**proposed** 51:16
**provide** 4:13 16:7
  49:21 66:7
**provided** 53:17
**public** 37:8
**publicly** 73:3
**pull** 16:10,21
**purpose** 25:5,6,7
  49:7 62:10
**pushed** 47:24
**put** 13:5 23:23
  40:4 47:19 48:22
  51:6 63:21 64:12
  68:22

---

**Q**

**qualified** 13:11,18
**question** 6:12,13
  6:25 7:12,14,24
  8:11,13 10:19
  11:9,11,18,22
  12:7,9,17,19
  13:13 14:8,11,16
  14:16 15:21
  18:11 19:8,14,15
  19:16,22 20:7
  23:4 26:2 35:5,24
  35:25 36:4 37:1
  38:2,18 40:7
  41:10 42:12
  51:19 55:21
  66:25 67:3 70:3
  71:22 73:15,16
  74:4,16

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

questions 4:21
  6:23 8:6 12:23
  15:24 18:16
  20:16,19,21,23
  21:12 31:15
  52:22 72:22 75:6
  75:13 76:16
quick 58:19
quite 45:7
quote 15:15

**R**

R 3:4
radio 34:2 36:16
  37:16 38:4,9 62:2
  62:4,11,12,20
raised 41:13 63:21
  70:23
range 20:21
rape 71:11
raped 61:18,24
  66:22,23
rate 41:20
RDR 1:25 78:23
reach 59:24,25
reached 59:23
  62:15
reaching 60:13
read 13:2,5,9 28:24
  28:25 31:4 75:15
  77:17
reading 78:13
real 4:11 58:19
really 11:14 13:22
  44:17 65:19 67:5
  74:19
reason 27:12 42:4
  50:11
reasonable 37:19
reasons 20:14
recall 14:15,17
  45:13 58:15
receive 26:24

received 15:18
  38:14 41:14
receives 37:7,9
Recess 16:25 24:22
  74:1 75:12
recollection 31:21
  71:10
reconfirm 76:13
reconvene 73:20
record 3:12 4:18
  7:7 14:1,10 16:20
  17:16 20:22 21:8
  34:14 64:7
redacted 28:25
  30:22
reduced 63:24
refer 70:4
reference 49:9
referred 10:7
  22:13 23:14
referring 10:22
  40:19
refused 26:4 44:1
refusing 63:2
regarding 9:12,15
  10:1 12:23 13:9
  14:8 25:17 53:1
  60:21 70:19
regular 32:11
regulations 13:5,8
relation 55:13
relative 78:15,16
release 10:16
remained 61:20
remember 5:18
  33:9 49:17
remind 4:9 25:1
reminder 74:3
remote 1:16 3:10
  76:19 77:16 78:5
remotely 1:25 3:9
  3:14
remove 74:8

repeat 7:14 8:13
  9:13 36:25 40:8
  42:11 49:25
  50:22
repetitive 31:16
rephrase 8:11
replied 34:4 38:11
  52:21
reply 21:1 22:9
  24:7 44:2
reported 1:25 78:5
reporter 3:6,12,24
  3:25 58:16 78:1,3
Reporters 1:20
  2:14
reporting 3:8 76:9
representative
  17:19 21:7
request 21:24
  37:12 43:11 44:2
  44:3 54:13 56:3,4
  57:1 59:7
requested 37:5,25
  38:5,16,19 43:15
  52:18 78:14
requesting 18:4
require 46:4 55:19
required 10:1 16:6
  16:7 38:15,24
  39:1 40:10 41:3
  53:4,23 55:18
requires 25:10
requiring 14:5
research 12:20
reserve 7:24
residence 27:21
resigned 27:9,11
resigning 27:12
resistance 50:20
  59:13,22,23 60:3
  60:4,8,14,14
  61:13
resolution 39:4,6

