# EXHIBIT N

**Deposition Transcript of Alexander Leuthauser**

Alexander Leuthauser, 4/19/2021

Page 1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3
    Michele Leuthauser,              )   Case No.
4                                    )   2:20-cv-479-JCM-VCF
                    Plaintiff,       )
5                                    )
    vs.                              )
6                                    )
    United States of                )
7   America; Unknown                 )
    Transportation Security          )
8   Administration Officer,          )
                                     )
9              Defendants.           )
    _____)
10

11

12

13

14            DEPOSITION OF ALEXANDER LEUTHAUSER

15            Taken on Monday, April 19, 2021

16            By a Certified Court Reporter

17                    At 9:00 a.m.

18            Via Web-Based Videoconferencing

19

20

21

22

23

24

25   Reported by:  Suzanne M. Stone, CCR 970, RPR

Alexander Leuthauser, 4/19/2021

Page 2

```
 1    APPEARANCES (via Videoconferencing):

 2
      For the Plaintiff:
 3
              JONATHAN CORBETT, ESQ.
 4            The Law Office of Jonathan Corbett, Esq.
              958 North Western Avenue
 5            Suite 765
              Hollywood, California  90029
 6
 7    For the Defendants:

 8            BRIANNA SMITH, ESQ.
              United States Attorney's Office
 9            501 Las Vegas Boulevard South
              Suite 1100
10            Las Vegas, Nevada  89101

11
      Also Present:
12
              KRISTA MAIZEL, ESQ.
13            Transportation Security Administration

14                    * * * * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

Alexander Leuthauser, 4/19/2021

Page 3

```
 1                    I N D E X

 2   WITNESS                              PAGE

 3   ALEXANDER LEUTHAUSER

 4     Examination by Ms. Smith            5

 5

 6

 7

 8                  E X H I B I T S

 9   NUMBER     DESCRIPTION              MARKED

10   (No exhibits were marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Alexander Leuthauser, 4/19/2021

```
 1               P R O C E E D I N G S

 2               THE REPORTER:  Good morning.  My name is

 3      Suzanne Stone.  I am a Nevada Certified Court

 4      Reporter here on behalf of Free State Reporting.  My

 5      CCR number is 970.

 6               Today's date is April 19, 2021.  The time

 7      is approximately 9:00 a.m.

 8               This is the deposition of Alexander

 9      Leuthauser in the matter of Michele Leuthauser v.

10      United States of America, et al., venued in the

11      United States District Court, District of Nevada,

12      Case Number 2:20-cv-479-JCM-VCF.

13               At this time, I will ask counsel to

14      identify themselves, state whom they represent, and

15      agree on the record that there is no objection to

16      this deposition officer administering a binding oath

17      to the witness through remote videoconferencing.  If

18      no objection is stated, we will proceed forward with

19      the agreement of all counsel.  We will begin

20      appearances with the noticing attorney.

21               MS. SMITH:  Good morning.  Brianna Smith

22      on behalf of the United States and Anita Serrano.

23      No objection.  And also present is Krista Maizel,

24      and she is an attorney for the TSA.

25               MR. CORBETT:  Good morning.  Jonathan
```

Free State Reporting, Inc.   410-974-0947

Alexander Leuthauser, 4/19/2021

1    Corbett here representing Michele and Alexander

2    Leuthauser.  No objection.

3              THE REPORTER:  Will the witness please

4    raise your right hand to be sworn.

5              (Witness sworn.)

6                ALEXANDER LEUTHAUSER,

7              having been first duly sworn, was

8              examined and testified as follows:

9                     EXAMINATION

10   BY MS. SMITH:

11       Q.    Good morning, Mr. Leuthauser.  We met

12   last -- well, not last week, but the week before,

13   and as you already know, I represent the United

14   States and Anita Serrano in this action.  And we're

15   here to take your deposition today in connection

16   with that case.

17              Do you understand that?

18       A.    Yes, I do.

19       Q.    Okay.  It seems like we're having a

20   little bit of a lag, at least on my end, but I can

21   hear you okay.  So if you have an issue with hearing

22   me, just let me know.  Okay?

23       A.    It seems quite all right for now.

24       Q.    Okay.  Sounds good.

25              The oath that you just gave the court

Alexander Leuthauser, 4/19/2021

1    reporter is the same oath that you would give in a

2    court of law; therefore, all of your testimony today

3    has to be truthful.

4              Do you understand that?

5         A.    Yes, I do.

6         Q.    Okay.  Could you just go ahead and state

7    and spell your name for the record.