39:14,25 40:2,11
resolved 8:3 39:17
  41:20
resolving 12:19
respect 36:1 44:13
respond 20:3 21:1
response 6:6,10
  10:4,13,18 22:8
  23:16 61:9
responsible 12:5
responsive 40:7
rest 8:18 55:13
restaurant 48:22
restrictions 10:23
result 40:24 41:25
  42:15,19 43:1,6
results 34:6,9 40:3
  40:17,20 41:12
  41:14,17
Resumed 24:23
retract 70:2
reveal 20:2
review 75:23 76:5
reviewed 30:19,25
  31:12
reviewing 7:13
right 4:19 16:24
  17:15,21,22
  18:21,22 19:1,18
  19:21 21:21 23:1
  23:12 26:2 29:4
  33:6 36:2 39:18
  54:25 59:10 62:1
  70:25 72:16
  75:19,25
role 9:2 29:13 30:4
rollers 44:5
room 3:7 10:1,11
  14:25 19:11 25:2
  25:5,8,11,25
  26:12 30:6 38:1,3
  38:24 39:1 43:11
  43:12,15 45:2,7

45:14,20 46:13
  46:19 47:6,10,12
  47:15,16,17 48:2
  53:23 56:22 62:5
  62:10,13,24
  63:10,12 64:15
  66:15,18
rooms 25:18
rotation 45:21,23
rule 14:4 20:10
  22:11 25:10
rules 25:17,25 26:3
  26:11 31:22
ruling 7:20
rush 51:15

**S**

S 3:4
safe 13:10,16,17,17
safety 27:17 28:16
  28:17
satisfied 56:9
saw 69:17
saying 10:9 13:17
  43:4,10 51:3
  54:17 57:5 60:16
  61:1 62:15
says 15:15 20:11
  23:13
scan 34:18 40:21
  40:25 51:6
scanner 34:6 38:14
  40:4,9,17,18
  42:24 51:25
  53:10
scanners 9:23 33:5
scope 21:9,25
scratch 35:17
  39:22 46:5
screen 51:12,23
  60:19
screened 10:2
  57:17,19

Anita Serrano ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

**screener** 19:9
53:16 71:15 72:5
74:17
**screeners** 46:13
**screening** 9:4,6,7,9
19:11 25:3,9,11
25:18 30:6 33:2,2
33:8 34:3,7 36:15
36:17,20 37:5,13
37:15,17,21 38:6
38:10,15,16,20
45:2,7,20,25 46:2
46:24 47:16
51:16,22 52:11
52:16,17,23 53:2
53:3,4,7,15 56:22
58:23 59:2 61:9
61:11 62:5,13,24
63:10 66:15,18
67:2 68:8,12,16
68:19 70:14
**sealed** 22:4,5,6,7
**seam** 50:7,7 57:21
57:23,24
**search** 33:4 43:2
56:11 57:9,15
71:17 72:21 74:5
74:8
**searches** 73:4,16
73:17
**second** 6:3 29:19
30:5,6,7 44:24
48:7 51:15 54:5
**secondary** 32:5
**secreting** 41:7
**secure** 70:12,16
**security** 1:7 2:16
6:5,7,11,14,16,19
7:13 8:1 9:1,3
10:4,14,16,20,24
11:3,6 12:11 13:7
13:22 17:14 18:4
18:21 19:7 26:23

70:5 75:22
**see** 21:20 22:4,16
23:1 33:20 34:6
38:14 40:17,20
47:10 48:13
50:10 64:5
**sees** 22:23
**semantical** 70:3
**semantics** 67:23
69:2
**send** 76:9
**sense** 74:19
**sensitive** 6:7,11,13
6:15,18 7:13 8:1
10:4,13,16,20,24
11:2,6 13:6,21
18:4,20 19:7
52:20,24 53:13
75:22
**sent** 30:24 31:2
76:14
**separate** 35:6,8
**Serrano** 1:16 2:21
3:20 4:3,4 6:3,9
6:12 7:12 10:5
11:2 17:23 24:25
36:24 37:22
40:16 41:11,24
46:12,18 54:23
77:15,20 78:6
**serve** 74:25
**set** 21:2 22:12
48:20 78:19
**sets** 31:9
**sheet** 76:15
**short** 18:2 33:15
33:15
**shorter** 55:15 65:1
65:7
**shorthand** 78:10
78:12
**show** 61:14
**shut** 63:10 64:15