8         A.    It is Alexander Leuthauser.  And my first

9    name is spelled A-L-E-X-A-N-D-E-R.  Last name is

10   spelled L-E-U-T-H-A-U-S-E-R.

11        Q.    Okay.  Now, because you were present for

12   your wife's deposition -- it was not last Friday,

13   but the following one -- I'm going to kind of

14   curtail the rules of the road a little bit.  Some

15   may come up periodically, but just a couple of the

16   important ones for the court reporter, especially

17   today since we are remote, just making sure that all

18   of your responses are audible, no shaking of the

19   head, things like that.

20              Also, I will do my best not to cut you

21   off, and likewise, just make sure that you try to do

22   your best with me.  If that happens, if we talk over

23   each other, what I'll try to do is restate the

24   question.  Okay?  And really that's just so we can

25   make sure that we have a very good transcript at the

Alexander Leuthauser, 4/19/2021

1    end of this.  Okay?

2         A.    Okay.

3         Q.    All right.  Now, because we are remote,

4    it really doesn't proceed any differently than it

5    did before in a court reporting office or as it

6    would proceed in a trial.  Okay?  And so what that

7    means is just to make sure that all of your

8    testimony is just from your personal knowledge.

9              Do you have anything in front of you

10   today?

11        A.    No, I do not.

12        Q.    Okay.  Just the laptop?

13        A.    Just my phone.

14        Q.    Oh, you're doing it from your phone.

15   Very well, okay.

16             So no notes or anything like that in

17   front of you?  Just want to make sure.

18        A.    No, ma'am.

19        Q.    Okay.  Thank you.  You know, when we're

20   in person, it's a lot easier to tell; so we just

21   like to make sure that, you know, you're not looking

22   at the answers to the test or anything.

23        A.    Absolutely.  I understand.

24        Q.    All right.  Now, another thing that

25   happens more than once in these proceedings is a

**Free State Reporting, Inc.  410-974-0947**

Alexander Leuthauser, 4/19/2021

1    question of mine may not be clear.  And if that

2    happens, will you just let me know, "Hey, Ms. Smith,

3    I don't understand.  Just rephrase it."  And I'll do

4    my best.  Okay?

5         A.    Absolutely.

6         Q.    All right.  Now, you heard some of the

7    stock questions that we ask everybody.  You heard me

8    ask your wife when you were sitting there, and I'm

9    going to do a couple of them.

10              Are you taking any medications or any

11   substances that would affect your ability to testify

12   truthfully today?

13        A.    No, I'm not.

14        Q.    Any medications or substances that would

15   affect your memory at all as it relates to

16   remembering things for this deposition today?

17        A.    No.

18        Q.    Okay.  Any other reason that you feel

19   like you can't give us your full and truthful

20   testimony today?

21        A.    No, ma'am.

22        Q.    Now, as I mentioned, you know, in the

23   other deposition, that you're welcome to take a

24   break.  You know, this isn't a marathon or anything.

25   I don't expect it to be all that long, but if you

Alexander Leuthauser, 4/19/2021

1    need a break, just let me know and we will do so.   I

2    just ask that you answer the question if there is

3    one pending at the time you ask for a break.  Do you

4    understand that?

5         A.    Yes, I do.  Thank you.

6         Q.    And then finally, there may be an

7    objection lodged by your counsel.  I understand

8    you're being represented today by Mr. Corbett.  Is

9    that right?

10        A.    Yes, I am.

11        Q.    Okay.  And so he may have an objection

12   from time to time, and, by and large, most of the

13   objections you're still free to answer afterwards,

14   after the objection is made; however, if it is

15   attorney-client privilege or any other privilege

16   like that, he may instruct you not to answer and so

17   we'll proceed in that way.

18            Do you understand that?

19        A.    Yes, I do.

20        Q.    Okay.  All right.  So what did you do

21   today to prepare for your deposition, if anything?

22        A.    Absolutely nothing.  Woke up, had some

23   coffee.  That was about it.

24        Q.    Okay.  Very well.  So you didn't review

25   any documents or any video, anything like that?