**side** 20:6 32:18
50:16,16 65:7
70:13
**sign** 75:15
**signature** 77:17
**signing** 78:14
**silent** 61:21
**similar** 35:25 65:6
**simple** 40:11
**simply** 44:7
**Simultaneously**
58:13 72:1
**sir** 20:9 50:8
**sitting** 21:7
**situation** 34:23
53:4
**six** 8:19
**skin** 5:6 33:13,14
65:3,3,9
**skipped** 52:16
**slender** 65:12,12
**slide** 50:6
**sliding** 50:12
**slightly** 65:11,12
**Smith** 2:8 3:17,17
4:3 6:18,21 7:5
11:8,13 13:12
15:1,4,12,20 16:8
16:19,24 17:5,5,7
17:25 18:14,14
18:18,20,25
19:22 21:8,15,23
24:20 25:13,23
25:24 26:6,15
35:10,12,14,22
35:24 36:9,21
38:7 39:19 40:12
41:9 46:6,7,14
51:18 55:2 58:18
58:21 69:24
71:19,20,24,25
72:7,11,16,25
73:1,2,8,19,22,24

75:7,8,11,13
76:15,18
**solely** 6:10 7:25
**somebody** 30:14
34:2 68:15
**something-Griffin**
53:21
**SOP** 38:17 39:11
39:13 40:1 46:3
**sore** 52:19,24
53:13
**sorry** 4:3 9:13
11:13 14:2 19:13
25:16 26:15
35:11 46:4 51:20
58:19,20 59:19
66:8 71:20 72:9
**sort** 20:19,21 21:2
59:14,16 60:12
61:14 63:21 65:6
67:23
**sorted** 21:11
**sound** 31:11 33:6
**sounds** 11:9 15:23
21:14,15
**South** 2:10
**Southwest** 32:6
**space** 45:10
**speak** 7:3,9 12:20
13:25 18:6 30:13
39:16 47:4 59:21
66:9,13 75:20
**speaking** 29:15
44:8 58:13 70:24
71:11 72:1
**speaks** 39:13
**special** 75:16,24
**specific** 25:17
72:22
**Specifically** 9:18
**specifics** 55:18
**specify** 29:14
**spell** 29:4

**spelling** 29:20
**spent** 14:3
**spoke** 30:11,14
**spoken** 30:8
**spread** 49:14 54:16
54:18,19
**SSI** 6:23 7:3 10:8
11:20,21,24 12:1
12:3,7,12,15,18
12:21,24 13:3,9
13:11,18 14:8,13
14:18,20,22 15:5
15:8,23 20:2,5
25:14,20 35:9,10
35:13,14,21 36:8
36:10 38:16
39:20 40:13 46:3
46:7,14 71:18
72:12,17,24 73:6
75:24 76:5,7
**stage** 21:4
**stainless** 48:21
**stance** 49:10 54:11
54:14,22,24 55:6
55:7,9,20,22,25
56:1,3,13,17,21
59:7,8,17 61:8
63:3,7
**stand** 4:11,15
**standard** 10:7
12:23 36:7 37:20
72:23
**standing** 33:21,21
49:19 69:17
**start** 4:9 5:17 8:14
17:25 42:10
71:11
**started** 5:21 8:24
8:25 27:2 37:3
54:9 57:9 68:7
**starting** 55:11,16
57:21 64:23
**starts** 31:9