Alexander Leuthauser, 4/19/2021

Page 10

```
 1        A.    No, I did not.

 2        Q.    Now, I'm not asking you to tell me any

 3   conversations you've had with counsel, but did you

 4   speak to your attorney in preparation for your

 5   deposition today?

 6        A.    No, I did not.  The only conversation

 7   we'd had was just prior to my wife's testimony.

 8        Q.    Understood.  Okay.

 9              Now, other than your attorney, your wife,

10   other than those two, have you spoken to anybody

11   else in preparation of your deposition today?

12        A.    No, I have not.

13        Q.    Okay.  Now, have you ever personally

14   filed a lawsuit before?

15        A.    Yes, I have.

16        Q.    On how many occasions?

17        A.    Just once.

18        Q.    And what was the nature of that case?

19        A.    It was just a car accident.

20        Q.    Was that the same car accident that

21   Ms. Leuthauser was in, that she had sued for, or is

22   this a different accident?

23        A.    It is the same accident.

24        Q.    So is it fair for me to assume that you

25   were both like, quote/unquote, "plaintiffs," you're
```

Alexander Leuthauser, 4/19/2021

```
 1   two individuals suing in the same case?

 2        A.    Yes, that's it.  And it also just went to

 3   settlement.  It never actually went to court; so --

 4        Q.    Okay.  Gotcha.

 5              Now, have you ever been sued before,

 6   meaning somebody is bringing a lawsuit against you

 7   personally?

 8        A.    Not that I'm aware of.

 9        Q.    Have you been convicted of a crime in the

10   last ten years?

11        A.    No, I have not.

12        Q.    Any convictions for crimes of dishonesty?

13        A.    No.

14        Q.    What is your date of birth?

15        A.    ████ ██ ████.

16        Q.    Okay.  And did you go to college?

17        A.    Yes, I did.

18        Q.    Could you just give us a brief thumbnail

19   sketch of your educational background.

20        A.    It was obviously high-school diploma and

21   then an associate of applied science in criminal

22   justice as well as Law Enforcement Academy.

23        Q.    Okay.  Very good.  And where did you get

24   your criminal -- was it a degree that you received

25   in criminal justice?
```

Alexander Leuthauser, 4/19/2021

```
 1        A.     Yes, an AAS.

 2        Q.     And that was from a college, I assume?

 3        A.     Yes, Western Nevada College.

 4        Q.     Okay.  Where is Western Nevada College

 5   located?

 6        A.     Carson City, Nevada.

 7        Q.     Okay.  Are you originally from that area?

 8        A.     Not born but for the most part lived

 9   there most of my life.

10        Q.     Okay.  Now, where are you currently

11   working?

12        A.     As of right now, I am unemployed.

13        Q.     Sorry to hear that.

14        A.     Oh, no, it's all good.

15        Q.     It's not that bad?  You're taking it

16   easy?

17        A.     Yep.

18        Q.     That's good.

19               When is the last time you were employed?

20        A.     Oh, I just -- my last day was the 14th.

21        Q.     Okay.  Yeah, I remember Michele saying

22   that you were employed as a security guard.  Is that

23   right?

24        A.     Yes, that's correct.

25        Q.     And what was the company name?
```

Alexander Leuthauser, 4/19/2021

1      A.    JDSS Investments.

2      Q.    And did you depart JDSS Investments

3  voluntarily?

4      A.    Yes, I did.

5      Q.    And how long were you employed by JDSS?

6      A.    Approximately 18 months.

7      Q.    And where did you work before JDSS?

8      A.    That would be The Signature at MGM Grand;

9  so MGM Resorts International.

10      Q.    In what capacity did you work for MGM?

11      A.    I was also a security guard for them as

12  well as a guest services supervisor.

13      Q.    And how long did you work for MGM for?

14      A.    Approximately five to six years on and

15  off.

16      Q.    And I recall when we were taking

17  Ms. Leuthauser's deposition that she mentioned you

18  worked for a sheriff's office?

19      A.    I did indeed.

20      Q.    And how long ago did you work for that

21  office?

22      A.    From 2002 to 2006, I worked for Carson

23  City Sheriff's Department, and then from late 2006

24  into 2007, I worked for San Francisco Sheriff's

25  Department.

Alexander Leuthauser, 4/19/2021

1      Q.    I'm sorry.  I didn't catch the dates for

2   the -- was it San Francisco?

3      A.    Yes, it was.  It was -- I believe it was

4   late 2006 to like mid-2007.

5      Q.    Okay.  And the Carson City Sheriff's

6   Office, was that where Ms. Leuthauser had said she

7   had volunteered for?

8      A.    Yes, ma'am.

9      Q.    What was your job at the Carson City

10  Sheriff's Office?

11     A.    I was a deputy sheriff and a field

12  training officer.

13     Q.    Any reason why you transitioned from

14  sheriff's deputy to security guard?

15     A.    Yeah, it's -- I got extraordinarily tired

16  of being a police officer.