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

state 3:11 4:22
27:25 78:4,20
statement 29:1
30:22 68:10 71:5
statements 4:14
28:24 30:21
states 1:1,7 2:9
73:3 75:1
status 69:21
statute 13:2
steel 48:21
step 43:20 49:1
55:24 56:1,5 57:2
stepped 53:9 54:4
56:8,22
stood 61:10
stopped 59:13
61:25 62:2,2
63:21
stopping 60:5
strike 21:20 23:17
23:24 24:8
strip 73:16 74:8
STSO 28:24 29:4,7
29:17 30:21
62:25 63:9,15
64:9,13,23 65:18
66:13,18 70:25
subject 5:25 7:15
9:9
submit 75:23 76:5
submitted 51:23
70:14
subsequently
66:10
substitute 22:14,16
22:20,25 23:8,13
23:20 24:10
substitution 23:11
successfully 58:24
68:5
suggestions 51:11
Suite 1:21 2:5,10

summoned 45:17
supervisor 29:9,11
66:9,11 67:18
suppose 44:10
supposed 61:4
sure 4:18 7:19
12:10 13:22
16:17 31:3 36:1
40:7 56:6 72:11
72:12 73:2 75:10
surely 54:23
surprise 7:10
surprised 66:1,2
suspect 41:6
suspicion 41:13
swear 3:13
sweaters 74:14,15
sworn 3:21 78:9
system 22:23

                T
table 48:20,21,23
take 16:19 19:10
19:20 20:21
22:10 44:6,12
48:15 52:2 54:10
56:3 61:8 63:2
64:22 73:7,13,24
75:8,15
taken 1:17,18 4:6
6:19 25:3 27:14
53:2,3
talk 14:25 21:17
talking 10:7 31:8
34:23
tall 33:17 48:1,3
taller 33:14,15
55:14 58:6,8
targeted 39:10,16
39:24 40:2,10
41:3,25 42:15,19
43:1,6 56:10 58:4
task 12:4

tasked 12:11
technical 76:9
technician 27:18
technology 9:23
33:4 34:24 35:2
41:14
Telephonically
2:17 17:1
tell 17:24 43:15,19
44:20 66:24 67:2
72:13
telling 40:23 49:22
temporarily 22:7
temporary 47:21
47:21 48:14
tenure 26:20
terminated 27:10
terms 5:4 44:17
testified 3:22 37:3
40:16,20
testify 78:9
testimony 14:19
30:18 37:23 43:9
49:5 63:25
text 76:1
thank 6:16 11:16
17:8,10 21:16
24:19,20,21
29:18 30:1,8
33:19 38:22
41:23 46:10
53:22 55:4 60:25
66:8 73:23,24
75:5,11 76:14,18
Thanks 16:24
Thereupon-- 3:19
thigh 34:21 35:1,7
50:19 59:10 60:6
60:7,13 62:16
thighs 60:11,17,18
thing 31:8 40:9
things 20:5,18
21:18

think 15:9 16:8,8,9
16:11 20:23 21:5
23:9,23 24:1
25:24 26:6,7
30:20 35:24
37:22,23 40:12
44:17 46:7 47:5
48:24 53:20
54:15 65:18 66:5
66:12 71:13 73:5
73:11 75:16
Thirty-eight 4:25
thought 6:18 44:15
three 30:20 47:24
52:21 63:11
64:23 65:14
threw 44:23
time 8:13 24:2
25:16 26:9 29:14
33:24 40:18 42:3
42:23 43:1,5
46:19 50:24 54:5
63:4 67:6 70:22
73:18
times 31:18 42:14
42:18 43:10,11
50:25 56:25
title 26:19 27:3
titles 26:22
today 15:10 20:19
told 12:4 15:20
34:9,11,12 36:16
37:18,24,25 38:5
38:19 40:1 41:1
50:1 52:2,3 54:15
56:12 67:4 68:22
tone 5:6 33:13,14
top 23:5 47:15,17
torso 50:20 60:3,4
60:5,8,14,23
61:13
total 8:21
totally 16:14