17     Q.    All right.  I understand that.

18        Now, can you just tell us from your

19  experience at Carson City Sheriff's Office and the

20  San Francisco office, what was the procedure for

21  performing pat-downs for those offices?

22     A.    In regards to what?

23     Q.    Well, I want to know what the procedure

24  was when you would need to pat down sensitive areas.

25     A.    On a woman?

Alexander Leuthauser, 4/19/2021

1      Q.    Well, so did you pat down women as well?

2      A.    Yes, I did.

3      Q.    And are the pat-downs different on women

4    than they are for men?

5      A.    Yes, they are.

6      Q.    Okay.  Why don't you describe for me what

7    the procedure was for patting down women

8    specifically.

9      A.    Women, if it was a sensitive area, as you

10   related, it would be the back of my hand, and that

11   would be underneath -- as far as the groin area

12   would be the back of my hand as well as underneath

13   your breasts it would be the back of my hand.

14     Q.    Okay.  And so on the note of the groin

15   area, is it similar in that you have to pat down the

16   inner thighs and go up until you meet resistance as

17   well?

18     A.    As far as a woman, go up -- I'm sorry.

19   Could you rephrase that for me?

20     Q.    Yeah.  Well, why don't you just tell me

21   what the procedure is for patting down a groin area

22   specifically for a female.

23     A.    As I said, on the woman, it's going to be

24   -- I'm using -- I'm using my -- the palm of my hand

25   until, I would say, 5 to 6 inches before I come to

Alexander Leuthauser, 4/19/2021

Page 16

1    the groin area just simply due to the fact it is

2    sensitive, and then I'm going to turn my hand so

3    that I'm not using, say, the blade of my hand in the

4    area of the groin.  And I want the person that I'm

5    performing that on to feel comfortable as well as

6    if, you know, they're not -- they're not being

7    violated in any way.  So it would be the back of my

8    hand usually, like I said, between 5 and 6 inches

9    away from the groin area.

10        Q.    And when you say "5 and 6 inches away

11   from the groin area," are you saying that's where

12   you stop or --

13        A.    Right.  I'm not -- I stop using, say, my

14   palm on the area of the leg that was -- that was

15   closer to the groin.

16        Q.    Well, and when you have, for example,

17   just hypothetically, like a suspect that hides

18   something in maybe their underwear, for example, how

19   do you go about patting down a female?

20        A.    I don't.

21        Q.    So you just --

22        A.    If there's any reason for me to believe

23   that she's hiding something in that area, I'm going

24   to get a female deputy to do the pat search.

25        Q.    Okay.  Understood.  Yeah, okay.  That

Alexander Leuthauser, 4/19/2021

1    makes sense.

2              And so when you have a male, for example,

3    that you need to pat down in the groin area, how

4    does the pat-down differ for a male?

5         A.   It's never to the point where -- so I'm

6    going to use the blade of my hand and go up each

7    thigh.  I'm not going to stop like I would with a

8    female nor am I going to use the back of my hand;

9    however, I'm going up, not to the genitals, more

10   just to the groin.  It's -- I'm not touching their

11   genitals in any way.

12        Q.   When you say the blade of your hand, can

13   you help me understand what you're meaning by that?

14        A.   Sure.  I would say it's the index finger

15   as well as all the way up to the -- to the first

16   knuckle, kind of like this (indicating).

17        Q.   Understood.

18             And is the policy that you pat down the

19   inner thigh up until it meets resistance of the

20   groin?

21        A.   Yes.

22        Q.   Okay.  And you're saying that you don't

23   touch the genitals of the male when you do a

24   pat-down?

25        A.   No, I do not.  The only time that that's

Alexander Leuthauser, 4/19/2021

Page 18

```
1    going to happen is -- and it didn't typically happen
2    ever because if we suspected that they were in
3    possession of drugs, weapons, things along that line
4    and they were being arrested, then you're going to
5    take them to jail, and they're going to proceed to
6    do a strip search of them -- of a male suspect.  As
7    I said, it's -- with a pat-down search of a male,
8    I'm just searching for weapons, and that's it.
9         Q.    Understood.  Got it.  All right.
10              When you graduated with your degree in
11   criminal justice, did you go directly to work for
12   the sheriff's office?
13        A.    It was approximately a year after I had
14   graduated from the police academy that I was hired
15   with Carson City Sheriff's Department.
16        Q.    And did you take the POST Academy
17   training?
18        A.    Yes, I did.
19        Q.    Is that what you were referring to?  When
20   you say academy training, was it the POST training
21   that you did?
22        A.    It was not Nevada State POST.  It was
23   Western Nevada Peace Officers Academy.
24        Q.    Okay.  Now, we already mentioned this,
25   but Ms. Leuthauser testified that she had
```

Alexander Leuthauser, 4/19/2021

1    volunteered -- was it for the Carson City Sheriff's

2    Office?

3         A.    No, it would have been more for the

4    academy.