touch 44:20 52:20
52:24 53:14 69:7
69:12
touched 44:18 47:2
touching 43:22
57:20 59:13
60:11,17,18
Town 1:21
trained 11:2,19,21
11:22,25 12:2,6
12:14 14:18,20
14:21 19:10 20:4
25:5
training 5:22,25
7:15,16,16,17,18
7:22 8:5,8,14,16
8:18,19,22 9:9,15
9:24,25 10:7,10
11:5,18 12:10,16
12:25 18:12 19:6
25:19,20 26:3,11
31:18 41:2 71:15
71:18 72:4,15
transcribed 78:10
transcript 75:15
75:17,21 78:11
transcription
77:16 78:12
transcripts 75:23
transferred 71:3
transportation 1:7
2:16 6:5 9:1,2
12:11 17:13
26:23
travel 68:8,21
traveled 45:6
trial 4:14
triggered 19:8
trouble 12:8 73:12
true 69:6 78:11
Trutanich 21:24
truth 78:9
try 23:4 51:25 59:5

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

**trying** 44:16 52:5
56:6 60:6 61:14
71:24
**TSA** 5:14,15,21
8:24 9:22 10:9,15
12:10,15 13:6
14:2 15:8,16,17
19:4,9,12,25
22:25 26:20 27:5
27:7 28:1,5 30:11
31:14 40:6 41:2
42:1 43:11 46:4
46:12 53:16
63:11 64:23
68:11 70:4,19
71:15 72:4,20
73:3 74:6,9,17,23
**TSA's** 7:21 9:18
14:11 31:22 73:6
**TSO** 28:25 29:22
30:5,22 45:20
53:19 61:19 62:1
62:7 65:5,10,21
65:25
**Tuesday** 24:3
**twice** 16:12
**two** 8:21 14:22
39:11 45:6 46:4
46:13 48:22
51:13 71:6
**two-dimensional**
34:24
**type** 18:11 22:1
**typewriting** 78:10
**typewritten** 78:11
**typically** 12:22
52:14

**U**
**U.S** 20:15
**UCF** 22:23
**ultimately** 44:4
**unable** 20:3 60:19

61:2 63:7
**understand** 4:15
9:8 14:22 17:22
18:12,16 20:8
31:7 36:4 44:7,11
54:23 55:1 68:6
69:1,1
**understanding**
7:24 39:12
**understood** 15:6
35:4
**United** 1:1,7 2:9
75:1
**UNKNOWN** 1:7
**unsure** 69:19
**unusual** 71:10,13
**upper** 34:21 35:1,7
**upset** 67:6
**use** 10:10 29:14
33:4,7 48:17 50:5
50:7,13,15 69:10
76:4
**utilized** 49:8

**V**
**varieties** 25:10
**Vegas** 1:22 2:10,11
3:1 28:7
**verbal** 30:18
**verbally** 69:16
**version** 18:2
**versus** 39:16 40:10
41:21
**vertical** 57:22
**videoconference**
1:16 2:3,9,13
24:23 76:19
77:16 78:5
**viewed** 23:15
**viewing** 23:22
**violating** 14:4
**voice** 63:21
**vs** 1:6

**vulva** 62:17

**W**
**waistband** 50:4,7
50:13 57:3,10,13
57:15,17 63:5,18
**wait** 69:11,13
**waiting** 34:5 37:18
69:19,22
**walked** 44:3
**walking** 45:10,19
**wall** 47:25
**walls** 47:15,19,20
47:21 48:1,14
**want** 11:13 13:25
14:9 16:11 20:21
23:19,25 36:1
51:4,5 64:12 73:7
73:9
**wanted** 69:20
74:19
**wants** 17:24 20:7
22:9
**Washington** 27:23
**wasn't** 35:25 50:23
51:22 72:11
**waving** 51:2
**way** 8:10 11:15
15:21 20:1 21:6
23:18 24:9 32:14
32:15 40:17
45:19 46:23 50:9
50:21 52:3 61:16
62:15 67:15 72:2
72:18 75:24 76:6
**ways** 51:12
**we're** 5:13 8:2
19:19 20:10,20
31:7 34:14,23
67:23 70:8
**wearing** 48:24
49:17
**Wednesday** 22:10