5         Q.    Oh, it was in the academy that she

6    volunteered?

7         A.    Indeed.

8         Q.    Okay.  And what was she doing when she

9    was volunteering for the academy?

10        A.    She would just come into a classroom

11   setting and volunteer her time to let us try to pat

12   search her for weapons.

13        Q.    Have you ever written any statements

14   about Ms. Leuthauser's experience with the TSA

15   screening on June 30th of 2019?

16        A.    Written statements, no.

17        Q.    Okay.  No emails to the TSA or anything

18   like that to your memory?

19        A.    Not that I can recall.

20        Q.    Okay.  Do you recall giving verbal

21   statements to TSA?

22        A.    No, I don't recall giving it to TSA.

23        Q.    Okay.  But did you give verbal statements

24   to anyone other than the TSA?

25        A.    Yes, I vaguely remember giving a verbal

Alexander Leuthauser, 4/19/2021

1   statement to the Inspector General's Office for

2   Homeland Security.

3        Q.   Okay.  How did it come to be that you

4   were speaking to the Office of Inspector General?

5        A.   As we'd stated before, we were just

6   trying to find someone to help, and that was one of

7   the places that I had found to file a complaint

8   with.

9        Q.   Okay.  And I thought -- and correct me if

10  I'm wrong because I know you were sitting there -- I

11  thought Ms. Leuthauser said that it was her cousin

12  that suggested to contact the OIG.  Did I get that

13  wrong?

14       A.   Yeah.  I'm sorry.  It was the senator's

15  office that she had suggested.

16       Q.   Understood.  Okay.  I may have mixed that

17  up.

18            Okay.  So it was on your suggestion to

19  contact the OIG then; is that fair?

20       A.   Yes, ma'am.

21       Q.   Okay.  And so was it you that contacted

22  OIG first?

23       A.   Yes.

24       Q.   Okay.  And tell me, what statement did

25  you provide to the OIG?

Alexander Leuthauser, 4/19/2021

Page 21

```
 1        A.     It was -- it would have been a very
 2   summarized, you know, detail of what happened.  But
 3   I don't exactly recall what I had said verbally to
 4   them as I didn't have anything written down.  As I
 5   said, it would have been a summary of the situation
 6   to them as she had explained it to me.
 7        Q.     Understood.  Okay.
 8               And do you recall any specifics as to
 9   what you conveyed to OIG?
10        A.     Not anything that I would be comfortable
11   elaborating on.  It's been a long time; so I
12   couldn't say for sure.  So, yeah, I don't recall
13   exactly.
14        Q.     What is your understanding of how the
15   pat-down was performed that Ms. Leuthauser, you
16   know -- the subject of her lawsuit here?
17        A.     Oh, that her lady area was penetrated.
18        Q.     Okay.  Anything else?
19        A.     No, that was the only thing that I could
20   -- that I was really concentrating on just simply
21   due to my training and experience and knowing that
22   Nevada Revised Statutes say, you know, anything
23   that's penetration, however slight; so it was my
24   understanding that it was sexual assault.
25        Q.     Okay.  And that was the purpose for
```

Alexander Leuthauser, 4/19/2021

1    contacting OIG; is that fair?

2          A.    Yes, ma'am.

3          Q.    Okay.  And so when you made contact with

4    OIG, did they ask you for any written statement or

5    anything like that?

6          A.    No, they did not.

7          Q.    Okay.  What were the next steps then

8    after you made contact with OIG?

9          A.    I believe the agent, Sandy Downs, had

10   given me a call probably within a few days after

11   putting in the complaint and spoken with me in

12   regards to what had happened, and I related to her

13   that I would give her my wife's phone number and she

14   could contact her, which I believe she did.

15         Q.    Okay.  And it sounded like when you say

16   "I believe she did," meaning your wife contacted

17   Sandy Downs.  Do you know for sure whether that

18   occurred or not?

19         A.    No.  I believe it was Sandy Downs that

20   actually contacted my wife via telephone, and I have

21   no idea whether or not that occurred.

22         Q.    Okay.  Were you present in the room when

23   your wife was talking to Sandy?