24:14
**weeds** 18:15
**weeks** 8:17,20
**weight** 5:2,3 33:12
33:16
**went** 57:22 63:8,9
66:15
**Western** 2:4
**whatsoever** 7:4
**WHEREOF** 78:19
**widen** 54:22,24
55:5,6,7,22,25
56:1,12,16,19
59:6,8,17
**wider** 49:15 54:11
54:16,18,20 55:8
55:19,19,22,25
56:3,19 61:8
**witness** 2:20 3:21
4:11,15 7:3 10:6
10:21,22 13:15
13:16,20 14:8,12
14:19,25 16:6
18:24 19:23 20:2
20:3,4,7 21:6
25:14 26:4 35:23
36:3,25 38:9
39:20 41:12
46:25 51:21
58:14,20 78:8,14
78:19
**woman** 65:13
**word** 29:14
**words** 9:14 52:5
54:19 64:3
**work** 27:5 70:19
73:21
**worked** 28:6 33:3
**working** 28:1,5
31:14 33:24
**wouldn't** 66:1,2
**write** 23:24 24:1
**writing** 63:24

**written** 63:25
**wrote** 21:21 29:1

**X**
**X-ray** 43:21 68:23

**Y**
**yeah** 22:14 43:18
46:7 58:14 65:21
66:20 71:7,25
73:19
**year** 5:18 27:1
**yellow** 49:2 54:11
55:10
**younger** 65:22

**Z**
**ZIP** 76:10
**Zoom** 2:14 3:5
24:23 76:12

**0**

**1**
**10** 20:17
**100** 41:25
**11** 14:4
**11:20** 73:20
**11:36** 76:20
**1100** 2:10
**1160** 1:21
**12th** 5:20 24:3,4,7

**2**
**2:20-cv-00479-J...**
1:6
**20** 48:9
**20-something** 71:2
**2006** 75:2
**2011** 75:2
**2016** 5:20
**2018** 27:2
**2019** 5:11,15 27:3
27:8 29:2,10

Anita Serrano  ~   January 8, 2021
* * * Confidential Remote Videoconference Deposition * * *

Page  13

| | |
|---|---|
| 30:15 31:15,25 33:1 | 78:23 |
| **2020** 21:22 | **684-3870** 2:6 |
| **2021** 1:18 3:1 77:18 78:7,21 | **7** |
| **20s** 65:22,22 | **7** 48:3 |
| **21st** 78:20 | **702** 2:11 |
| **25** 42:25 | **75** 43:5 |
| **28** 66:3 | **765** 2:5 |
| **28th** 21:22 | **8** |
| **3** | **8** 1:18 3:1 78:7 |
| **30** 20:10 | **8:54** 1:19 3:2 78:7 |
| **30(c)** 20:10 | **89101** 2:11 |
| **300** 1:21 | **9** |
| **30s** 66:4 | **90029** 2:5 |
| **30th** 5:15 23:16 27:3 29:9 31:14 31:25 33:1 | **958** 2:4 |
| **310** 2:6 | |
| **32** 22:5,6,6,17 23:13,15,19 | |
| **34** 22:6,17 23:14 23:20,22 | |
| **34-1** 22:3 | |
| **38** 66:7 | |
| **388-6336** 2:11 | |
| **4** | |
| **4** 2:22 | |
| **40** 48:12,13 | |
| **40s** 65:19,21 | |
| **5** | |
| **5-2** 65:8 | |
| **5-3** 65:8 | |
| **5-5** 65:13 | |
| **5-foot** 65:1 | |
| **5-foot-3** 33:18 65:2 | |
| **50** 66:2 | |
| **501** 2:10 | |
| **6** | |
| **650** 1:25 3:13 | |