24         A.    I had given her the phone number, and she

25   had called; so it was -- I don't believe I was

Free State Reporting, Inc.   410-974-0947

Alexander Leuthauser, 4/19/2021

Page 23

1    there.

2         Q.    Do you have any memory of talking to

3    anybody specifically at the TSA?

4         A.    No, I do not.

5         Q.    Do you remember speaking to a TSA

6    employee by the name of Carie Muirhead?

7         A.    Carie Muirhead.  It sounds familiar, but

8    I'm not quite a hundred percent on that.

9         Q.    Okay.  And you said you're not

10   comfortable with reconveying what you reported to

11   the OIG based on your memory?

12        A.    No, I'm not.  It's -- as you said before,

13   it's been over a year, and I don't have a report to

14   look at; so I don't feel comfortable just going off

15   of my own recollection.

16        Q.    Okay.  Now, I understand from

17   Ms. Leuthauser that you were the one who dropped her

18   off at McCarran Airport on June 30th of 2019.  Is

19   that right?

20        A.    Yes, I was.

21        Q.    Okay.  So you dropped her off at the

22   airport, and is it fair for me to assume then that

23   you departed the airport, you were not present when

24   she was inside the airport?

25        A.    Yes, I departed.

Alexander Leuthauser, 4/19/2021

1          Q.     And did you return back home, or where

2     were you headed to that morning?

3          A.     I believe I just returned home.

4          Q.     Now, I assume there comes a time when you

5     received a phone call from Ms. Leuthauser while

6     she's at the airport?

7          A.     Yes, I did.

8          Q.     Okay.  And at what point in time

9     approximately -- do you believe that you received

10    the call before she went through TSA screening or

11    would that have been afterwards?

12         A.     It would have been afterwards.

13         Q.     Okay.  And was it to your recollection

14    that she had already gone through TSA screening at

15    that point when she called you?

16         A.     Yes, she had.

17         Q.     Okay.  Now, I understand that she also

18    walked over to the Metro, the Las Vegas Metropolitan

19    police officers that were there.  We can just

20    shorten that to "Metro officers" if that's okay.

21    And when Ms. Leuthauser walked over to the Metro

22    officers, you were still on the telephone or the

23    cell phone; right?

24         A.     Yes, I was.

25         Q.     Okay.  And did you speak to the police

Alexander Leuthauser, 4/19/2021

1    officers?

2         A.    Yes, I did.  I spoke to one police

3    officer.

4         Q.    Okay.  And do you have any memory of what

5    that officer's name was?

6         A.    No, I do not.

7         Q.    Okay.  The name of Dempsey Lauderdale,

8    does that sound familiar to you at all?

9         A.    Not at all.  He did not give me his name

10   when I spoke to him.

11        Q.    Okay.  And what did you understand the

12   purpose was of you talking to the officer?

13        A.    In order to help my wife with the

14   situation that had just occurred.

15        Q.    Now, was it your request to talk to the

16   officers, or how did it go about?

17        A.    She was -- she was very distraught, and I

18   had asked if there was any police officers in the

19   area, and she said that there was.  So she made her

20   way to that group of police officers that were

21   there.  And she was crying and was really having a

22   difficult time getting the information to them.  She

23   asked them, "Could you please speak to my husband?"

24   which he stated, "I don't usually, but I will."

25             When I spoke to him on the

Alexander Leuthauser, 4/19/2021

 1    phone -- because it's been a while, I don't recall

 2    exactly what -- what that conversation consisted of.

 3    What I do remember was that he said he was unable to

 4    take a report.

 5         Q.    And do you recall any more specifics

 6    about what you told him?

 7         A.    No, I don't.

 8         Q.    I assume you told him something which

 9    would, you know -- what you wanted him to take a

10    report about.

11         A.    As far as I remember, yes.

12         Q.    Okay.  And as far as you know, you don't

13    recall what you said to him, but he said he was

14    unable to help you?

15         A.    Yes.

16         Q.    And what was your understanding as to why

17    he was unable to help?

18         A.    It would have been in -- it would have

19    been speculation in my case.  I assumed it was

20    something jurisdictionally, and that was -- that was

21    kind of what I related to my wife.

22         Q.    Okay.  Understood.

23               But he didn't say it was

24    jurisdictionally.  It was just, you know, he said to

25    you he can't help, and that was your understanding

Alexander Leuthauser, 4/19/2021

1    that you communicated to Ms. Leuthauser.  Did I get

2    that right?

3         A.    He might have said something about

4    jurisdiction, but as I said, I don't really recall.

5         Q.    Okay.  And do you recall him saying

6    anything about Metro's procedure for patting down

7    just to kind of ease your mind at all?

8         A.    Not at all.

9         Q.    Well, are you saying you don't recall, or

10   are you saying he did not say that?

11        A.    So when I was on the phone with her and

12   he said that there was -- you know, basically

13   relayed that there was nothing he could do, he gave

14   the phone back to my wife and she began talking to

15   me again.  And nowhere in that time would he have

16   even had the opportunity to explain how a pat search

17   would have gone because she was on the phone with me

18   still.

19        Q.    But do you remember him saying it to you

20   at all?

21        A.    Not at all.

22        Q.    Did you convey that -- you know,

23   sometimes former police officers, when they come up

24   to another police officer, they say, "Hey, you know,

25   I was a police officer at one point.  Can you help

Alexander Leuthauser, 4/19/2021

Page 28

1    us out?"  Did you ever communicate to him that you

2    had previously worked at the sheriff's office?

3         A.    Yes, I did.  And that was basically the

4    reason he gave that he was willing to speak with me

5    on the phone.  He told her something along the lines

6    of, "I don't usually talk to people on the phone."

7               But she explained to him that I was a

8    former police officer, and he then took the phone

9    from her to speak to me.

10        Q.    Okay.  And that's the best you can recall

11   about your communication?

12        A.    Yes.  Unfortunately, like I said, it's

13   been such a long time, I don't really feel

14   comfortable just due to the fact I didn't write a

15   report on it or anything else.  I have nothing to

16   refresh my memory.

17        Q.    Have you read any of Michele's statements

18   that she's provided about --

19        A.    Yes, I have.

20        Q.    Okay.  And when's the last time you read

21   her statements?

22        A.    Shortly after the incident occurred.  I'd

23   say maybe one to two weeks after it occurred.

24        Q.    Okay.  Do you recall the Metro officer

25   referring you to the TSA management or anything like

Alexander Leuthauser, 4/19/2021

Page 29

```
 1   that?

 2          A.     I don't recall.

 3          Q.     And Ms. Leuthauser does end up making her

 4   flight that day; right?

 5          A.     Yes, she did.

 6          Q.     Now, how did it come to be that you

 7   reported it to the OIG?

 8          A.     As I said, both of us were just looking

 9   for a way to -- looking for a way to help the

10   situation.  So my wife was going through TSA in

11   regards to a complaint or what have you, and then I

12   found Department of Homeland Security had an

13   inspector general, and that was -- we were, you know

14   -- we were kind of working together just to find

15   somebody to resolve the situation.

16          Q.     And when you were speaking with OIG, do

17   you have any understanding as to the outcome of what

18   they did?

19          A.     No, none.

20          Q.     Okay.  Did you ever make any follow-up

21   phone calls to Sandy Downs?

22          A.     No, I did not.

23          Q.     Any reason why not?

24          A.     I figured after my wife's seeking legal

25   counsel that going any further in that regard was
```

**Free State Reporting, Inc.  410-974-0947**

Alexander Leuthauser, 4/19/2021

    1   kind of a moot point; so we just continued with

    2   Mr. Corbett in regards to his help.

    3       Q.    Okay.  Understood.

    4             And I think Ms. Leuthauser testified that

    5   she had retained Mr. Corbett maybe a week or so

    6   after the screening, which occurred on June 30th,

    7   2019.  Does that comport with your recollection?

    8       A.    I don't recall exactly.

    9       Q.    Do you recall whether or not you had

   10   retained Mr. Corbett before or after reporting this

   11   to OIG?

   12       A.    I don't recall.

   13       Q.    Did anybody from OIG or TSA explain how

   14   the pat-downs are generally performed?

   15       A.    No.

   16       Q.    And you already said you don't recall

   17   speaking to anybody at TSA; right?

   18       A.    Nope.

   19       Q.    Okay.  Do you recall telling the OIG that

   20   Ms. Leuthauser had some childhood trauma, I think

   21   was the words?

   22       A.    Possibly.  I don't recall exactly.

   23       Q.    And is there any reason why you thought

   24   that they should know that?

   25       A.    Just due to mental health.  I think that

Alexander Leuthauser, 4/19/2021

1   it would be a different circumstance in regards to

2   that, especially if she had explained that she was

3   sexually abused as a child and had explained that to

4   the TSA.  I felt that that was pertinent information

5   for the OIG's office.

6          Q.    Well, what do you mean when it would have

7   been a different circumstance?

8          A.    I'm sorry.  What was that?

9          Q.    You said that it would have been a

10  different circumstance if they had known that --

11                (Simultaneous conversation.)

12         Q.    -- reporting to OIG; so I'm wondering

13  what you meant by that.

14         A.    I felt like it was a circumstance that

15  needed to be included simply due to the fact that

16  after having explained that she was sexually abused

17  to TSA and them not taking the proper procedures in

18  regards to that, I felt that that was pertinent

19  information to give to the inspector general's

20  office.

21         Q.    What procedures were you looking for the

22  TSA to do after reporting that?

23         A.    In regards to mental health?

24         Q.    Right.

25         A.    Something that would have been much,

Alexander Leuthauser, 4/19/2021

1   much, much more professional.

2        Q.   When you're saying "they" and

3   "something," are you talking about OIG or are you

4   talking about TSA just for clarity?

5        A.   When I say "they," I'm saying the TSA.

6   And if she had explained that she had been sexually

7   abused as a child prior to a pat-down and they

8   didn't take any other precautions in regards to

9   that, I think that that was extraordinarily

10  unprofessional.

11       Q.   Okay.  If you don't mind, I'm just going

12  to take a brief break.  Is that okay?  Maybe like

13  five minutes.

14       A.   Absolutely.

15       Q.   Thank you.  I appreciate it.

16            (Recess taken from 9:34 a.m.

17            to 9:40 a.m.)

18  BY MS. SMITH:

19       Q.   Mr. Leuthauser, I don't have any

20  additional questions for you.  Just want to say I

21  appreciate your time.

22       A.   Absolutely.  Thank you very much.

23            MS. SMITH:  I'll pass the witness.

24            MR. CORBETT:  I don't have any questions

25  either.

Alexander Leuthauser, 4/19/2021

1          MS. SMITH:  All right.  Thank you.

2          Mr. Leuthauser, as you may have caught

3    from Ms. Leuthauser's deposition, you have the

4    opportunity to review and sign the transcript if you

5    wish.  You are able to waive that as well.  What

6    would you like to do?  Would you like to review and

7    sign?

8          THE WITNESS:  Mr. Corbett?

9          MR. CORBETT:  It's up to you.  I'm not

10   sure there's too much to review here.

11         THE WITNESS:  Then I will decline.

12         MS. SMITH:  Okay.  That's sounds good.

13   All right.  Thank you.

14         THE REPORTER:  Mr. Corbett, would you

15   like a copy?

16         MR. CORBETT:  No.

17         (Deposition recessed at 9:42

18         a.m.)

19

20

21

22

23

24

25

Alexander Leuthauser, 4/19/2021

Page 34

```
 1                    CERTIFICATE OF WITNESS

 2      PAGE    LINE   CHANGE                REASON

 3      _____

 4      _____

 5      _____

 6      _____

 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19                    *   *   *   *   *

20          I, ALEXANDER LEUTHAUSER, witness herein, do
        hereby certify and declare under penalty of perjury
21      the within and foregoing transcription to be my
        deposition in said action; that I have read,
22      corrected and do hereby affix my signature to said
        deposition.

23

24      _____  _____
        ALEXANDER LEUTHAUSER
25      Witness                               Date
```

**Free State Reporting, Inc.   410-974-0947**

Page 35

1                      REPORTER'S CERTIFICATE

2

STATE OF NEVADA          )
3                        ) ss
COUNTY OF CLARK          )
4

5          I, Suzanne M. Stone, a duly certified court
reporter licensed in and for the State of Nevada, do
6    hereby certify:

7          That I reported the taking of the deposition
of the witness, ALEXANDER LEUTHAUSER, at the time
8    and place aforesaid;

9          That prior to being examined, the witness was
by me duly sworn to testify to the truth, the whole
10   truth, and nothing but the truth;

11         That I thereafter transcribed my shorthand
notes into typewriting and that the typewritten
12   transcript of said deposition is a complete, true
and accurate record of testimony provided by the
13   witness at said time to the best of my ability.

14         I further certify (1) that I am not a
relative, employee or independent contractor of
15   counsel of any of the parties; nor a relative,
employee or independent contractor of the parties
16   involved in said action; nor a person financially
interested in the action; nor do I have any other
17   relationship with any of the parties or with counsel
of any of the parties involved in the action that
18   may reasonably cause my impartiality to be
questioned; and (2) that transcript review pursuant
19   to FRCP 30(e) was waived.

20         IN WITNESS WHEREOF, I have hereunto set my
hand in the County of Clark, State of Nevada, this
21   22nd day of April 2021.

22

23   _____
     Suzanne M. Stone, CCR 970, RPR
24

25